# Exhibit 59

## Transfer of shares / assets

| | |
|---|---|
| Date of release | 07 Oct 2008 08:13 |
| Date of judgment / ruling / decision / control signal | 22 Apr 2008 07:21 |
| SKM number | SKM2008.803.SR |
| Authority | The Tax Council |
| Case number | 08-143808 |
| Document type | Binding answer |
| Overall topics | treasure |
| Topics Topics | Shares and other securities as well as intellectual property rights |
| Keywords | Share divestment, activity divestiture, option agreement |
| Summary | The Tax Council confirms that a final and binding agreement on the transfer of shares / activities for tax purposes has only been entered into when certain specified conditions have been met. |
| | The Tax Council further confirms that a possible transfer of shares in a store in accordance with a right to buy and sell is only considered to have taken place at the time when the right may be exercised. |
| Legal basis | J.nr. 08-005360 |
| Reference (s) | The Capital Gains Tax Act |
| Reference | Equation Guide 2008-3 **SG2.5** |

In the review below, some of the actual information will be omitted.

**Questions**

1. Can SKAT confirm that a final and binding agreement on the transfer of shares / activities for tax purposes has been entered into at the earliest when the board of directors of the cooperative utilizes its authorization to enter into an agreement on the sale of the activity to Newco A / S?
2. Can SKAT confirm that a possible transfer of shares in a store in accordance with a right to buy and sell is considered to have taken place at the time when the right may be exercised?

**Reply**

1. Yes, cf., however, SKAT's recommendation and justification.
2. Yes, cf., however, SKAT's recommendation and justification.

**Description of the actual conditions**

The request for a binding reply provided the following information:

1. Introduction

On 31 August 2007, AK / S (the Financial Partner) submitted subsequent indications for the purchase of B AmbA's assets and activities and certain liabilities, as well as the stores belonging to the store chain.

The co-operative members in B are the shop owners.

A key element of the bid is the transformation of the store chain from a voluntary chain to a capital chain.

2. The content of the purchase offer

*2.1 Purchase price*

The acquisition will take place via the newly established joint stock company Newco.

The total purchase price that Newco must pay for B's assets and activities and certain liabilities as well as all stores amounts to a maximum of DKK ... million. (on a debt- and cash-free basis and based on a normalized EBITDA of DKK ... million at chain level).

The purchase price is distributed among the sellers on the basis of the annual reports that the sellers have submitted in 2006 and on the basis of a closing balance per. March 31, 2008. In connection with the presentation of the indicative bids, B has notified the individual store owner of an estimated enterprise value.

*2.2 Opportunity for co-investment*

The sellers of stores in the chain (participating store owners) will be offered co-investment. The co-investment will take place in a holding company that, via Newco, will own both this store chain and an additional chain. The co-investment will take place on the same terms as the Financial Partner invests on.

*2.3 The structure of the store chain after the transfer*

Newco acquires all assets and activities and certain liabilities in B. In addition, Newco acquires stores from the store owners who wish to sell.

The expected transaction structure will be as follows:

For the store owners who want to sell their store, there are two options described as model A and model B below, respectively. For store owners who do not want to sell their store, there is an option described as Model C.

**Model A**

Participating store owners have the opportunity to transfer their store (s) to Newco, either by selling the shares in the store owner's operating company or by selling assets. The purchase price for the store is calculated on the basis of the same EBITDA multiple for both the sale of shares and assets.

**Model B**

Participating store owners who own their store (s) through an operating company and a holding company, where in relation to the operating company per. March 31, 2008 is an ownership period of less than three years, but at least one year, may choose to enter into an option agreement for a possible later sale of their store (s).

**Model C**

Store owners who do not wish to transfer their store (s) to Newco are offered a franchise agreement.

The further course

*3.1 Contingent transfer agreements*

At member meetings in 2007, store owners, representing more than 2/3 of the shareholders in B, have stated that they intend to contribute to the establishment of the new capital chain. These statements are in the form of declarations of intent and are therefore not legally binding.

At the end of January 2008, store owners representing more than 2/3 of the shareholders in B must state that they continue to intend to contribute to the establishment of the new capital chain. These statements will also be in the form of declarations of intent and will therefore not be legally binding. At the same time, store owners representing more than 2/3

of the shareholders in B must give the Board of Directors irrevocable authority to enter into an agreement on the sale of the activity to Newco, provided that at least 2/3 of the members finally wish to complete the sale process.

It is expected that transfer agreements with the store owners who choose Model A can be signed by both parties no later than the beginning of April 2008. It is also expected that for the store owners who choose Model B, option agreements will be entered into that can be signed by both parties. no later than the beginning of April 2008.

Closing will probably take place continuously in the period from the beginning of April 2008 until 31 July 2008, alternatively there will be closing at the same time for everyone on a specified date.

There are no final drafts of transfer agreements with the store owners yet. However, the terms of the transfer agreements will reflect the terms of the offer from the Financial Partner.

The completion of the transaction is for Newco in relation to all participating store owners conditional on a number of conditions being met, including:

- The total purchase price that Newco must pay for the stores amounts to a maximum of DKK ... million. (on a debt- and cash-free basis and based on a normalized 2006 EBITDA of DKK ... million at chain level, which can only to a negligible extent be negatively affected).
- Conclusion and implementation of the B transfer agreement.

The completion of the transaction is for the individual participating store owner conditional on a number of conditions being met, including:

- Newco executes and executes all the transactions covered by the store agreement as well as all other agreements entered into with or concerning the participating store owner in question, the relevant agreements with or concerning the individual store owner being considered interdependent.
- Conclusion and implementation of the B transfer agreement, provided that a minimum of 2/3 of the members finally want to complete the sale process either through the signing of purchase agreements or franchise agreements.

*3.2 Exercise of the buyer's right and right of sale*

Participating store owners who own their store (s) through an operating company and a holding company, where in relation to the operating company per. March 31, 2008 is an ownership period of less than three years, but at least one year, may choose to enter into an option agreement for a possible later sale of their store (s).

The model that will be used will be an option model, where the store owner gets a put option (right of sale) and Newco gets a call option (buyer's right), which can only be exercised when the ownership time requirement is met.

The purchase price when exercising the call option is determined according to the same principles that apply to stores that are sold now. This means that the price for the stores is calculated with a multiple of the historical normalized EBITDA for 2006 with the adjustments required by the buyer. The multiple is set at 8.7.

The purchase price upon exercise of the put option is calculated with a multiple of 7.7 times the historical normalized EBITDA for the last 12 months before the exercise of the option. However, the value of the put option will not be able to exceed the value of the call option.

Exercise of the right of purchase precedes exercise of the right of sale. The right of sale expires after the date of exercise of the right of purchase.

The earnings in the period up to the exercise of the option will accrue to the seller to the extent that the earnings have affected the net debt in the store.

The fact that the store owner enters into an option agreement with Newco thus does not change the fact that the financial risk of operating the store and that the ownership rights remain with the store owner.

**Additional information**

The questioner's representative, has stated per. telephone that no payment will be made regarding the option agreements until it has been agreed to exercise the right of purchase or sale.

Questioner's possible opinion according to request and comments on case presentation

*Re question 1. Tax waiver date*

**Background**

As the tax waiver date is important for the owners of those stores and for the buyer, the question is to be clarified by a binding answer from SKAT.

It will be appropriate for both the sellers and the buyer to establish a common transfer date for everyone who chooses to transfer the store by selling shares or activities. Thus, the individual tax owners' individual tax conditions have not been taken into account, but since the tax waiver date is important in many relationships, it will be appropriate for the store owners to have this determined.

Furthermore, it should not matter to the individual store owners whether they are the first or the last to sign the conditional agreements, because the agreement is not final until the board of directors in B has exercised its authority to sell the activity in B, and before the other conditions are met.

**Suspensive conditions**

For tax purposes, the store owners' shares / activity are deemed to have been disposed of at the time when there is a final binding agreement on disposal. A final and binding agreement is generally available when the last of the parties to the agreement has signed the transfer agreement.

As the agreement is conditional and contains suspensive conditions, the tax waiver date is deferred until the suspensive conditions are met.

A suspensive condition is defined in Equation Guide 2007-2 section EA3.l.2 as follows:

" If the condition is of such a nature that there is real uncertainty as to whether the agreement will be implemented, for example when buying a property, where the purchase is conditional on the sale of another property at a certain price within 1 month, taxation only when the condition is met ".

Newco's offer to purchase the stores is conditional on Newco being able to purchase the activity in B. Correspondingly, B's sale of assets and liabilities is conditional on at least 2/3 of the members finally wanting to complete the sale process. The agreements with the individual store owners are thus conditional on the transaction with B being completed.

The Financial Partner will, on behalf of Newco, submit a purchase offer, after which the individual store owner can calculate an estimated sale price for shares or assets. This will be followed by the signing of transfer agreements. Although both parties sign, no final and binding agreement has been entered into, as the agreement i.a. is conditional on the transaction with B being completed.

**Significant conditions in purchase offers**

An important condition for the transaction to be completed is that the board of directors in B uses its authority to sell the activity in B. In the opinion of the questioner's representative, this is a crucial condition for the entire transaction to be expected to be completed. However, there is no final and binding agreement at the time when the Board of Directors decides to exercise its authority to sell the activity in B. Only when all conditions in the tender offer have been met, is there a final and binding agreement for the parties.

Question 1 is formulated in such a way that it is clarified when the transfer of shares / activity can be considered to have taken place at the earliest, cf. further below.

According to the purchase offer, the purchase of the stores is conditional on Newco being able to purchase the activity in B.

B has decided that a sale is conditional on a minimum of 2/3 of the members finally wanting to complete the sale process.

The Board of Directors of B will not decide on a sale of the activity in B until certainty has been created that the conditions that a minimum of 2/3 of the members finally wish to complete the sale process have been met through the signing of purchase agreements or franchise agreements.

Store owners who have signed purchase agreements or franchise agreements can thus only be sure that this essential condition for the entire transaction has been fulfilled when a sufficient number of agreements have been entered into with store owners and when the Board of Directors has decided to sell the activity in B . At this point, however, there will still be conditions that must be met before the agreements are final.

Only when all conditions for the transaction are met, is there a final and binding agreement.

**Schedule for concluding agreements**

It is in everyone's interest to complete the process as soon as possible, and the process is therefore organized so that signing of the agreements can take place as quickly as practically possible. The store owners are also interested in the signing of the agreements and thus the subsequent Closing taking place as soon as possible, as the store owners only receive remuneration for the stores at the Closing time.

According to the timetable that the parties agree to work on, signing must take place no later than the beginning of April 2008. This is an ambitious timetable, and it can therefore not be ruled out that the process will be delayed.

It has been informed that the parties expect that the Board of Directors of B will exercise its authority to sell the activity in B in close connection with the time when it can actually be established that there is sufficient support for the transaction.

In view of the above, it is the opinion of the questioner's representative that the decision of the Board of Directors to exercise its authority to sell the activity in B must be regarded as a suspensive condition that postpones the taxable transfer of shares and activities. For tax purposes, the stores can therefore be transferred at the earliest at this time, so that question 1 can be answered in the affirmative.

The questioner's representative is aware that in other similar cases the Tax Council has issued a binding answer, according to which the tax transfer date could be set at the date of the board's decision to sell the assets in the cooperative. In the same cases, the Tax Council confirmed that the transfer under a buyer's right and right of sale is deemed to have taken place at the time when such a right may be exercised, cf. question 2 below.

*Ad question 2. Purchase and sale right*

**Background**

The question concerns the store owners who are expected to use the option model described above, Model B. It is the intention that both a buyer's right and a right of sale will be entered into, where the right of purchase takes precedence over the right of sale.

An option agreement is characterized by the holder having a right, but not an obligation, to buy or sell the asset. An option agreement has therefore not been entered into with a final and binding waiver agreement.

A final and binding agreement is only considered entered into when the holder of the option exercises this to buy or sell an asset.

**Review of practice**

A review of practice shows that entering into option agreements is not equated with a sale of shares or other assets when there is a real possibility that the options will not be exercised. In practice, option agreements are only disregarded if the parties have entered into a number of other agreements in connection with the conclusion of the option agreement, which means that the parties have in fact already been placed as if the shares or assets had been sold, or if both a buyer's right and right of sale at prices, which means that it is clear from the outset that the right of purchase will be exercised without taking into account the development in the value of the underlying shares / assets.

From practice where the conclusion of purchase and sale rights is not equated with the sale at the time of the conclusion of the purchase and sale rights, the questioner's representative has referred to the following:

*TfS 1993, 221*

The Tax Assessment Council ruled that a person who had been granted a time-limited right of sale and who had received a bank guarantee for the payment of the sale price had not disposed of his shares for tax purposes when the right of sale was granted, but only at the time he exercised his right of sale.

*TfS 1996, 469*

According to the Supreme Court ruling, a landlord's issue of a buyer's right and obligation to a property was not considered a transfer for tax purposes. The purchase obligation must be fulfilled within seven years of the conclusion. The Supreme Court ruled that regardless of whether the right of purchase was combined with a purchase obligation, there was such a degree of uncertainty about the further contract when the person in question could only be considered to have acquired the property when the right of purchase was exercised.

From practice where the conclusion of purchase and sale rights is equated with the sale at the time of the conclusion of the purchase and sale rights, the questioner's representative has referred to the following:

*TfS 1999.214*

The majority of the Supreme Court found that a taxpayer had effectively disposed of the shares in a company by issuing a call option. At the same time as the call option was issued, the taxpayer had received an installment-free loan from the holder of the option. The loan corresponded to the sale price and fell due for redemption upon exercise of the call option five years later. Dividend payments on the shares corresponded to the return on the loan. The shares were pledged as security for the loan. The holder of the call option had been transferred all voting and subscription rights regarding the shares.

*TfS 2005.933 ( **SKM2005.490.HR** )*

In this case, it was obvious that a buyer's right with an exercise price of DKK 92 million. DKK would be utilized, as the buyer according to a simultaneously established put option would be forced to acquire the shares for 121 mill. The shares were therefore deemed to have been disposed of at the same time as the options were issued.

**Real uncertainty about utilization**

In the present case, there is a spread in the purchase sums under the right of purchase and the right of sale, which means that the parties at the exercise times of the options must carefully consider the value of the store before making a choice to exercise the option.

The multiple underlying Newco's buyer right is 8.7, while the multiple underlying the store owner's right of sale is only 7.7. However, the value of the put option will not be able to exceed the value of the call option.

Furthermore, different reference periods must be used. The right of purchase is based on EBITDA in the financial year ended in 2006. The store owner's right of sale is based on EBITDA realized in the last 12 months prior to the exercise of the right of sale.

The price according to the right of purchase is determined according to the same principles that apply to the stores that sell in 2008, and so that EBITDA for 2006 forms the basis for the store's value.

The price according to the store owner's put option is determined on the basis of the realized EBITDA in the last 12 months prior to the exercise date of the put option. This means that the store owner bears the risk of a decrease in EBITDA.

If a store's EBITDA falls in the 12-month period prior to the exercise of the right of purchase or the right of sale in relation to EBITDA for the financial year 2006, Newco will thus lose out on exercising its right of purchase. The store owner will also lose out on exercising his right of sale, which is why in this situation neither of the parties will have an interest in exercising their option.

With unchanged or lower EBITDA, this means that the store owner obtains a higher price if Newco exercises the right to buy. than if the store owner exercises the right of sale after Newco has chosen not to exercise the right of purchase. Newco will specifically take a position on the exercise of the right of purchase on the basis of the store's expected future development.

**Examples to illustrate uncertainty**

The questioner's representative has in the following examples illustrated the consequences for Newco resp. the store owners by exercising the right to buy / sell at different values of a store.

They have illustrated 3 examples with stagnant, declining and increasing earnings, respectively, and commented on the examples:

1. EBITDA at the time of utilization corresponds to EBITDA for 2006 (stagnant earnings)

2. EBITDA at the time of utilization is less than EBITDA for 2006 (declining earnings)

3. EBITDA at the time of utilization is higher than EBITDA for 2006 (increasing earnings)

*Example 1*

In the example, it is assumed that the value of the store is the same as that which could be calculated on 2006 figures. If Newco exercises the right to buy, Newco will not make any gain or loss. However, there may be other factors that make Newco choose not to exercise the right to purchase.

During the term of the right of purchase, Newco can e.g. have established themselves in the same area either by starting up a new store in an attractive location or by merging / taking over other stores / chains. Thus, there may be future circumstances that mean that Newco does not want to exercise the right to purchase.

If Newco does not exercise the right of purchase, the store owner can choose to exercise the right of sale. The price for the store in this case is based on a lower multiple, and the store owner in the example gets a loss of t.kr. 1,202. This may mean that the Store Owner chooses to continue running the store and therefore does not exercise the right to sell.

Example 1 thus illustrates that future conditions may mean that neither the right of purchase nor the right of sale is exercised, even though earnings are at the same level as in 2006.

*Example 2*

In the example, it is assumed that earnings fall by 10% and thus the value of the store has fallen at the time of utilization in relation to what could be calculated on 2006 figures. If Newco exercises the right to buy, Newco will in the example receive a loss of DKK thousand. ...

If Newco does not exercise the right of purchase, the store owner can choose to exercise the right of sale. Both the EBITDA for the reference period and the multiple to be applied to the put option are less than the corresponding factors of the put option. The store owner will therefore in the example have a loss of t.kr. 1,082 by exercising the right of sale.

Example 2 shows that declining earnings may mean that neither Newco nor the store owner wants to do, respectively. the right of purchase / right of sale applies.

*Example 3*

In this example, earnings have increased relative to the reference period for Newco's buyer rights. This means that Newco in the example will have a gain of t.kr. 1,046 by exercising the right of purchase. However, in the same way as in Example 1, there may be circumstances which mean that Newco nevertheless chooses not to exercise the right of purchase. This may be the case if in the intervening period Newco has established itself in the same area either by starting up a new store in an attractive location or by merging / taking over other stores / chains.

If Newco chooses to let the right of purchase expire without exercising it, the store owner can choose to exercise the right of sale. In this example, however, it will result in a loss of t.kr. ... for the store owner, who can therefore choose to continue running the store himself.

**Summary about uncertainty**

The various examples show that there is a real uncertainty that neither the right of purchase nor the right of sale will be exercised. This is partly because the price of the store will be different depending on whether it is the right of purchase or the right of sale that is asserted, and partly that a number of future conditions. which neither party knows at the time the right of purchase and right of sale is entered into is relevant. The fact that the store owner enters into an option agreement with Newco does not change the fact that the financial risk of operating the store and ownership rights remain with the store owner. The risk for the operation of the store, including declining earnings, thus lies with the store owner, and may have the consequence that Newco will not exercise its right of purchase. In that situation, the store owner can choose to exercise the right of sale, but as stated above, this can result in a significantly lower transfer price for the store. It is the opinion of the enquirer's representative that in the present case, where there is a difference between the value of

the right of purchase and the value of the right of sale of 10% or more (at lower EBITDA in the calculation of right of purchase), there is a real risk that the right of purchase respectively the right of sale will not be exercised. Question 2 can thus, in the opinion of the questioner's representative, be answered in the affirmative. that the right of purchase or the right of sale will not be exercised. Question 2 can thus, in the opinion of the questioner's representative, be answered in the affirmative. that the right of purchase or the right of sale will not be exercised. Question 2 can thus, in the opinion of the questioner's representative, be answered in the affirmative.

The model for the Financial Partner's purchase follows the model used in other similar cases when purchasing "voluntary" retail chains.

**SKAT's recommendation and justification**
*In general*

It is probable that the conclusion of the agreements as a result of the case processing time for the present request for a binding reply will be delayed by up to 3 months in relation to what is stated in the request for a binding reply. The binding answer is therefore valid, regardless of a possible delay of the agreements of up to 3 months.

*Question 1*

When an agreement is conditional, the time for when a final and binding agreement has been entered into for tax purposes, cf. section 4 of the State Tax Act, depends on the content and significance of the condition, cf. SKAT's tax assessment guide (2008-1) section **EA3.1.2** .

If the condition is almost in the nature of a formal case and there is no real doubt that the condition will be fulfilled, the condition is resolute and the agreement is considered for tax purposes at the time of the agreement.

If, on the other hand, there is real uncertainty as to whether the agreement will be implemented, the condition is, on the other hand, suspensive. The agreement is then considered for tax purposes only entered into when the condition is met.

According to the information, the transfer agreements in the present case contain, among other things, the following conditions, cf. the above-mentioned description of the facts:

The completion of the transaction is for Newco in relation to all participating store owners conditional on, among other things. the following conditions are met:

1. The total purchase price that Newco must pay for the stores amounts to a maximum of DKK ... million. (on a debt- and cash-free basis and based on a normalized 2006 EBITDA of DKK ... million at chain level, which can only to a negligible extent be negatively affected).

2. Conclusion and implementation of the B transfer agreement.

The completion of the transaction is for the individual participating store owner conditional on, among other things. the following conditions are met:

3. Newco executes and executes all the transactions covered by the Store Agreement as well as all other agreements entered into with or concerning the participating store owner in question, the relevant agreements with or concerning the individual store owner being considered interdependent.

Conclusion and implementation of the B transfer agreement, provided that at least 2/3 of the members finally want to complete the sale process either through the signing of purchase agreements or franchise agreements.

It is stated that the Board of Directors of B will not decide on a sale of the activity in B until certainty has been created that the conditions that a minimum of 2/3 of the members finally wish to complete the sale process are met through the signing of purchase agreements or franchise agreements. (condition 4). According to the purchase offer, the purchase of the stores is conditional on Newco being able to purchase the activity in B (condition 2).

These conditions are estimated to be considered as suspensive conditions. This is because there must be considered to be real uncertainty as to whether the conditions will be met, just as the questioner has no decisive influence on whether the conditions will be met or not.

The fact that, according to the information, statements of intent have been issued regarding the transfer of the shares, cannot lead to any other result, as the statements of intent, according to the information, are not legally binding.

It is assumed that a final and binding agreement has been entered into no later than 1 October 2008.

It is therefore recommended that question 1 be answered with "Yes".

*Question 2*

The conclusion of an agreement on a right of purchase or sale is not the conclusion of an agreement on sale, and according to the general rules of tax legislation, capital gains taxation must only take place when a final agreement on sale has been entered into.

In certain cases, however, the terms of an option agreement are such that the conclusion of an option agreement is in fact the conclusion of a sales agreement. In this connection, reference is made to the Supreme Court judgment, published in the Journal of Taxes and Duties 1999.214H, and the Supreme Court judgment, published as **SKM2005.490.HR** (TfS 2005, 933), where the Supreme Court in the present circumstances found it unlikely that the right of purchase did not would be exploited.

In the present case, however, it cannot be considered a given that the option agreements will be exercised, cf. the arguments put forward by the questioner, and there is nothing in the information provided to indicate that the option agreements should in fact be sales agreements. According to the available information, it must therefore be considered that there is a real possibility that the option agreements will not be exercised.

It is stated that the conclusion of an option agreement can be chosen by the store owners who own their stores through an operating company and a holding company, where in relation to the operating company there is an ownership period of less than 3 years. This condition could possibly be due to the desire to utilize the rule in section 9 (1) of the Danish Capital Gains Tax Act. 1, according to which a company's sale of shares is tax-free when the ownership period has been 3 years or more.

However, when there is real uncertainty as to whether the option agreements will be exercised or not, this fact cannot mean that the share transfers can be considered to have taken place before the time when the option agreements are exercised.

The transfer of shares in accordance with concluded purchase and sale rights can therefore only be considered to have taken place at the time when the right may be exercised.

As the wording of the option agreements is not available, it cannot be assessed on the present basis whether the option agreements will be covered by the Capital Gains Act's rules on financial contracts, cf. section 29 (1) of the Capital Gains Act. 1, or whether they will be exempt from taxation according to these rules in accordance with the Capital Gains Act, section 30, subsection. 1, no. 5 and para. 3 and 4. Therefore, no decision has been made on the question of possible taxation of the option agreements in accordance with the rules in the Capital Gains Act on financial contracts.

Question 2 is therefore answered with "Yes - see SKAT's recommendation and justification".

**The Tax Council's decision and justification**
The Tax Council agreed with SKAT's recommendation and justification.

**The answer is binding on the tax authorities in the following period**
For 5 years, calculated from the receipt of the answer, cf. the Tax Administration Act, section 25, subsection. 1.