# Exhibit 71

U.1993.143    HR1992.I 323/1991    TfS 1993, 7

# Højesterets dom af 18. december 1992, j.nr. I 323/1991.

*Texaco Denmark Inc., herunder dette selskabs filial i Danmark,* (adv. Aage Spang-Hanssen) mod *Skatteministeriet* (kammeradv. v. adv. H. C. Vinten).
TfS 1993, 7

U.1993.143H

---

**Opgørelsen af den skattepligtige indkomst for amerikansk selskabs danske filial i årene 1981-1985.**

---

Tvisten vedrørte spørgsmålet om, i hvilket omfang der ved indkomstopgørelserne kunne fradrages renteudgifter samt valutakurstab og medregnes valutakursgevinster på lån i dollars. Højesteret hjemviste ansættelsen af filialens skattepligtige indkomst for årene 1983, 1984 og 1985 til fornyet behandling ved Ligningsrådet på det grundlag, at filialen med virkning fra 30. december 1983 har fradragsret for renter og valutakurstab og pligt til at indtægtsføre valutakursgevinst vedrørende lån af samme dato, da dette lån efter det oplyste vedrørte filialens drift. (Dissens af 1 dommer for at give filialen medhold med virkning fra 27. december 1982). [Note 1]
I tidligere instans er der truffet afgørelse i Østre Landsret OEL1991 145/1986.

---

## Østre Landsret

### *Østre Landsrets dom 27. september 1991 (8. afd.)*

(Ulsig, Reisz, Niels Østergaard (kst.)).

Texaco Denmark Inc. er et amerikansk selskab, som er et datterselskab af Texaco Inc. Selskabet har ikke haft anden aktivitet end gennem sin herværende filial at deltage som partner i Danish Underground Consortium (D.U.C.). Den danske filial, sagsøgeren, er registreret i Aktieselskabs-Registeret under navnet »Texaco Denmark Inc., Delaware, Branch in Denmark«.

Sagerne vedrører spørgsmålet om, i hvilket omfang der ved opgørelsen af den skattepligtige indkomst for Texaco Denmark Inc., Filial i Danmark, i årene 1981-1985 kan fradrages renteudgifter samt valutakurstab og medregnes valutakursgevinster på lån i dollars således:

For 1981 og 1982 renteudgifter og kurstab på lån i hovedkontoret, Texaco Denmark Inc., U.S.A.

For renteudgifter og kurstab i 1983 som følge af, at et lån ydet sagsøgeren af hovedkontoret for Texaco Denmark Inc. den 30. december 1983 blev besluttet omlagt til et lån ydet af moderselskabet Texaco Inc. med virkning fra den 1. januar 1983.

Om lån ydet af andre långivere end hovedkontoret fuldt ud er anvendt til sagsøgers drift, således at renteudgifter, valutakurstab og -gevinster fuldt ud kan medregnes i 1984 og 1985.

**Under sagen nr. 145/1986, der er anlagt den 9. maj 1986, har sagsøgeren nedlagt følgende påstande:**

Principalt: at sagsøgte tilpligtes at anerkende, at der ved sagsøgerens skatteansættelse for skatteårene 1982/83 (1981)og 1983/84 (1982) tilkommer sagsøgeren ret til fradrag for renter og kurstab vedrørende lån, som sagsøgeren har optaget hos hovedkontoret, Texaco Denmark Inc., U.S.

Subsidiært: at sagen henvises til fornyet behandling ved ligningsmyndighederne på det grundlag, at der tilkommer sagsøgeren ret til fradrag for renter og kurstab vedrørende de lån, som filialen har optaget hos hovedkontoret, Texaco Denmark Inc., U.S., men således, at fradrag begrænses til den del af den anvendte kapital, der efter en gennemsnitsbetragtning vil kunne accepteres som lånekapital.

**Under sagen nr. 164/1989, der er anlagt den 11. april 1989, har sagsøgeren nedlagt følgende påstande:**

Principalt: At sagsøgte tilpligtes at anerkende,

at skattemyndighederne ved ansættelsen af sagsøgerens skattepligtige indkomster efter Kulbrinteskattelovens kap. 2 for årene 1983, 1984 og 1985 har savnet føje til at beskære de af sagsøgeren beregnede fradrag for renter, som for året 1983 var 162.666.562 kr., for 1984 var 221.143.250 kr. og for 1985 var 150.905.000 kr.,

at skattemyndighederne endvidere har savnet føje til at reducere det af sagsøgeren foretagne fradrag på valutakurstab, som for 1983 var 210.684.743 kr. og for 1984 248.222.570 kr., og således at sagsøgerens valutakursgevinst for 1985 indtægtsføres med 348.878.000 kr., samt

at sagsøgerens ansættelse i henhold til Kulbrinteskattelovens kap. 3 ændres i overensstemmelse hermed.

Subsidiært:

At sagsøgerens ansættelse for indkomstårene 1983, 1984 og 1985 hjemvises til fornyet behandling i Ligningsrådet på det grundlag, at der tilkommer sagsøgeren fradragsret for renter, samt at sagsøgeren har fradragsret for valutakurstab og pligt til at indtægtsføre valutakursgevinst, uden at fradragsretten for renter og valutakurstab respektive forpligtelsen til at indtægtsføre valutakursgevinst kan beskæres som sket ved Ligningsrådets ansættelser af sagsøgeren for indkomståret 1983, 1984 og 1985.

Særskilt for 1983 nedlægges den mere subsidiære påstand, at sagen hjemvises til fornyet ansættelse af Ligningsrådet på det grundlag, at der tilkommer sagsøgeren fradragsret for renter og valutakurstab for en af retten fastsat del af året 1983.

Sagsøgte har i begge sager påstået frifindelse.

Sagerne er domsforhandlet under ét.

I 1963 meddelte Den Danske Stat koncession til Mærsk Olie og Gas A/S bl.a. vedrørende indvinding af kulbrinter på den kontinentale sokkel, og i 1965 indtrådte Texaco Denmark Inc., Filial i Danmark, som »assisting partner« i Danish Underground Consortium (DUC) Siden 1965 har karakteren af sagsøgerens virksomhed ikke ændret sig. Arbejdet som »operator« har gennem den periode, sagen vedrører, været udført af Mærsk Olie og Gas A/S.

Sagsøgeren har ingen direkte ansatte i Danmark ud over personale i administration og regnskabsføring vedrørende salg af kulbrinter. Fra 1985 har virksomheden tillige omfattet køb og salg af råolie. Indtil 1. januar 1984 har filialens regnskab været ført fra hovedkontorets engelske søsterselskabs kontor. Siden 1. januar 1984 har regnskaberne været ført her i landet.

Den 24. august 1982 skrev Texaco's tax administrator for Skandinavien Sten Vberg til Statsskattedirektoratet og anmodede om et møde. I brevet rejses følgende 2 spørgsmål:

Texaco Denmark Inc.'s regnskaber er hidtil blevet udfærdiget i dollars, således at alene status ved årets udgang er omregnet til danske kroner. Der forespørges, om kurstab vil kunne fradrages, hvis filialen overgår til at omregne de enkelte transaktioner med hovedkontoret pr. transaktionsdagen.

Såfremt financieringen af Texaco Denmark Inc.'s virksomhed i den danske del af Nordsøen sker gennem lån fra hovedkontoret, opstår spørgsmålet, om eventuel rentebetaling for sådanne lån udgør en fradragsberettiget omkostning for den danske filial.

Foranlediget af Sten Vbergs brev af 24. august 1982 afholdtes den 12. januar 1983 et møde mellem Statsskattedirektoratet og sagsøgeren. Til brug for skattevæsenets mødedeltagere havde revisor Svend Allan Jensen i Statsskattedirektoratets kontor for kulbrintebeskatning udfærdiget et notat af 4. januar 1983, hvori det bl.a. konkluderes om kurstab, at dispositioner i fremmed valuta skal omregnes til danske kroner pr. transaktionsdagen. I notatet anføres bl.a.:

»Filialens mellemregnskab med modervirksomheden anses, efter kulbrinteafdelingens opfattelse, som modervirksomhedens egenkapital (indskud)i filialen og evt. valutagevinst eller tab er indkomstopgørelsen uvedkommende. Det gælder uanset om mellemregnskabet anføres som 1) løbende mellemregning, 2) egentlig lån, 3) indskud eller kapitalkonto.

– – –

Som foran anført anser de danske myndigheder enhver mellemregning med modervirksomheden for egenkapital eller kapitalindskud, og som følge heraf er der ikke hjemmel til at fradrage beregnede (interne)renter af disse konti, ligesom man heller ikke godkender fradrag for kurstab.

Det skal bemærkes, at såfremt der optages externe lån til finansiering af virksomheden i Danmark, behandles renter og kurstab (gevinst)herpå efter danske regler«.

I mødet deltog for Statsskattedirektoratet kontorchef i kontoret for kulbrintebeskatning Birgit Kjeldsen, ledende revisor Kirsten Aamand og revisor Svend Allan Jensen. For Texaco deltog Sten Vberg og tax manager Robert Shepherd fra Texaco's skatteafdeling i London. Parterne er ikke enige om mødets konklusion vedrørende spørgsmålet om renter til hovedkontoret. Statsskattedirektoratets repræsentanter mener, at det på mødet blev tilkendegivet, at renter til hovedkontoret alene kunne fradrages, såfremt hovedkontoret havde optaget externe lån til brug for filialen og således alene optrådt som låneformidler, hvorimod Texaco's repræsentanter mener, at mødedeltagerne fra Statsskattedirektoratet meddelte, at renter til hovedkontoret kunne fradrages.

Den 31. januar 1983 indsendte Sten Vberg på vegne Texaco Denmark Inc. en revideret selvangivelse for 1981, der bl.a. indeholder et fradrag på 98.700.525 kr. vedrørende »operating expenses«, hvilket beløb ifølge en note indeholder realiserede kurstab. Der er i 1981 efter det oplyste ikke udfærdiget særskilt regnskab for filialen, og kurstab er ikke beregnet i relation til transaktionsdatoerne, men beregnet i forhold til vekselkursen ultimo 1981.

Efter et møde mellem Texaco og Statsskattedirektoratet den 9. februar 1983 skrev Statsskattedirektoratet den 15. februar 1983 til Texaco og bad om yderligere oplysninger vedrørende kurstabet på 49.035.455 kr., der indgik i fradraget på de ca. 98 mill. kr., og om lånene, der havde givet anledning til kurstabene, herunder långivers navn. Det anførtes i skrivelsen, at en »stillingtagen til selvangivelsen beror på besvarelsen af ovennævnte spørgsmål«.

Steen Vberg svarede den 25. februar 1983, at kurstabet var en følge af tilbagebetalinger i 1981 af forskud fra hovedkontoret siden 1977.

I en agterskrivelse af 8. juni 1983 meddelte Københavns kommunes skatteforvaltning sagsøgeren, at man agtede at indstille til ligningskommissionen, at sagsøgerens ansættelse for 1981 ændredes i overensstemmelse med en vedlagt rapport af 2. juni 1983 fra Statsskattedirektoratet. (Det bemærkes, at ligningen af sagsøgeren ved kulbrinteskattelovens ikrafttræden den 1. januar 1982 overgik fra Københavns kommune til Statsskattedirektoratet). I rapporten udtales om fradrag for valutakurstab:

»Ved den nedenfor anførte ansættelse for skatteåret 1982/83 (1981)er den senere indsendte korrigerede selvangivelse lagt til grund. I denne nye selvangivelse har Texaco fratrukket et valutakurstab på 49 mill. kr.

Statsskattedirektoratet har indtil videre godkendt det foretagne fradrag for valutakurstab, idet man endnu ikke har taget endelig stilling til fradragsretten. Dette vil ske i forbindelse med gennemgangen af selvangivelsen for skatteåret 1983/84 (1982) I det omfang denne gennemgang måtte bevirke, at det omhandlede valutakurstab ikke kan anses for fradragsberettiget, vil den nedenfor anførte ansættelse for skatteåret 1982/83 blive ændret på dette punkt«.

I sommeren 1983 var repræsentanter for Statsskattedirektoratet i London for at gennemgå filialens regnskaber, og den 21. september 1983 skrev Statsskattedirektoratet til sagsøgeren:

»Vedrørende fradrag for kurstab kr. 49.035.455 for skatteåret 1982/83 (1981)og fradrag for renter kr. 173.479.577 og for kurstab kr. 170.856.715 for skatteåret 1983/84 (1982).

De fradrag for renter og kurstab, som Texaco har foretaget for skatteårene 1982/83 og 1983/84 vedrører lån, som den danske filial af Texaco Denmark Inc. har optaget hos sit amerikanske hovedkontor, Texaco Denmark Inc., Delaware, USA.

Lånene er optaget i henhold til tilladelser fra Danmarks Nationalbank og er etableret i overensstemmelse med valutabekendtgørelsens regler om finanslån.

Den 8. december 1982 fik den danske filial fra Nationalbanken tilladelse til at optage et lån på 203 mill. $ hos sit amerikanske hovedkontor ved konvertering af filialens lånemellemværende med hovedkontoret. Denne tilladelse blev udnyttet med ialt 173.697.749 $, hvilket lån ligeledes er etableret som et finanslån.

Med virkning fra den 1. januar 1982 har den danske filial indgået en låneaftale med sit amerikanske hovedkontor, hvorefter lånet skal forrentes med en rentesats på LIBOR + 1%.

Det er en betingelse for fradragsret for renter, at der foreligger et egentligt gældsforhold, jfr. statsskattelovens § 6.

Den danske filial af Texaco og det amerikanske hovedkontor udgør i civilretlig henseende een juridisk person. Filialens lån hos hovedkontoret kan derfor ikke i skattemæssig henseende anses for egentlige gældsforhold, idet dette ville være det samme som at optage lån hos sig selv. Det er derfor Statsskattedirektoratets opfattelse, at de lån, som den danske filial af Texaco har optaget hos sit hovedkontor, i skattemæssig henseende må anses for filialens egenkapital.

At lånene i henhold til valutareglerne anses for egentlige gældsforhold, kan efter Statsskattedirektoratets opfattelse ikke tillægges betydning ved den skattemæssige behandling, idet en filials retlige status er anderledes efter valutabestemmelserne end efter skattelovgivningen. Medens en filial således i skattemæssig henseende ikke anses for et selvstændigt retssubjekt, anses en filial i henhold til valutareglerne for et selvstændigt retssubjekt.

Da de omhandlede finanslån optaget hos hovedkontoret således ikke kan anses for egentlige gældsforhold, er den grundliggende betingelse for fradragsret for renteudgifter ikke opfyldt, jfr. statsskattelovens § 6. Da der endvidere ikke er hjemmel til at fratrække renteudgifter vedrørende egenkapital, kan Texaco ved sin indkomstopgørelse for skatteåret 1983/84 ikke fratrække renteudgifter vedrørende lånet hos hovedkontoret.

Det er endvidere Statsskattedirektoratets opfattelse, at art. III i den amerikansk-danske overenskomst til undgåelse af dobbeltbeskatning (bekendtgørelse af 11. januar 1949) ikke hjemler adgang til at fratrække renter af lån modtaget fra filialens hovedkontor.

Der henvises endvidere til kommentaren (punkt 17)til art. 7 i OECD's modelkonvention, hvoraf fremgår, at en filial ved sin indkomstopgørelse ikke kan fratrække renteudgifter vedrørende lån modtaget fra hovedkontoret. - - -

Ifølge bestemmelsen i ligningslovens § 8 D kan valutakurstab vedrørende gæld, der har tilknytning til erhvervsmæssig virksomhed, fratrækkes ved indkomstopgørelsen. Fradragsret for kurstab forudsætter således også, at der er tale om kurstab vedrørende et egentligt gældsforhold.

Med samme begrundelse som ovenfor er anført vedrørende renteudgifter, kan lånene fra det amerikanske hovedkontor heller ikke i relation til kurstab anses for egentlige gældsforhold, men må anses for egenkapital.

Da betingelserne for fradrag for kurstab i henhold til ligningslovens § 8 D således ikke er opfyldt, og da der ikke er hjemmel til at fratrække kurstab vedrørende egenkapital, kan Texaco efter Statsskattedirektoratets opfattelse ved sin indkomstopgørelse ikke fratrække kurstab vedrørende de omhandlede finanslån.

Statsskattedirektoratet finder derimod, at Texaco vil kunne få fradrag for renteudgifter og kurstab vedrørende følgende typer lån:

Lån som den danske filial eller det amerikanske hovedkontor har optaget hos uafhængig trediemand, i det omfang lånet er optaget til og anvendt til den danske filials virksomhed.

Lån som den danske filial eller det amerikanske hovedkontor har optaget hos koncernforbundne selskaber under forudsætning af, at lånet er ydet som en sædvanlig forretningsmæssig disposition bl.a. vedrørende forrentning og afdragsvilkår, og at lånet er optaget til og anvendt til den danske filials virksomhed.

Fradragsret for renter og kurstab vedrørende ovennævnte typer af lån forudsætter, at Texaco til dokumentation heraf indsender følgende oplysninger vedrørende lånene:

-

Kopi af låneaftalen.

-

Oplysning om kursen på tidspunktet for lånets optagelse.

-

Oplysning om kursen på tidspunktet for lånets hele eller delvise indfrielse.

Det tilføjes, at såfremt Texaco ikke dokumenterer at have renteudgifter og kurstab vedrørende andre lån end vedrørende lånene fra hovedkontoret, kan Texaco efter Statsskattedirektoratets opfattelse ikke foretage fradrag for renteudgifter og kurstab for skatteårene 1982/83 og 1983/84«.

Sten Vberg svarede den 28. september 1983, at de lån, som den danske filial af Texaco Denmark Inc. hidtil har optaget hos sit amerikanske hovedkontor, er lån, som selskabets moderselskab, Texaco Inc., har optaget på det amerikanske lånemarked. Lånet er optaget udelukkende for at finansiere den danske filials virksomhed i Danmark. Filialen er således i henhold til Deres skrivelse berettiget til fradrag for de renter og kurstab, som er angivet i indkomstårene 1981 og 1982 for disse lån. I svaret anmoder Texaco om at få lejlighed til senere at fremkomme med den begærede dokumentation for, at lånene virkelig udgør sådanne lån, for hvilke der er fradragsret i overensstemmelse med Statsskattedirektoratets skrivelse.

Statsskattedirektoratets skrivelse af 21. september 1983 gav anledning til møder mellem Texaco og Statsskattedirektoratet den 3. november og den 22. december 1983.

Efter yderligere korrespondance mellem parterne meddelte Statsskattedirektoratet den 30. maj 1984, at man agtede at indstille til ligningsrådet, at der ved filialens indkomstansættelse for 1981 og 1982 ikke godkendtes et kurstab på 49.035.455 kr. i 1981 samt et rentefradrag og et kurstab på i alt 344.336.242 kr. i 1982. Den 27. juni 1984 meddelte Statsskattedirektoratet, at ligningsrådet havde truffet afgørelse i overensstemmelse med denne indstilling. Ved landsskatterettens kendelse af 12. november 1985 blev denne afgørelse stadfæstet. Landsskatterettens præmisser er sålydende:

»Tre retsmedlemmer, herunder retsformanden, finder efter de foreliggende oplysninger at kunne tiltræde ligningsrådets opfattelse, hvorefter de fra hovedkontoret i Delaware til den danske filial som lån betegnede kapitaloverførsler må anses som egenkapital. Der er herved bl.a. henset til, at der er tale om overførsel inden for samme juridiske enhed af midler, der ikke hidrører fra eksterne lån. Disse retsmedlemmer bemærker, at der således ikke i det foreliggende tilfælde er tale om fordeling af renteudgifter afholdt af selskabet, samt at anvendelsen af den direkte metode ved filialens indkomstopgørelse ikke i sig selv findes at give grundlag for skattemæssig anerkendelse af låneaftaler inden for samme juridiske enhed, hvorved yderligere bemærkes, at selskabet i den omhandlede relation efter disse retsmedlemmers opfattelse ikke kan sidestilles med et finansforetagende. At nationalbanken har godkendt tilskuddene som lån er ikke afgørende for den skatteretlige vurdering af forholdet. Disse retsmedlemmer kan herefter tiltræde ligningsrådets afgørelse om, at der ved opgørelsen af filialens skattepligtige indkomst, herunder kulbrinteindkomst, ikke godkendes fradrag for renter og kurstab vedrørende lån optaget hos hovedkontoret.

## It retsmedlem udtaler:

Princippet i <u>selskabsskattelovens § 12, stk. 1</u> og 2 er, at datterselskaber og filialer af udenlandske virksomheder i videst muligt omfang skal sidestilles med danskejede selvstændige virksomheder.

Med dette udgangspunkt forekommer det derfor ulovhjemlet og ubegrundet, når statsskattedirektoratet i sin oplyste praksis gør forskel på dels datterselskaber og filialer, dels på den ene side alle andre sædvanlige driftsudgifter og på den anden side udgifter til forrentning af lånt kapital fra moderselskabet respektive hovedkontoret.

En filial skal også foretage sin opgørelse efter den såkaldt direkte metode og har det samme behov for at kunne anvende lånekapital til finansiering af sin virksomhed som enhver anden selvstændigt arbejdende forretning. Kun et fåtal af virksomheder kan gennemføre en kapitalkrævende drift uden tilførsel af lånemidler.

Der ville være mulighed for at forvride sammenligningsgrundlaget, hvis rentevilkårene var ekstraordinært tyngende. I det foreliggende tilfælde er rentesatsen efter statsskattedirektoratets udtalelse sædvanlig og derfor acceptabel.

Texaco har imidlertid oplyst, at den til brug for deltagelsen i DUC-operationerne anvendte kapital til 100% er blevet forrentet i forhold til det amerikanske hovedkontor. Dette må betragtes som usædvanligt og bør medføre regulering efter reglerne i <u>selskabsskattelovens § 12, stk. 1</u> og 2. Intet dansk selskab ville kunne deltage i en virksomhed, der

krævede så store kapitalindskud som DUC-operationerne, uden selv at besidde en egenkapital af en betragtelig størrelse. I så henseende er det klagende selskabs situation forskellig fra tilsvarende danskejede selskaber.

Jeg voterer herefter for i princippet at godkende rentefradragsret for de af det klagende selskab hos hovedkontoret optagne lån, men tillige for at begrænse rentefradraget til den del af den anvendte kapital, der efter en gennemsnitsbetragtning må kunne accepteres som lånekapital. Skønnet over hvor stor en del af kapitalen, der med rimelighed må kunne forudsættes som uforrentet egenkapital, må i første instans henskydes til de lignende myndigheder.

Der træffes afgørelse efter stemmeflertallet, og ligningsrådets afgørelse, hvorefter der ikke er godkendt fradrag for de omhandlede renter og kurstab, stadfæstes herefter«.

Ved skrivelse af 8. december 1982 til sagsøgeren tillod Nationalbanken som foran nævnt side 3, at filialens mellemværende med hovedkontoret Texaco Denmark Inc., U.S.A., blev afløst af et nyt lån på op til 203 mill. $, der optoges hos hovedkontoret med virkning fra den 1. januar 1982. Den 6. januar 1983 tillod Nationalbanken sagsøgeren at optage et yderligere lån på 60,2 mill $ hos hovedkontoret Texaco Denmark Inc., U.S.A. Dette lån blev optaget pr. 1. januar 1983. Låneaftalen vedrørende lånet på 203 mill $ er dateret den 27. december 1982. Låneaftalen vedrørende lånet på 60,2 mill $ er ikke dateret.

I en skrivelse af 27. december 1983 fra Texaco Denmark Inc. til Nationalbanken refereres til tidligere drøftelser om et kreditorskifte på lånene fra Texaco Denmark Inc. til moderselskabet Texaco Inc., og det bekræftes, at datoen for overdragelsen skal være 1. januar 1983. Nationalbanken svarede den 23. januar 1984, at man havde taget disse oplysninger til efterretning.

Den 30. december 1983 besluttede Texaco Denmark Inc., at der med virkning fra 1. januar 1983 skulle foretages udlodning til selskabets aktionærer med 3.300 $ pr. aktie ialt 99 mill $.

Om sagsøgerens selvangivelse for 1983 udtales i Statskassedirektoratets skrivelse af 22. februar 1985 til sagsøgeren:

»Af såvel Texaco Denmark Inc.'s som filialens regnskab for 1983 fremgår, at selskabets moderselskab, Texaco Inc., er kreditor vedrørende et lån på 172.040.328 $. På forespørgsel har den danske filial oplyst, at Texaco Inc. har overtaget Texaco Denmark Inc.'s interne tilgodehavende vedrørende midler, som hovedkontoret i overensstemmelse med Nationalbanktilladelser har stillet til rådighed for filialen. Aftale herom er indgået den 30. december 1983 med tilbagevirkende kraft til 1. januar 1983. Texaco Denmark Inc. har således optaget et eksternt lån.

Ifølge bestyrelsesbeslutning af 30. december 1983 udloddes udbytte på 99 mio. $. Det er uklart, hvorledes den overskydende del af det eksterne lån posteres.

– – –

Efter statsskattedirektoratets opfattelse kan lån der optages til at finansiere udlodning af egenkapital ikke anses for optaget til og anvendt til den danske filials virksomhed. Renter og kurstab i forbindelse med finansielle transaktioner, som ikke har tilknytning til filialens drift, er filialens indkomstopgørelse uvedkommende. Der kan således ikke fradrages renter og kurstab på den del af det optagne lån, der anvendes til udlodningen.

– – –

Låneaftalen indgås med tilbagevirkende kraft til 1. januar 1983. Dette kan ikke accepteres skattemæssigt, hvor aftaletidspunktet skal lægges til grund ved den skattemæssige behandling. Dette medfører, at selv om lånet var blevet anvendt til finansiering af den danske filials virksomhed, ville fradragsret for renter og kurstab først indtræde ved aftaleindgåelsen den 30. december 1983. Anskaffelseskursen for lånet ville ligeledes være kursen pr. aftaletidspunktet.

For 1983 kan de selvangivne renteudgifter og kurstab vedrørende lånet for Texaco Inc. efter statsskattedirektoratets opfattelse derfor nægtes godkendt med den dobbelte begrundelse, at lånet for det første ikke er optaget til og anvendt til filialens drift, og for det andet at lånet ikke kan optages med tilbagevirkende kraft, således at der højst kunne indrømmes fradrag for renter og kurstab for 1 dag, nemlig den 31. december 1983.

Ifølge det oplyste sammensætter de i selvangivelsen for 1983 fratrukne renter og kurstab sig af såvel poster som vedrører ovennævnte interne lån som andre poster. Ifølge de foreliggende specifikationer udgør renter og kurstab vedr. det interne lån/lånet fra Texaco Inc. for 1983 nedenstående beløb, som ikke kan fratrækkes i indkomstopgørelsen:

```
Renter ................................................  162.666.562
Realiseret kurstab ifølge filialens beregning ............  124.955.899
Urealiseret kurstab ifølge filialens beregning ..........  116.943.961
                                                          -------------
Kr.                                                        404.566.422
                                                          -------------
```

Vedr. filialens beregning af realiseret kurstab bemærkes i øvrigt, at den efter statsskattedirektoratets opfattelse er principielt forkert på 2 punkter. Dels omfatter realiserede kurstab et kurstab vedrørende det afdrag, som ifølge aftalen skulle have været posteret ultimo 1982 men først blev posteret medio 1983. Dette kurstab burde nærmere have været en korrektion til 1982. Dels beregnes kurstabet med udgangspunkt i den historiske optagelseskurs for det interne lån. Da Texaco for 1982 og 1983 har anvendt lagerprincippet, skal realiseret kurstab beregnes med udgangspunkt i primokursen, da det samme kurstab ellers delvis ville blive fratrukket 2 gange.


- - -«


Den 26. juni 1985 meddelte Statsskattedirektoratet sagsøgeren, at ligningsrådet havde truffet afgørelse, hvorefter fradrag for renter og kurstab for 1983 nægtedes. Sagsøgeren påklagede den 19. august 1985 ligningsrådets afgørelse vedrørende 1983 til landsskatteretten.

Af filialens regnskab for 1984 fremgår bl.a., at filialen havde optaget banklån i $ svarende til 510.080.000 kr.

I korrespondancen vedrørende sagsøgerens selvangivelser for 1984 og 1985 fastholdt Statsskattedirektoratet, at lån, der optages til at finansiere udlodning af egenkapital, ikke anses for optaget til og anvendt til den danske filials virksomhed«.

De beløbsmæssige konsekvenser af dette synspunkt fremgår af Statsskattedirektoratets rapport af 4. marts 1987 vedrørende indkomståret 1984:

»Det fremlagte materiale vedrørende New York-bogføringen viste, at Texaco's kapitaltilførsel i 1983 på 21 mio. $ er sket ved en forøgelse af nettogæld til affilierede selskaber, der således ultimo 1983 udgør 49 mio. $ netto. Der har således ikke været ydet kapitaltilskud i 1983. Materialet viste samtidig at nettogælden bestod af gæld til moderselskabet på 104 mio. $ fordelt på nedennævnte konti og tilgodehavende hos Textrader på 55 mio. $, jfr. nedenstående sammendrag:

Bogføring ultimo 1983 før lånetransaktionen.

N.Y. bogføring (hovedkontoret)

Ultimo 1983 før lånetransaktionen:

```
Texaco Inc. G.O (General Office) ...................... / 53.646.735,33
Texaco Europe ........................................   / 130.167,87
Texaco Int. Exploration Corporation ................... / 50.977.369,34
Diverse ..............................................   / 3.865,00
                                                      ---------------
                                                       / 104.758.137,54
Textrader ........................................... + 43.663.508,11
                                                      ---------------
Nettogæld bogført i hovedkontoret .................... / 61.094.629,34


Filialens bogføring:
Tilgode Textrader bogført i filialen ultimo 1983 før
lånetransakt ........................................ + 11.606.004,00
Texaco Denmark Inc.'s nettogæld før lånetransaktionen   / 49.488.625,00
```

I forbindelse med låneoptagelsen pr. 30. december 1983 hos moderselskabet indfries lånet på de 104 mio. $, og samtidig udlignes den væsentligste del af tilgodehavendet hos Textrader. Det fremgår ikke klart af det fremlagte materiale, om indfrielsen af ovennævnte lån på 104 mio. $ fortrinsvis sker ved anvendelsen af lånet fra moderselskabet eller ved udligning af tilgodehavendet hos Textrader. Det er imidlertid statsskattedirektoratets opfattelse, at uanset den formelle fremgangsmåde vil det indfriede lån på 104 mio. $ kunne betragtes som afløst af et rentebærende lån optaget hos moderselskabet. 104 mio. $ af lånet optaget den 30. december 1983 kan derved henføres til den danske filials virksomhed. Udligning af ca. 49 mio. $ af tilgodehavendet hos Textrader anses således anvendt til udlodning. Heraf er der sket fuldstændig udligning af tilgodehavendet opført i hovedkontoret, ca. 44 mio. $ og udligning ca. 5 mio. $ af filialens tilgodehavende. Den resterende del af det optagne lån, 154 mio. $ - 104 mio. $ = 50 mio. $ kan ikke anses for at vedrøre den danske filials virksomhed, fordi det hverken er overført til filialen eller anvendt til udligning af andre gældsposter.

Da den overskydende del af det optagne lån, svarende til 50 mio. $, ikke er opført som et tilgodehavende for filialen ultimo 1983 vil denne del heller ikke senere kunne anses at vedrøre den danske filials virksomhed. En afstemning af regnskabsmaterialet viser derimod, at udlodningen af de 99 mio. $ kun kan være sket ved udligning af tilgodehavendet på ca. 49 mio. $ og anvendelse af den resterende del på ca. 50 mio. $ af det optagne lån.

– – –

Efter statsskattedirektoratets opfattelse kan $ 104.758.137 af det optagne lån hos moderselskabet herefter anses for optaget og anvendt til filialens aktivitet, og til kursen pr. aftaledatoen 30. december 1983 9,8785, svarende til d.kr. 1.034.853.256. Af afdraget ultimo 1984 $ 45.286.134, posteret til kurs 11,1366 kan en forholdsmæssig andel henføre til filialens lån, svarende til $ 27.575.459 eller d.kr. 307.096.857.

Af renterne på I/C (Inter Company) lånet kan ligeledes godkendes en forholdsmæssig andel:

221.143.250 y 104.758.137 / 172.040.326 = 134.657.702

Sammen med øvrige renter udgør de totale renteudgifter herefter kr. 136.064.692.

Kursreguleringer på lånet udgør:

248.222.570 y 104.758.137 / 172.040.326 = 151.146.738

Sammen med øvrige kursreguleringer udgør de totale kurstab kr. 135.588.117. Heri er indeholdt nettokursgevinst vedrørende køb og videresalg af råolie fra Chevron på 1,8 mio. kr. Kurstab vedrørende kulbrintevirksomheden bliver herefter 137.388.117«.

Statsskattedirektoratet anerkendte således et fradrag for renteudgifter og kurstab på ca. 104/172 af disse udgifter og tab på lånet på de ca. 172 mill. $ svarende til den del af beløbene, der skønnedes anvendt til driften.

I overensstemmelse med rapporten meddelte Statsskattedirektoratet den 10. marts og 21. maj 1987, hvorledes man endeligt agtede at indstille sagsøgerens selvangivelser for 1983, 1984 og 1985 til ligningsrådet. For så vidt angår 1984 anføres vedrørende renter og kurstab:

»Som beskrevet i revisionsrapporten finder statsskattedirektoratet, at Texaco med fremlæggelsen af uddrag af bogføringen i hovedkontoret for 1983 har belyst, hvorledes det ultimo 1983 optagne lån hos moderselskabet på 172 mio. $ er anvendt. Det fremgår af materialet, at lånet på 172 mio. $ sammen med tilgodehavendet på 49 mio. $ hos søsterselskab, i alt 221 mio. $ dels anvendes til afløsning af ovenfor nævnte rentefri gæld vedrørende filialen, som ultimo 1983 udgjorde 104 mio. $ og dels anvendes til udlodning af i alt 117 mio. $. Udlodningen er dels udlodning af egenkapital pr. 1. januar 1983 på 99 mio. $, dels beregnede renter for 1983 på 18 mio. $, som konsekvens af, at Texaco giver lånetransaktionen tilbagevirkende kraft til 1. januar 1983. Skattemæssigt må renter beregnet forud for låneaftalen anses for udlodning. Af det optagne lån på 172 mio. $ kan efter statsskattedirektoratets opfattelse 104 mio. $ anses for optaget til og anvendt til filialens drift. Statsskattedirektoratet har herved indtaget det standpunkt, at låneoptagelsen først er anvendt til indfrielse af gælden på 104 mio. $, således at den resterende del af lånet 172 mio. $ - 104 mio. $ = 68 mio. $ sammen med tilgodehavendet på 49 mio. $ blev anvendt til at finansiere udlodningen på 117 mio. $, uanset at tilgodehavendet ifølge Texacos egen beskrivelse af rækkefølgen i transaktionerne forlods var anvendt til nedbringelse af gælden. Renter og kursreguleringer er ansat forholdsmæssigt svarende til den del af lånet, der kan henføres til den danske filial«.

For 1985 har Statsskattedirektoratet gennemført en tilsvarende beregning af renteudgifter og kursgevinster efter fradrag af den del af afdragene på lånene, der kan henføres til filialens drift således, at renter og kursgevinster medregnes med ca. 77/126.

Den 22. juni 1987 meddelte Statsskattedirektoratet sagsøgeren, at ligningsrådet havde truffet endelig afgørelse vedrørende 1983, 1984 og 1985. Afgørelsen er i overensstemmelse med Statsskattedirektoratets agterskrivelser af 10. marts 1987 og af 21. maj 1987, som der henvises til i begrundelsen. Sagsøgeren indbragte afgørelsen vedrørende 1984 og 1985 for landsskatteretten.

Landsskatteretten traf den 10. januar 1989 afgørelse vedrørende 1983, 1984 og 1985:

»Texaco Denmark Inc.'s filial i Danmark, som for indkomstårene 1983, 1984 og 1985 har selvangivet sin indkomst i henhold til kulbrinteskattelovens kapitel 2 til henholdsvis / 121.258.957 kr., / 323.270.249 kr. og 271.895.072 kr. samt sin indkomst i henhold til kulbrinteskattelovens kapitel 3 til henholdsvis / 69.485.110 kr., / 88.041.157 kr. og 193.854.537 kr., klager over, at Ligningsrådet for nævnte indkomstår har ansat den skattepligtige indkomst i henhold til kulbrinteskattelovens kapitel 2 til henholdsvis 163.102.521 kr., 0 (/ 245.992.614 kr.) og 248.449.748 kr., samt indkomsten i henhold til kulbrinteskattelovens kapitel 3 til henholdsvis 3.511.219 kr., 86.975.966 kr. og 209.818.507 kr.«.

## Landsskatterettens præmisser er sålydende:

»Landsskatteretten skal bemærke, at det klagende selskab tidligere har finansieret filialens aktiviteter i Nordsøen ved hjælp af midler overført fra hovedkontoret i USA, men at der i årene 1982 og 1983 løbende er optaget driftslån hos affilierede selskaber, således at selskabets driftslån ultimo 1983 androg 104 mio. $. Landsskatteretten kan tiltræde, at der ved ligningsrådets afgørelse er godkendt fradrag for renter og kurstab vedrørende den del af det ultimo 1983 optagne lån på i alt 172 mio. $, der erstatter de nævnte driftslån 104 mio. $.

Med hensyn til de resterende 68 mio. $ af det optagne lån må Landsskatteretten efter det oplyste lægge til grund, at denne del af lånet er anvendt til finansiering af den ultimo 1983 foretagne udlodning til moderselskabet, og at denne

udlodning i hvert fald som udgangspunkt må anses at vedrøre selskabets kapitalforhold i USA og ikke kan henføres til etablering eller drift af de aktiviteter, der er undergivet begrænset skattepligt i landet.

Der vil efter rettens opfattelse alene kunne indrømmes fradrag for renteudgifter og kurstab på det omhandlede lån i det omfang, at det kan godtgøres, at midlerne har været anvendt til filialens aktivitet, jf. selskabsskattelovens § 9, og retten finder ikke, at selskabet har påvist i forbindelse hermed at have anvendt yderligere midler fra den foretagne omfinansiering end godkendt af Ligningsrådet. Der er ved afgørelsen også henset til, at den godkendte fordeling mellem egenfinansiering og finansiering ved lånte midler efter det oplyste svarer til, hvad der er tilfældet i tilsvarende selskaber, og hvad der må anses for rimeligt og økonomisk forsvarligt. Der findes herefter ikke at være tilstrækkeligt grundlag for at foranledige foretaget talmæssige ændringer.

Landsskatteretten kan således tiltræde, at Ligningsrådet ved de påklagede ansættelser for indkomstårene 1984 og 1985 alene har godkendt fradrag for renter og kurstab vedrørende 104 mio. $ af det optagne lån og finder herefter ikke grundlag for at tage hverken den principale eller den subsidiære påstand til følge.

Hvad særlig angår indkomståret 1983 finder Landsskatteretten at måtte lægge til grund, at de i årene 1982 og 1983 optagne driftslån på i alt 104 mio. $ ikke har været rentebærende, og at der således først kan indrømmes rentefradrag fra det tidspunkt, hvor disse lån erstattes af det i sagen omhandlede rentebærende lån. Der var ikke udfærdiget egentlige lånedokumenter vedrørende sidstnævnte lån, der alene fremgår af posteringer, der er foretaget i de amerikanske selskaber ultimo 1983, og Landsskatteretten finder ikke på dette grundlag at kunne godkende rentefradrag for nogen del af dette år«.

Herefter stadfæstede landsskatteretten ligningsrådets afgørelse.

Der er ved domsforhandlingen afgivet forklaring af vidnerne Sten Vberg, Robert Shepherd, Kirsten Aamand, Ole Kjær, Birgit Kjeldsen, Svend Allan Jensen og Jørgen Skou.

Sten Vberg har forklaret, at han siden 1972 har været ansat i Texaco-koncernen som skatterådgiver for Skandinavien. Anledningen til hans brev af 24. august 1982 var den nye kulbrinteskat. Da man overvejede at lade filialen betale renter til hovedkontoret, ville man høre om sådanne betalinger var fradragsberettigede. På mødet den 12. januar 1983 brugte vidnet udtrykket det amerikanske selskab. Der var ingen tvivl om, at det var hovedkontoret, han sigtede til. Kontorchef Birgit Kjeldsen sagde, at filial og hovedkontor skulle stilles som datter- og moderselskab, således at der var fradragsret for renteudgifter. Fradragsret for kurstab ved tilbagebetaling af lån til hovedkontoret blev også drøftet, og det blev bekræftet, at der var fradragsret for konstaterede kurstab. Mødet foregik på en blanding af dansk og engelsk, idet vidnet oversatte for Robert Sherpherd. Da mødets slutning spurgte Robert Shepherd på engelsk Birgit Kjeldsen, om der var fradragsret, hvilket hun bekræftede på engelsk. Vidnet og Robert Sherherd udfærdigede efter mødet hver et »memo«, hvori de refererede, at der var fradragsret. Vidnet blev ikke gjort bekendt med Statsskattedirektoratets notat af 4. januar 1983.

I mødet den 9. februar 1983 deltog fra Statsskattedirektoratet Kirsten Aamand og Svend Allan Jensen og fra Texaco vidnet, Robert Sherherd og mr. Gale, der forestod selve bogføringen i London. På mødet drøftedes bl.a. afskrivning og størrelsen af kurstabet i 1981, der var opgjort til 49 mill. kr. Retten til at fradrage kurstabet blev bekræftet.

Vidnet har ikke hæftet sig ved, at Statsskattedirektoratet i skrivelsen af 15. februar 1983 bad oplyst långivers navn, og at Statsskattedirektoratet i revisionsrapporten af 2. juni 1983 meddelte, at fradraget alene var godkendt »indtil videre«. Han var bekendt med, at der ifølge kommentaren til OECD-konventionen ikke var rentefradragsret, men anså denne for uden betydning.

Robert Shepherd har forklaret, at han siden 1981 har været ansat i Texaco's skatteafdeling i London. Han deltog i mødet den 12. januar 1983, hvor Sten Vberg undervejs oversatte til engelsk. På et tidspunkt oplyste Vberg, at han havde fået svaret, at renterne var fradragsberettigede. For at være sikker spurgte vidnet selv senere på engelsk og

fik et tilsvarende svar fra Birgit Kjeldsen. Samme aften lavede han et »memo« om, hvad der var oplyst på mødet, og rapporterede i overensstemmelse hermed til Texaco's skatteafdeling, at renter og kurstab var fradragsberettigede.

På mødet den 9. februar 1983 drøftedes bl.a. filialens bogføring. Det blev bekræftet, at realiserede kurstab kunne fratrækkes, men Statsskattedirektoratet krævede yderligere dokumentation vedrørende kurstabet på de 49 mill. kr.

Kirsten Aamand har forklaret, at hun er uddannet statsautoriseret revisor og har været ansat i kulbrinteafdelingen fra den 1. november 1982 som ledende revisor. På mødet den 12. januar 1983 var det væsentligt Birgit Kjeldsen, der førte ordet for Statsskattedirektoratet. Birgit Kjeldsen oplyste, at filialen ikke kunne opnå rentefradrag ved lån fra hovedkontoret til filialen. Dog kunne der opnås fradrag, hvis der var renter af lån, som hovedkontoret havde optaget alene til filialens formål. Mødet blev afholdt på dansk. Vidnet hørte, at Vberg oversatte for Shepherd. Konklusionen på mødet den 9. februar 1983 var, at Vberg skulle fremskaffe yderligere oplysninger, da det ikke kunne udledes af regnskabstallene i selvangivelsen, hvorledes det påståede kurstab var opstået. Ønsket om yderligere oplysninger blev skriftligt formuleret i Statsskattedirektoratets brev af 15. februar 1983.

Vidnet skrev Statsskattedirektoratets rapport af 2. juni 1983. Rapporten gav ikke udtryk for, at fradragsretten var godkendt. Statsskattedirektoratet kunne efter Vbergs oplysninger ikke afvise, at der lå et eksterne lån bag hovedkontorets lån til filialen, uanset at det ikke fremgik af selvangivelsen. I maj 1983 var vidnet og Svend Allan Jensen i London, hvor de gennemgik bogføringen. De fik her bekræftet, at der var tale om en mellemregning mellem filialen og hovedkontoret. Der var ikke opført et eksternt lån. Vidnet var dog fortsat i tvivl, om der alligevel kunne ligge et eksternt lån bag mellemregningen, idet Nationalbanken i tilladelsen af 8. december 1982 havde angivet långiver som »moderselskabet Texaco Denmark Inc.«, medens moderselskabet rettelig var Texaco Inc.

Under mødet den 3. november 1983 var skattevæsenet repræsenteret af Birgit Kjeldsen, Ole Kjær og vidnet. Texaco var repræsenteret af Sten Vberg og to revisorer fra revisonsfirmaet Arthur Andersen. Det var navnlig Ole Kjær og statsautoriseret revisor Jørgen Skou, der førte ordet. Statsskattedirektoratet fastholdt, at filialen ikke kunne fradrage renterne.

I mødet den 22. december 1983 deltog fra skattevæsenet Birgit Kjeldsen, Ole Kjær og vidnet. For Texaco deltog landsretssagfører Aage Spang-Hanssen, Sten Vberg og Albert E. Doyle. Landsretssagfører Spang-Hanssen oplyste, at Texaco påtænkte at nedsætte egenkapitalen. Det affødte ingen kommentarer fra Statsskattedirektoratet.

Ole Kjær har forklaret, at han som afdelingschef i Statsskattedirektoratet deltog i møderne den 3. november og 22. december 1983. Ved mødet i november 1983 havde Statsskattedirektoratet fået nye oplysninger fra Texaco, hvoraf ikke klart fremgik, om lånene var eksterne. På mødet i december 1983 oplyste Texaco's repræsentanter, at man agtede at optage lån i moderselskabet, hvilket Statsskattedirektoratet ikke havde indvendinger imod, idet Texaco herved ville blive stillet som de øvrige deltagere i DUC. Statsskattedirektoratet afviste imidlertid, at sådanne lån kunne optages med tilbagevirkende kraft, da lånene skulle optages med henblik på driften, for at renterne skulle være fradragsberettigede.

Birgit Kjeldsen har forklaret, at hun blev kontorchef i Statsskattedirektoratets kulbrinteskattekontor, da dette blev oprettet i sommeren 1982. Forud for mødet den 12. januar 1983 drøftede man i Statsskattedirektoratet Svend Allan Jensens notat af 4. januar 1983. Vidnet var enig i notatets konklusion. Notatet blev ikke udleveret til Texaco i forbindelse med mødet. Vidnet fungerede som mødeleder og oplyste, at der ikke var fradragsret for renter på lån fra hovedkontoret til filialen. Vberg oplyste, at der var banklån. Vidnet svarede, at såfremt fremmede lån anvendtes til filialens drift, ville kurstab og renter være fradragsberettigede. Hun fulgte ikke med i Vbergs oversættelse for Shepherd, og hun har ikke under selve drøftelserne udtalt sig direkte til Shepherd.

Baggrunden for at Statsskattedirektoratet i rapporten af 2. juni 1983 indstillede fradraget for 1981 godkendt »indtil videre« var, at Vberg havde oplyst, at der var eksterne lån, hvorfor man ikke uden videre ville afvise fradragsret. Statsskattedirektoratet antog, at det beroede på en misforståelse eller skrivefejl, at Nationalbanken i lånetilladelsen havde anført »moderselskabet Texaco Denmark Inc.« som kreditor og ikke moderselskabet Texaco

Inc., da Statsskattedirektoratet ikke mente, at en pengeoverførsel fra hovedkontoret Texaco Denmark Inc. til filialen kunne være et lån. Mødet den 3. november 1983 fandt sted på baggrund af Statsskattedirektoratets brev af 21. september 1983 og Vbergs brev af 28. september 1983. Det kom her frem, at Texaco tilsyneladende havde misforstået Statsskattedirektoratet. På mødet den 22. december 1983 foreslog landsretssagfører Spang-Hanssen en omlægning af interne lån til eksterne. Statsskattedirektoratet afviste, at dette kunne ske med tilbagevirkende kraft.

Svend Allan Jensen har forklaret, at han er statsautoriseret revisor og ansat i Statsskattedirektoratet fra den 1. juli 1982. Han erindrer ikke, at Birgit Kjeldsen under mødet den 12. januar 1983 gav udtryk for andre retlige synspunkter, end hvad han havde anført i notatet. Selve drøftelserne foregik på dansk, men i forbindelse med mødets afslutning var der lidt uformel høflig snak på engelsk.

Jørgen Skou har forklaret, at han er statsautoriseret revisor og medindehaver af revisionsfirmaet Arthur Andersen. Han deltog i mødet den 3. november 1983 og gav her udtryk for, at der var fradragsret for filialen, da denne måtte betragtes som en selvstændig skattemæssig enhed. Han var ikke bekendt med, om Texaco Denmark Inc. havde optaget eksterne lån, der var videregivet til filialen.

Sagsøgeren har til støtte for sine påstande anført, at der som udgangspunkt ikke er forskel på den skatteretlige stilling for selskaber og for herværende filialer af udenlandske selskaber. Ifølge selskabsskattelovens § 2, stk. 1 a, jfr. stk. 2, 1. pkt., er filialen, der udøver erhverv med fast driftssted her i landet, skattepligtig efter skattelovgivningens regler begrænset til indtægter fra det faste driftssted, hvilket modsvares af en fradragsret jfr. § 9, stk. 1, for udgifter vedrørende denne drift. Der er intet betænkeligt ved denne retstilstand, idet skattemyndighederne har hjemmel i selskabsskattelovens § 12 til at gribe ind, hvis dispositioner mellem hovedkontoret og filialen foregår på andet end markedslignende vilkår. En tilsvarende begrænset skattepligt fremgår af kulbrinteskatteloven. Den begrænsede skattepligt medfører for så vidt en fiktion, idet f.eks. salg af varer fra hovedkontoret til filialen ikke obligationsretligt kan karakteriseres som et salg, da hovedkontor og filial er en og samme juridiske person, men ved opgørelsen af den skattepligtige indtægt, der vedrører driftsstedet, er det nødvendigt skatteretligt at anse det som et salg. Der er ingen logisk grund til at behandle renter anderledes, idet renter i denne henseende blot er udtryk for filialens betaling for leje af kapital. Sagsøgeren er i høj grad en financiel virksomhed, medens det er DUC, der udfører det faktiske arbejde. Sagsøgeren har i perioden til 1987 investeret knap 4 mia. kr., og renteudgifter har således været den centrale udgift i virksomheden. Det fremgår i øvrigt af kulbrinteskattelovens forarbejder, at man overvejede - men netop afstod fra - en begrænsning af den almindelige adgang til at fradrage renteudgifter.

For så vidt angår valutakurstab, der vedrører det faste driftssted, er der en tilsvarende adgang til fradrag ifølge den dagældende ligningslovs § 8 D, jfr. fra 1986 kursgevinstbeskatningslovens § 6.

Særligt til støtte for fradragsretten vedrørende 1981 og 1982 har sagsøgeren gjort gældende, at sagsøgeren har disponeret i tillid til, at renter og kurstab vedrørende lånene i 1981 og 1982 var fradragsberettigede, og at sagsøgeren er blevet bestyrket i denne opfattelse, idet sagsøgte har bekræftet denne opfattelse på møderne den 12. januar og 9. februar 1983. Sagsøgte har først ved skrivelsen af 21. september 1983 givet udtryk for den modsatte opfattelse, og sagsøgte må være afskåret fra at ændre sit standpunkt uden at have givet sagsøgeren lejlighed til at indrette sine dispositioner i overensstemmelse med ændringen.

Såfremt sagsøgerens påstand vedrørende 1981 og 1982 tages til følge, må sagsøgerens påstand vedrørende 1983 også tages til følge.

Hvis sagsøgeren ikke får medhold vedrørende 1981 og 1982, har sagsøgeren anført, at sagsøgte ud fra tilsvarende synspunkter må være afskåret fra at nægte fradragsret for 1983, da det er sagsøgtes ændrede standpunkt, der har gjort det nødvendigt for sagsøgeren i december 1983 at optage lånet hos moderselskabet.

Sagsøgeren har endvidere anført, at sagsøgtes begrænsning af renteudgifter, kurstab og kursgevinster for 1984 og 1985 har været uhjemlet. Sagsøgtes beregninger er baseret på, at begrebet »egenkapital« kan anvendes på filialen, hvilket er forkert, og hvilket i øvrigt ikke ville give nogen vejledning. Beregningen af en eventuel egenkapital særligt for filialen ville bl.a. bero på, hvor hurtigt sagsøgeren valgte at afskrive investeringerne. Sagsøgtes standpunkt forudsætter, at man kan følge pengestrømmen fra låneoptagelsen, hvilket imidlertid er umuligt, da der ikke nødvendigvis vil være nogen påviselig sammenhæng mellem låneoptagelsen og investeringen. Sagsøgtes standpunkt er endvidere baseret på hovedkontorets regnskaber, mens det er filialen, der skal beskattes af virksomheden her i landet. Sagsøgte tager endelig ikke hensyn til, at sagsøgeren må være berettiget til en vis udlodning. De eneste regler, der eksisterer på området, er ligningsvejledningens regler om udlændinges faste ejendom her i landet, hvor der anerkendes et rentefradrag for gæld op til 80% af ejendomsværdien. Sagsøgtes standpunkt er således udtryk for en nyskabelse, der ville kunne afskrække udenlandske investorer.

Det anførte om fradragsret for renter af lån må også føre til, at sagsøgeren har adgang til at fradrage kurstab. Det følger af valutabekendtgørelsen, at filialen anses som valutaindlænding, uanset selskabet som sådan anses som valutaudlænding. Selvom rentefradragsret måtte blive nægtet med den begrundelse, at hovedkontor og filial er samme juridiske person, vil sagsøgeren have lidt et fradragsberettiget kurstab, idet de realiserede kurstab er endelige.

Sagsøgte har til støtte for sin frifindelsespåstand indledningsvis anført, at rette sagsøger formelt er Texaco Denmark Inc. og ikke filialen. Dette fremgår bl.a. af selskabsskattelovens § 2, stk. 1 a, hvorefter skattepligten påhviler »selskabet« som sådan.

Særligt vedrørende 1981 og 1982 har sagsøgte anført, at sagsøgeren ikke er en financieringsvirksomhed, hvorom der gælder særlige regler. Selskabets indtægter er salgsindtægter som i et handelsselskab, selvom det er et andet selskab, der fungerer som »operator«. Problemet vedrørende den begrænsede skattepligt er reelt et spørgsmål om fordeling af selskabets skattebyrde på Danmark og U.S.A. Det er ved denne fordeling nødvendigt at foretage en opdeling af de enkelte indtægts- og udgiftsposter. Egenkapitalen må ligeledes opdeles. Sagsøgeren ønsker at konvertere filialens egenkapital til et gældsforhold, hvorved der vil opstå udvidede fradragsmuligheder i forhold til, hvad der er tilladt for selvstændige selskaber. Dette er formentlig baggrunden for, at der ifølge kommentaren til OECD-konventionen ikke er fradrag for renteudgifter vedrørende lån fra hovedkontoret. Hovedkontoret og filialen er én juridisk person. Fradrag af renter og kurstab må forudsætte, at selskabet som sådan har optaget et lån, og at dette lån anvendes som led i driften af filialen og dermed indtjeningen af filialens skattepligtige indtægt.

Statsskattedirektoratets behandling af sagen kan ikke føre til et ændret resultat, idet Statsskattedirektoratet ikke har skabt berettigede forventninger om fradrag hos sagsøgeren - selskabet. Sagsøgeren må selv bære risikoen, for så vidt sagsøgeren har misforstået Statsskattedirektoratets oplysninger. Statsskattedirektoratets opfattelse blev tilkendegivet klart i møderne. Statsskattedirektoratet har endvidere efter mødet den 12. januar 1983 krævet yderligere oplysninger, hvilket ville være meningsløst, hvis der under alle omstændigheder var fradrag for renter af lån fra hovedkontoret. Et forventningsprincip er irrelevant særligt for 1981 og 1982, idet filialen ikke kunne få rentefradrag for årene 1981 og 1982. Uanset hvilke forventninger sagsøgeren måtte have fået på mødet den 12. januar 1983, var det da for sent at ændre dispositionerne for 1981 og 1982.

Vedrørende 1983, 1984 og 1985 har sagsøgte anført, at lånet på de 172 mill. $ er optaget af selskabet og derfor kan begrunde fradrag i det omfang, hvori sagsøgeren beviser, at lånet er anvendt til filialens drift eller til aktiver, hvis afkast er omfattet af den begrænsede skattepligt. Lånet kan ikke begrunde fradrag for perioden før optagelsen den 30. december 1983, da det ikke kan være anvendt til driften før optagelsen. Det fremgår af Statsskattedirektoratets beregninger, at filialen ved udgangen af 1983 har anvendt ca. 104 mill. $ til indfrielse af et mellemværende med hovedkontoret, ca. 99 mill. $ til udlodning og ca. 17 mill. $ til betaling af renter med tilbagevirkende kraft af lånet optaget den 30. december 1983. Kapitalen til disse dispositioner er fremskaffet ved anvendelse af filialens tilgodehavende på ca. 48 mill. $ hos salgsselskabet Textrader og ved optagelse af lånet på de ca. 172 mill. $. Statsskattedirektoratets beregninger fører til, at udlodningen på de 99 + 17 mill. $ alene kunne finansieres med ca. 48 mill. $ af filialens aktiver, mens resten ca. 68 mill. $ nødvendigvis må være finansieret med lånet.

Statsskattedirektoratet har ved denne beregning i videst muligt omfang tilgodeset sagsøgeren, idet man accepterer, at alle filialens aktiver er udloddet, samt accepterer, at det rentefri mellemværende på 104 mill. $ er ombyttet med et rentebærende lån. Dette fører til, at renter og kurstab/kursgevinster af lånet ved beregningen af udgifter til filialens drift alene kan medtages med ca. 104/172. I det omfang Statsskattedirektoratets opgørelse over anvendelsen af lånet på 172 mill. $ måtte antages at bero på et skøn, er skønnet unddraget rettens prøvelse, medmindre der er skønnet klart forkert.

## Retten skal udtale:

Af de af sagsøgte anførte grunde findes Texaco Denmark Inc. at være rette sagsøger.

Ved vurderingen af, hvorvidt sagsøgeren har fradragsret for renteudgifter og kurstab i 1981 og 1982, må henses til, at interne kapitalbevægelser mellem hovedkontor og filial, der er en og samme juridiske person, ikke medfører renteindtægter/udgifter for selskabet, hvorfor det ikke, således som det f.eks. er tilfældet ved filialens salg til trediemand, er nødvendigt at foretage en fordeling af en indtægt på henholdsvis hovedkontor og filial til brug ved opgørelsen af den begrænsede skattepligtige indkomst for driftsstedet (filialen) Der er ikke udfærdiget særskilt regnskab for filialen for årene 1981 og 1982. Lånet pr. 1. januar 1982 er ifølge sagsøgerens eget lånedokument etableret den 27. december 1982 med virkning fra den 1. januar 1982. Sagsøgeren har ikke dokumenteret, at der i perioden indtil den 27. december 1982 har foreligget et mellemværende, der kan sidestilles med et reelt gældsforhold. En anerkendelse af mellemværendet som et reelt gældsforhold i relation til statsskattelovens § 6 og den dagældende ligningslov § 8 D ville åbne mulighed for, at vilkårlige ændringer af mellemværendet tillagdes skatteretlige konsekvenser. Det må i denne sammenhæng komme sagsøgeren til skade, at mellemværendet savner den præcision og dokumenterbarhed, der normalt foreligger ved en låneaftale indgået med en uafhængig trediemand, i hvilken situation muligheden for vilkårligt at ændre dispositionerne med tilbagevirkende kraft afskæres.

Idet det af sagsøgeren heroverfor anførte ikke kan føre til, at mellemværendet alligevel bør sidestilles med et sædvanlig juridisk forpligtende gældsforhold, og idet det om parternes drøftelser i 1983 oplyste ikke kan føre til andet resultat, tages sagsøgtes frifindelsespåstand i sag nr. 145/1986 vedrørende 1981 og 1982 til følge.

Den 30. december 1983 optog sagsøgeren et lån på 172 mill. $ i det amerikanske moderselskab. Allerede fordi dette lån ikke kan have været anvendt - hverken helt eller delvist - som led i driften før låneoptagelsen må lånet frakendes skatteretlige konsekvenser i 1983. For så vidt angår filialens mellemværende med hovedkontoret findes sagsøger heller ikke at have dokumenteret, at der for 1983 forelå et sædvanligt, juridisk forpligtende gældsforhold.

For så vidt angår 1984 og 1985 er det ligeledes en forudsætning for hensyntagen til renteudgifter, kurstab og kursgevinster ved fastsættelsen af den skattepligtige indkomst, at lånene er anvendt som led i filialens drift. Det fremgår af Statsskattedirektoratets beregning, der lægges til grund for bedømmelsen, at 68 mill. $ af udlodningen alene har kunnet finansieres ved låneoptagelse, hvorfor alene 104 mill. $ af lånet på 172 mill. $ kan anses som anvendt til filialens drift, således at kun renter, kurstab og kursgevinster vedrørende disse 104 mill. $ kan medtages ved opgørelsen af filialens skattepligtige indkomst.

Herefter tages sagsøgtes frifindelsespåstand i sag nr. 164/1989 vedrørende 1983, 1984 og 1985 ligeledes til følge.

– – –

Ingen af parterne betaler sagsomkostninger til den anden part.

# Højesteret

## Højesterets dom.

Den indankede dom er afsagt af Østre Landsret.

I pådømmelsen har deltaget syv dommere: Pontoppidan, Kiil, Kardel, Marie-Louise Andreasen, Poul Sørensen, Melchior og Per Sørensen.

Appellanten har gentaget sine påstande. Dog er den mere subsidiære påstand for landsretten blevet til den mest subsidiære påstand for Højesteret, idet appellanten mere subsidiært har nedlagt påstand om, at sagen for skatteårene 1982/83 (1981) og 1983/84 (1982) samt for indkomstårene 1983, 1984 og 1985 hjemvises til fornyet behandling af Ligningsrådet på det grundlag, at der tilkommer appellanten fradragsret for valutakurstab respektive pligt til at indtægtsføre valutakursgevinst, uden at denne fradragsret respektive pligt til indtægtsførelse begrænses som sket ved Ligningsrådets ansættelser.

Indstævnte har påstået stadfæstelse.

Der er enighed mellem parterne om den beløbsmæssige opgørelse af fradragene og om, at appellanten skal have fuldt medhold for indkomstårene 1983, 1984 og 1985, såfremt selskabet får medhold i sit principale synspunkt for så vidt angår 1981 og 1982. Ved transporterklæring af 30. december 1983 overdrog Texaco Denmark Inc. sit krav på filialen på ca. 172 mio. USD til Texaco Inc. Indstævnte har ikke bestridt, at der ved transporterklæringen blev stiftet et eksternt låneforhold mellem appellanten og Texaco Inc. på dette beløb.

Artikel III, pkt. 3, i dobbeltbeskatningsoverenskomsten af 6. maj 1948 mellem Danmark og USA lyder således:

»Saafremt et Foretagende i den ene kontraherende Stat udøver Handels- eller Forretningsvirksomhed indenfor den anden Stats Omraade fra et der beliggende fast Driftssted, skal til saadant fast Driftssted henføres den industrielle eller handelsmæssige Fortjeneste, som det kunde forventes at ville have opnaaet, hvis det havde været et uafhængigt Foretagende, der udøvede den samme eller lignende Virksomhed paa samme eller lignende Betingelser, og som under frie Vilkaar afsluttede Foreninger med det Foretagende, hvis faste Driftssted det udgør. Den Fortjeneste, der saaledes tilskrives det i den anden Stat beliggende Driftssted, skal, i det Omfang sidstnævnte Stats Lovgivning hjemler det, anses som Indkomst for Kilder indenfor denne Stats Omraade«.

Artikel 7, stk. 2 og 3, i OECD's modeloverenskomst vedrørende dobbeltbeskatning af 1977 lyder i den for Højesteret forelagte oversættelse:

»2. Under iagttagelse af bestemmelserne i stk. 3, skal der, når et foretagende i en kontraherende stat driver erhvervsvirksomhed i den anden kontraherende stat gennem et dér beliggende fast driftssted, i hver af de kontraherende stater til dette faste driftssted henføres den fortjeneste, som det kunne forventes at have opnået, hvis det havde været et uafhængigt foretagende, der udøvede den samme eller lignende virksomhed på samme eller lignende betingelser, og som under fuldstændigt frie forhold afsluttede forretninger med det foretagende, hvis faste driftssted det er.

3. Ved ansættelse af et fast driftssteds fortjeneste skal det være tilladt at fradrage udgifter, som er afholdt til gavn for det faste driftssted, herunder udgifter til ledelse og almindelig administration i øvrigt, hvadenten de afholdes i den stat, hvor det pågældende faste driftssted er beliggende, eller andre steder«.

Bestemmelsen går tilbage til OECD's modeloverenskomst fra 1963 og er blevet gentaget i 1992 modeloverenskomsten.

I kommentaren til stk. 3 hedder det bl.a.:

»16. Bortset fra hvad der kan betragtes som sædvanlige omkostninger, er der visse kategorier af betalinger mellem faste driftssteder og hovedkontorer, som giver anledning til særlige problemer, og det er hensigtsmæssigt at behandle dem her.

De følgende punkter drøfter tre særlige tilfælde af denne karakter og giver løsninger for dem.

Der bør selvfølgelig ikke sluttes, at det kun er i relation til de i disse punkter nævnte tre slags betalinger, der kan opstå problemer. Der kan meget vel være betalinger af anden art, på hvilke lignende overvejelser finder anvendelse.

17. Det første af disse tilfælde vedrører betalinger, som under betegnelsen »renter, royalties osv.« foretages af et fast driftssted til dets hovedkontor til gengæld for lånte beløb eller til gengæld for til rådighed stillede patenter fra dette til det faste driftssted. I et sådant tilfælde anses betalingerne ikke at skulle tillades fratrukket ved beregningen af det faste driftssteds skattepligtige fortjeneste. Ligeledes skal sådanne betalinger til et fast driftssted fra hovedkontoret holdes ude fra beregningen af det faste driftssteds skattepligtige fortjeneste. Det anerkendes imidlertid, at særlige hensyn skal tages til rentebetalinger foretaget indbyrdes af forskellige dele af et finansforetagende (f.eks. en bank) og hidrørende fra kortvarige lån (til forskel fra formue henlagt til dem) i betragtning af den kendsgerning, at det at yde og modtage kortvarige lån er snævert knyttet til sådanne foretagenders almindelig forretning.

Hvis yderligere et foretagende yder betalinger af rente, osv. til tredjemand, og disse betalinger delvis har forbindelse med det faste driftssteds virksomhed, skal en forholdsmæssig del af disse naturligt tages i betragtning ved beregningen af det faste driftssteds fortjeneste, for så vidt de med rette kan betragtes som omkostninger, der er afholdt til fordel for det faste driftssted«.

For Højesteret har appellanten yderligere gjort gældende, at det følger af artikel III, pkt. 3, i dobbeltbeskatningsoverenskomsten mellem Danmark og USA, at et amerikansk selskabs filial i Danmark har fradragsret for renter og valutakurstab vedrørende lån optaget hos hovedkontoret i USA, jf. Skattedepartementets vejledning i cirkulære nr. 232 af 12. september 1949. OECD's modeloverenskomst og kommentaren hertil indeholder kun anbefalinger, der ikke er bindende for de danske skattemyndigheder. For så vidt angår retten til fradrag for valutakurstab fører Nationalbankens valutabestemmelser til, at der er fradragsret for valutakurstab, også selv om der ikke måtte være fradragsret for renter. Filialen har en selvstændig valutarisk status, således at et driftstilskud skal betragtes som lån, hvis det som her er ydet som finanslån med krav om tilbagebetaling. Ved hjemtagningen af lånene fra USA har filialen måttet omveksle beløbene til danske kroner, men har måttet tilbagebetale i dollars. Afgørende for, om et tab er fradragsberettiget, er derfor alene, om tabet er forbundet med filialens erhvervsmæssige virksomhed.

**Højesterets bemærkninger.**

Seks dommere - Pontoppidan, Kiil, Kardel, Poul Sørensen, Melchior og Per Sørensen - udtaler:

Den begrænsede skattepligt, som efter selskabsskatteloven og kulbrinteskatteloven påhviler udenlandske selskaber, der udøver eller deltager i erhverv med fast driftssted her i landet, omfatter også selskaber, hvis virksomhed her er etableret som filialvirksomhed. Grundlaget for skatteberegningen er i så fald filialens indtægter med fradrag af de udgifter, der vedrører filialens drift, jfr. selskabsskattelovens §§ 2 og 9 samt kulbrinteskattelovens §§ 4 og 12, dog med mulighed for de skattelignende myndigheder til at foretage korrektion af indkomstopgørelsen efter armslængde-princippet i selskabsskattelovens § 12, stk. 2, jfr. stk. 1.

Det må lægges til grund, at det i dansk og international skattepraksis - på baggrund af OECD's modeloverenskomster med de foran citerede kommentarer - har været fast antaget, at renter af lån mellem et hovedkontor og dets udenlandske filial ikke kan fradrages ved beregningen af filialens skattepligtige fortjeneste. Der er ikke holdepunkter for, at man ved selskabsskatteloven, kulbrinteskatteloven eller dobbeltbeskatningsoverenskomsten mellem USA og Danmark har tilsigtet at hjemle fradragsret for sådanne interne renter, og fradragsretten findes ikke at være en nødvendig følge af princippet om filialens skatteretlige selvstændighed. Herefter tiltræder vi, at de i filialens regnskaber opførte interne renteudgifter ikke kan fradrages ved opgørelsen af filialens skattepligtige indkomst.

Da valutakurstab i forbindelse med pengeoverførslerne mellem hovedkontoret og filialen ikke er en følge af noget gældsforhold, er der ikke hjemmel til at fradrage sådanne tab ved opgørelsen af filialens skattepligtige indkomst, jf.

den dagældende bestemmelse i ligningslovens § 8 D.

Der er endelig ikke grundlag for at fastslå, at de danske skattemyndigheder med bindende virkning har givet udtryk for, at appellanten kunne opnå fradrag for sådanne renter og kurstab.

Transporterklæringen af 30. december 1983 kan ikke tillægges skatteretlig virkning for perioden forud for dette tidspunkt. Vi tiltræder derfor, at appellanten ikke har fradragsret for renter og kurstab vedrørende de beløb, der indtil da var overført til filialen.

Lånet af 30. december 1983 på ca. 172 mio. USD blev etableret som led i den finansieringsomlægning, der var forårsaget af skattemyndighedernes nægtelse af at godkende fradrag for filialens renter og valutakurstab. I forbindelse med omlægningen gennemførtes en udlodning til moderselskabet på 99 mio. USD, som er grundlaget for skattemyndighedernes begrænsning af fradragsretten. Det appellerende selskab driver imidlertid udelukkende virksomhed gennem sin filial i Danmark, og til og med 1980 havde det investeret ca. 485 mio. kr. eller ca. 81 mio. USD i virksomheden. Af de regnskabsmæssige oplysninger fremgår desuden, at der i årene 1981-1985 blev investeret i alt 2.481 mio. kr. eller ca. 276 mio. USD i filialens drift. Under disse omstændigheder må det lægges til grund, at lånet i sin helhed vedrørte filialens drift, uanset om en del af lånebeløbet måtte være anvendt til udlodning. Skattemyndighederne har derfor ikke været berettiget til at beskære appellantens fradrag for renteudgifter og kurstab vedrørende dette lån for tiden fra den 30. december 1983.

Vi stemmer herefter for at afsige dom som nedenfor bestemt.

**Dommer Marie-Louise Andreasen - der tiltræder flertallets bemærkninger om grundlaget for skatteberegningen - udtaler:**

Reglerne om begrænset skattepligt afspejler det grundsynspunkt, at et udenlandsk selskabs filial i relation til den danske skattepligt skal sidestilles med et uafhængigt foretagende. Ved gennemførelse af filialens skatteretlige selvstændighed må skattemyndighederne derfor også i et vist omfang acceptere, at der sker betalinger mellem filial og hovedkontor, selv om de udgør én juridisk person. Nationalbankens tilladelse af 8. december 1982 til filialens låneoptagelse hos hovedkontoret blev udnyttet ved låneaftalen af 27. december 1982, der ubestridt er indgået på sædvanlige forretningsmæssige vilkår. Rentebeløbene, der i hvert fald for tiden efter aftalens dato optræder som posteringer i filialens regnskab, vedrører de indkomstkilder, hvis indtægter er skattepligtige, og de er derfor omfattet af selskabsskattelovens § 9, uden at der er grundlag for at foretage korrektion efter § 12. Jeg finder ikke, at bestemmelserne i OECD's modeloverenskomst og de kommentarer, der er givet hertil, eller den skattepraksis, der måtte være opstået på baggrund heraf, kan medføre noget andet resultat i den foreliggende sag.

Jeg stemmer derfor for at give appellanten medhold i påstandene for så vidt angår tiden efter den 27. december 1982.

Afgørelsen træffes efter stemmeflertallet.

## Thi kendes for ret:

*Ansættelsen af appellantens skattepligtige indkomst for indkomstårene 1983, 1984 og 1985 hjemvises til fornyet behandling ved Ligningsrådet på det grundlag, at appellanten med virkning fra 30. december 1983 har fradragsret for renter og valutakurstab og pligt til at indtægtsføre valutakursgevinst vedrørende lånet af samme dato på 172.040.328 USD.*

*I øvrigt frifindes Skatteministeriet.*

*I sagsomkostninger for landsret og Højesteret skal Skatteministeriet inden 14 dage efter denne højesteretsdoms afsigelse betale 2 mio. kr. til Texaco Denmark Inc., herunder dette selskabs filial i Danmark.*

**Fodnoter**

[1] Jf. U.1982.618 og U.1984.957 H, Helkett: Opgørelse af den skattepligtige indkomst, 1987, s. 636, Aage Michelsen: International Skatteret s. 168 ff., Thøger Nielsen: Indkomstbeskatning II s. 435, betænkning nr. 1060 af 1985 s. 222, Ole Bjørn m.fl.: Lærebog om indkomstskat, 6. udg., s. 263 og 590 ff og Engholm Jacobsen m.fl.: Skatteretten s. 391 f.



U.1993.143     HR1992.I 323/1991     TfS 1993, 7

# Judgment of the Supreme Court of 18 December 1992, j.no. I 323/1991.

Texaco Denmark Inc., including this company's branch in Denmark, (attorney Aage Spang-Hanssen) against the Ministry of Taxation
(public attorney with attorney H. C. Vinten).
TfS 1993, 7

U.1993.143H

---

The statement of taxable income for an American company's Danish branch in the years 1981-1985.

---

The dispute concerned the question of the extent to which interest expenses as well as exchange rate losses could be deducted from the income statements and exchange rate gains on loans in dollars could be included. The Supreme Court rejected the employment of the branch's taxable income for the years 1983, 1984 and 1985 for reconsideration by the Tax Assessment Council on the basis that the branch with effect from 30 December 1983 has the right to deduct interest and exchange losses and the obligation to recognize exchange gains on loans of the same date. as this loan reportedly related to the operation of the branch. (Dissent of 1 judge to uphold the branch with effect from 27 December 1982). [Note 1]
In a previous instance, a decision has been made in the Eastern High Court OEL1991 145/1986.

---

## Eastern High Court

### Eastern High Court's judgement 27 September 1991 (8th dept.)
(Ulsig, Reisz, Niels Østergaard (kst.)).

Texaco Denmark Inc. is a US company which is a subsidiary of Texaco Inc. The company has had no activity other than through its present branch to participate as a partner in the Danish Underground Consortium (D.U.C.). The Danish branch, the applicant, is registered in the Register of Limited Liability Companies under the name 'Texaco Denmark Inc., Delaware, Branch in Denmark'.

The cases concern the question of the extent to which in the calculation of the taxable income for Texaco Denmark Inc., Branch in Denmark, in the years 1981-1985, interest expenses as well as exchange rate losses can be deducted and exchange rate gains on loans in dollars are included as follows:

For 1981 and 1982 interest expenses and capital losses on loans at headquarters, Texaco Denmark Inc., U.S.A.

For interest expenses and capital losses in 1983 resulting from a loan granted by the applicant to the head office of Texaco Denmark on 30 December 1983, said loan was converted to a loan granted by the parent company Texaco Inc. with effect from 1 January 1983.

If loans granted by lenders other than the head office have been used in full for the plaintiff's operations, so that interest expenses, exchange rate losses and gains can be fully included in 1984 and 1985.

**In Case 145/1986, brought on 9 May 1986, the applicant claims that the Court should:**

Principally: that the defendant be ordered to acknowledge that in the tax assessment of the plaintiff for the tax years 1982/83 (1981) and 1983/84 (1982), the plaintiff is entitled to a deduction for interest and capital losses relating to loans taken out by the plaintiff at the head office, Texaco Denmark Inc., U.S.

Alternatively, refer the case back to the tax authorities on the basis that the applicant is entitled to a deduction of interest and capital losses in respect of loans taken out by the branch at its head office, Texaco Denmark Inc., U.S., but that the deduction is limited to: the part of the capital used which, after a consideration of averages, can be accepted as loan capital.

**In Case 164/1989, brought on April 11, 1989, the applicant claims that the Court should:**

Principally: That the defendant be ordered to acknowledge,

that the tax authorities in the assessment of the plaintiff's taxable income according to the Hydrocarbon Tax Act chap. 2 for the years 1983, 1984 and 1985 has lacked the right to reduce the deductions calculated by the plaintiff for interest, which for the year 1983 was DKK 162,666,562, for 1984 was DKK 221,143,250 and for 1985 was DKK 150,905,000,

that the tax authorities have also failed to reduce the deduction made by the plaintiff on exchange rate losses, which for 1983 was DKK 210,684,743 and for 1984 DKK 248,222,570, and so that the plaintiff's exchange rate gain for 1985 is recognized as income by DKK 348,878,000, and

that the plaintiff's employment in accordance with the Hydrocarbon Tax Act, ch. 3 is amended accordingly.

Alternatively:

That the plaintiff's employment for the income years 1983, 1984 and 1985 is remanded for reconsideration in the Tax Assessment Council on the basis that the plaintiff has the right to deduct interest, and that the plaintiff has the right to deduct exchange losses and the obligation to recognize exchange rate gains without deducting interest and exchange rate losses, and the obligation to recognize exchange rate gains as income can be reduced as was the case with the Tax Assessment Council's employment for the applicant for the income years 1983, 1984 and 1985.

Separately for 1983, the more subsidiary claim is that the case be remanded for re-employment by the Tax Assessment Council on the basis that the applicant is entitled to a deduction for interest and exchange rate losses for a part of the year 1983 determined by the court.

Defendant has in both cases claimed acquittal. The cases

are adjudicated together.

In 1963, the Danish State announced a concession to Maersk Oil and Gas A/S, among other things. concerning the extraction of hydrocarbons on the continental shelf, and in 1965 Texaco Denmark Inc., a branch in Denmark, became an "assisting partner" in the Danish Underground Consortium (DUC). Since 1965, the nature of the applicant's business has not changed. The work as an 'operator' throughout the period to which the case relates, has been carried out by Maersk Oil and Gas A/S.

The applicant has no direct employees in Denmark other than personnel in administration and accounting relating to the sale of hydrocarbons. From 1985, the company has also been permitted to include the purchase and sale of crude oil. Until 1 January 1984, the branch's accounts were kept by the head office of the English sister company. Since 1 January 1984, the accounts have been kept in this country.

On 24 August 1982, Texaco's tax administrator for Scandinavia, Sten Vberg, wrote to the State Tax Directorate requesting a meeting. The letter raises the following 2 questions:

Texaco Denmark Inc.'s accounts have so far been prepared in dollars, so that only the balance at the end of the year has been converted to Danish kroner. It is asked whether capital losses can be deducted if the branch switches to converting the individual transactions with the head office as of the transaction date.

If the financing of Texaco Denmark Inc.'s operations in the Danish part of the North Sea takes place through loans from the head office, the question arises as to whether any interest payment for such loans constitutes a deductible cost for the Danish branch.

In response to Sten Vberg's letter of 24 August 1982, a meeting was held between the State Tax Directorate and the applicant on 12 January 1983. For the use of the tax authorities' meeting participants, auditor Svend Allan Jensen in the State Tax Directorate's office for hydrocarbon taxation had prepared a memorandum of 4 January 1983, which concludes, regarding capital losses, that transactions in foreign currency must be converted to Danish kroner as of the transaction date. The memorandum states, among other things:

"The branch's interim accounts with the parent company are considered, in the hydrocarbon department's view, as the parent company's equity (deposits) in the branch and any currency gain or loss is irrelevant to the income statement. This applies regardless of whether the interim accounts are stated as 1) current interim accounts, 2) actual loans, 3) deposits or capital account.

⸺

As stated above, the Danish authorities consider any interim account with the parent company to be equity or capital contributions, and as a result there is no authority to deduct calculated (internal) interest from these accounts, just as no deduction for capital losses is approved.

It should be noted that if external loans are taken out to finance the company in Denmark, interest and capital losses (gains) are treated in accordance with the Danish rules".

The meeting was attended by Birgit Kjeldsen, Head of the Hydrocarbon Taxation Office, Kirsten Aamand, Senior Auditor, and Svend Allan Jensen, Auditor. For Texaco, Sten Vberg and tax manager Robert Shepherd from Texaco's tax department in London attended. The parties did not agree at the conclusion of the meeting on the issue of interest rates for the head office. The State Tax Directorate's representatives believe that at the meeting it was stated that interest to the head office could only be deducted if the head office had taken out external loans for the branch and thus only acted as a loan intermediary, whereas Texaco's representatives believe that the meeting participants from the State Tax Directorate announced that interest to the head office could be deducted.

On January 31, 1983, Sten Vberg filed on behalf of Texaco Denmark Inc. a revised tax return for 1981, which contains a deduction of DKK 98,700,525 relating to operating expenses, which amount contains realized capital losses according to a note. In 1981, according to the information, no separate accounts were prepared for the branch, and capital losses are not calculated in relation to the transaction dates, but are calculated in relation to the exchange rate at the end of 1981.

Following a meeting between Texaco and the State Tax Directorate on 9 February 1983, the State Tax Directorate wrote to Texaco on 15 February 1983 requesting further information regarding the capital loss of DKK 49,035,455, which was included in the deduction of the approx. 98 million DKK, and about the loans that had given rise to the capital losses, including the lender's name. The letter stated that a "decision on the tax return depends on the answer to the above questions".

Steen Vberg replied on 25 February 1983 that the exchange rate loss was due to repayments in 1981 of advances from the head office since 1977.

In a letter of intent dated 8 June 1983, the City of Copenhagen's tax administration informed the applicant that it intended to recommend to the Tax Assessment Commission that the applicant's employment for 1981 be changed in accordance with an attached report of 2 June 1983 from the State Tax Directorate. (It is noted that the tax assessment of the applicant on the entry into force of the Hydrocarbon Tax Act on 1 January 1982 passed from the City of Copenhagen to the State Tax Directorate). The report states about deductions for exchange rate losses:

"In the case of the employment listed below for the tax year 1982/83 (1981), the later submitted a corrected tax return is used as a basis. In this new tax return, Texaco has deducted an exchange rate loss of DKK 49 million.

The State Tax Directorate has so far approved the deduction made for exchange rate losses, as no final decision has yet been made on the right to deduct. This will take place in connection with the review of the tax return for the tax year 1983/84 (1982). In so far as this examination may have the effect that the exchange rate loss in question cannot be considered deductible, the assessment below for the 1982/83 tax year will be amended on this point".

In the summer of 1983, representatives of the State Tax Directorate were in London to review the branch's accounts, and on 21 September 1983 the State Tax Directorate wrote to the applicant:

"Regarding deductions for capital losses of DKK 49,035,455 for the tax year 1982/83 (1981) and deductions for interest of DKK 173,479,577 and for capital losses of DKK 170,856,715 for the tax year 1983/84 (1982).

The deductions for interest and capital losses that Texaco has made for the tax years 1982/83 and 1983/84 relate to loans made by the Danish branch of Texaco Denmark Inc. has registered at its US headquarters, Texaco Denmark Inc., Delaware, USA.

The loans have been raised in accordance with permits from Denmark's National Bank and have been established in accordance with the rules on financial loans in the Executive Order on Foreign Exchange.

On 8 December 1982, the Danish branch of Denmark's National Bank received permission to take out a loan of USD 203 million at its U.S. headquarters by converting the branch's loan balances with the headquarters. This license was utilized with a total of USD 173,697,749, which loan is also established as a finance loan.

With effect from 1 January 1982, the Danish branch has entered into a loan agreement with its US head office, according to which the loan must bear interest at an interest rate of LIBOR + 1%.

It is a condition for the right to deduct interest that there is an actual debt relationship, cf.  State Tax Act §6.

The Danish branch of Texaco and the American head office constitute one legal person in civil law matters.
The branch's loan from the head office can therefore not be regarded as an actual debt relationship for tax purposes, as this would be the same as taking out a loan from oneself. It is therefore the State Tax Directorate's opinion that the loans that the Danish branch of Texaco has taken out at its head office must be regarded for tax purposes as the branch's equity.

In the opinion of the State Tax Directorate, the fact that the loans are considered to be actual debt conditions in accordance with the currency rules cannot be given significance in the tax treatment, as a branch's legal status is different according to currency regulations than under tax legislation. Thus, while a branch is not considered an independent legal entity for tax purposes, a branch is considered an independent legal entity under the monetary rules.

As the financial loans in question raised at the head office can thus not be regarded as actual debt conditions, the basic condition for the right to deduct interest expenses has not been met, cf. State Tax Act § 6. Furthermore, as there is no authority to deduct interest expenses relating to equity, Texaco cannot deduct interest expenses relating to the loan from the head office in its income statement for the 1983/84 tax year.

It is also the opinion of the State Tax Directorate that art. III of the American-Danish Convention for the Avoidance of Double Taxation (Order of 11 January 1949) does not authorize access to deduct interest on loans received from the branch's head office.

Reference is also made to the comment (paragraph 17) to Art. 7 of the OECD Model Convention, which states that a branch may not deduct interest expenses on loans received from the head office in its income statement. - - -

According to the provision in the Tax Assessment Act § 8 D, exchange rate losses relating to debt related to business activities can be deducted in the income statement. The right to deduct capital losses thus also presupposes that there is a capital loss relating to an actual debt ratio.

For the same reasons as stated above regarding interest expenses, the loans from the US head office cannot in relation to exchange rate losses be regarded as actual debt ratios, but must be regarded as equity.

As the conditions for deduction of exchange rate losses in accordance with the Tax Assessment Act § 8 D are thus not met, and as there is no authority to deduct exchange rate losses relating to equity, Texaco may not, in the opinion of the State Tax Directorate, deduct exchange rate losses relating to the financial loans in question in their income statement.

> On the other hand, the State Tax Directorate finds that Texaco will be able to receive a deduction for interest expenses and exchange rate losses in connection with the following types of loans:

> Loans that the Danish branch or the American head office has taken out from an independent third party, to the extent that the loan has been taken out for and used for the Danish branch's business.

> Loans that the Danish branch or the American head office has taken out from group companies, provided that the loan has been granted as a usual business arrangement, e.g. regarding interest and repayment terms, and that the loan has been raised for and used for the Danish branch's business.

The right to deduct interest and capital losses relating to the above types of loans presupposes that Texaco submits the following information regarding the loans to document this:

-

Copy of the loan agreement.

-

Information about the exchange rate at the time of taking out the loan.

-

Information about the exchange rate at the time of full or partial repayment of the loan.

It is added that if Texaco does not document interest expenses and exchange rate losses on loans other than the loans from the head office, Texaco cannot, in the opinion of the State Tax Directorate, make deductions for interest expenses and exchange rate losses for the tax years 1982/83 and 1983/84 '.

Sten Vberg replied on 28 September 1983 that the loans granted by the Danish branch of Texaco Denmark Inc. so far raised at its U.S. headquarters are loans that the parent company of the company, Texaco Inc., has raised in the U.S. lending market. The loan was taken out solely to finance the Danish branch's business in Denmark. Thus, according to your letter, the branch is entitled to a deduction for the interest and exchange rate losses declared in the income years 1981 and 1982 for these loans. In its reply, Texaco requests an opportunity to later provide the requested documentation that the loans actually constitute such loans, for which there is a right of deduction in accordance with the State Tax Directorate's letter.

The State Tax Directorate's letter of 21 September 1983 gave rise to meetings between Texaco and the State Tax Directorate on 3 November and 22 December 1983.

Following further correspondence between the parties, the State Tax Directorate announced on 30 May 1984 that it intended to recommend to the Tax Assessment Board that the branch's income assessment for 1981 and 1982 did not approve a capital loss of DKK 49,035,455 in 1981 and an interest deduction and a capital loss of a total of DKK 344,336,242 in 1982. On 27 June 1984, the State Tax Directorate announced that the Tax Assessment Board had taken a decision in accordance with this recommendation. By order of the National Tax Tribunal of 12 November 1985, this decision was upheld.

The premises of the National Tax Tribunal are as follows:

"According to the available information, three members of the court, including the chairman of the court, find themselves able to agree with the Tax Assessment Council's view, according to which the capital transfers from the head office in Delaware to the Danish branch must be regarded as equity. This includes given that there is a transfer within the same legal entity of funds not arising from external loans. These members of the court note that in the present case there is no question of apportionment of interest expenses incurred by the company, and that the application of the direct method in the branch's income statement is not in itself found to provide a basis for tax recognition of loan agreements within the same legal entity, further noting that, in the view of those members of the court, the company in the relationship in question cannot be equated with a financial undertaking. The fact that Denmark's National Bank has approved the grants as loans is not decisive for the tax assessment of the situation. These members of the court can then agree with the Tax Assessment Council's decision that in calculating the branch's taxable income, including hydrocarbon income, no deduction for interest and exchange rate losses regarding loans taken out at the head office is approved.

## The court member states:

The principle in the Corporation Tax Act § 12, para. 1 and 2 is that subsidiaries and branches of foreign companies must, as far as possible, be equated with Danish-owned independent companies.

From this point of view, it therefore appears unlawful and unjustified when the State Tax Directorate in its stated practice distinguishes between subsidiaries and branches, on the one hand all other usual operating expenses and on the other hand expenses for return on borrowed capital from the parent company and head office.

A branch must also make its statement according to the so-called direct method and has the same need to be able to use loan capital to finance its business as any other self-employed business. Only a few companies can carry out a capital-intensive operation without the supply of loan funds.

It would be possible to distort the basis of comparison if interest rates were extraordinarily burdensome. In the present case, according to the opinion of the State Tax Directorate, the interest rate is usual and therefore acceptable.

However, Texaco has stated that the capital used for the participation in the DUC operations has been 100% remunerated in relation to the US head office. This must be regarded as unusual and should lead to regulation in accordance with the rules in the Corporation Tax Act § 12, para. 1 and 2. No Danish company would be able to participate in a company that

required such large capital contributions as the DUC operations, without even possessing an equity of a considerable size. In this respect, the situation of the complaining company is different from similar Danish-owned companies.

I then vote in favor of approving the interest deduction right in principle for the loans taken out by the complaining company at the head office, but also to limit the interest deduction to the part of the capital used which, after an average consideration, may be accepted as loan capital. The estimate of how large a part of the capital that can reasonably be assumed as non-interest-bearing equity must in the first instance be referred to the similar authorities.

A decision is made by a majority of votes, and the decision of the Tax Assessment Council, according to which no deduction has been approved for the interest and exchange rate losses in question, is hereby confirmed".

By letter of 8 December 1982 to the applicant, Denmark's National Bank, as mentioned on page 3, allowed the branch's balance with the head office of Texaco Denmark Inc., U.S.A., to be replaced by a new loan of up to USD 203 million recorded by the head office with effect from 1 January 1982. On January 6, 1983, Denmark's National Bank allowed the plaintiff to take out an additional USD 60.2 million loan from Texaco Denmark Inc., U.S.A. This loan was taken out as of January 1, 1983. The USD 203 million loan agreement is dated December 27, 1982. The USD 60.2 million loan agreement is not dated.

In a letter dated 27 December 1983 from Texaco Denmark Inc. to Denmark's National Bank refers to previous discussions about a change of creditor on the loans from Texaco Denmark Inc. to the parent company Texaco Inc. and it is confirmed that the date of the transfer must be 1 January 1983. Denmark's National Bank replied on 23 January 1984 that it had taken note of this information.

On December 30, 1983, Texaco Denmark Inc. decided that with effect from January 1, 1983, a distribution of USD 3,300 per share would be made to the company's shareholders, in total USD 99 million.

Regarding the applicant's tax return for 1983, the State Treasury's letter of 22 February 1985 states to the applicant:

"From both Texaco Denmark Inc.'s and the branch's accounts for 1983, it appears that the company's parent company, Texaco Inc., is the creditor for a loan of USD 172,040,328. Upon request, the Danish branch has stated that Texaco Inc. has taken over Texaco Denmark Inc.'s internal receivables for funds that the head office has made available to the branch in accordance with Denmark's National Bank permits. An agreement to this effect was concluded on 30 December 1983 with retroactive effect to 1 January 1983. Texaco Denmark Inc. has thus taken out an external loan.

According to the Board of Directors' decision of 30 December 1983, a dividend of USD 99 million was distributed. It is unclear how the excess part of the external loan is posted.

———

In the opinion of the State Tax Directorate, loans taken out to finance the distribution of equity cannot be considered taken up for and used for the Danish branch's business. For interest and exchange rate losses in connection with financial transactions that are not related to the branch's operations, the branch's income statement is irrelevant. Thus, interest and exchange rate losses cannot be deducted on the part of the raised loan that is used for the distribution.

———

The loan agreement is entered into retroactively until 1 January 1983. This cannot be accepted for tax purposes, where the time of the agreement must be taken into account in the tax treatment. This means that even if the loan had been used to finance the Danish branch's business, the right to deduct interest and exchange rate losses would not take effect until the conclusion of the agreement on 30 December 1983. The acquisition price for the loan would also be the price as of the time of the agreement.

For 1983, in the opinion of the State Tax Directorate, the taxable interest expenses and exchange rate losses related to the loan for Texaco Inc. are therefore denied approval on the double grounds that the loan was firstly not raised for and used for the branch's operation, and secondly that the loan could not be raised retroactively, so that no more deductions could be granted for interest and exchange rate losses for 1 day, namely 31 December 1983.

According to the information, the interest and exchange rate losses deducted in the tax return for 1983 consist of items that relate to the above-mentioned internal loans as well as other items. According to the available specifications, interest and exchange rate losses regarding. the internal loan/the loan from Texaco Inc. for 1983 the following amounts, which cannot be deducted in the income statement:

```
Interest .............................................   162,666,562
Realized capital loss according to the branch's        124,955,899
calculation ............
Unrealized price loss according to the branch's        116,943,961
calculation ...........                                 --------------
DKK                                                     404,566,422
                                                       --------------
```

Regarding the branch's calculation of realized exchange rate losses, it is also noted that, in the opinion of the State Tax Directorate, it is in principle incorrect on 2 points. On the one hand, realized exchange rate losses comprise an exchange rate loss relating to the instalment, which according to the agreement should have been posted at the end of 1982 but was not posted until mid-1983. This exchange rate loss should have been a correction to 1982. In part, the exchange rate loss is calculated on the basis of the historical exchange rate for the internal loan. Since Texaco has applied the inventory principle for 1982 and 1983, realized exchange rate losses must be calculated on the basis of the initial exchange rate, as the same exchange rate losses would otherwise be partially deducted twice.

- - - «

On 26 June 1985 the State Tax Directorate informed the applicant that the Tax Assessment Board had taken a decision refusing to deduct interest and exchange rate losses for 1983. On 19 August 1985, the applicant appealed against the decision of the Tax Assessment Board concerning 1983 to the National Tax Tribunal.

From the branch's accounts for 1984 it appears, among other things, that the branch had taken out a bank loan in USD corresponding to DKK 510,080,000.

In the correspondence concerning the applicant's tax returns for 1984 and 1985, the State Tax Directorate maintained that loans taken out to finance the distribution of equity are not considered taken up for and used for the Danish branch's business".

The financial consequences of this view are set out in the State Tax Directorate's report of 4 March 1987 concerning the income year 1984:

"The material presented concerning the New York accounts showed that Texaco's capital injection in 1983 of USD 21 million has occurred by an increase in net debt to affiliates, which thus at the end of 1983 amounts to USD 49 mill. net. Thus, no capital injection was granted in 1983. The material also showed that the net debt consisted of debt to the parent company of USD 104 million, with USD 55 million distributed among the accounts listed below and receivables from Textrader, cf. the following summary:

Bookkeeping at the end of 1983 before the loan transaction.

N.Y. bookkeeping (head office)

at the end of 1983 before the loan transaction:

```
Texaco Inc. G.O (General Office) ....................  / 53,646,735.33
Texaco Europe ............. ........................   / 130,167.87
Texaco Int. Exploration Corporation ..................  / 50,977,369.34
Various ..............................................    / 3,865.00
                                                       ----------------
                                                       / 104,758,137.54
Textrader ...........................................  + 43,663,508.11
                                                       ----------------
Net debt booked at head office ...................... / 61,094,629.34

Branch bookkeeping:
Credit Textrader booked in the branch at the end of
1983 before loan transaction                          + 11,606,004.00
Texaco Denmark Inc.'s net debt before the loan        / 49,488,625.00
transaction
```

In connection with the borrowing as of December 30, 1983 with the parent company, the loan of USD 104 million, and at the same time the most significant part of the receivable with Textrader is settled. It is not clear from the submitted material whether the repayment of the above-mentioned loan of USD 104 million was primarily done by using the loan from the parent company or by settling the receivable with Textrader. However, the State Tax Directorate is of the opinion that, regardless of the formal procedure, the repaid loan of USD 104 million could be considered replaced by an interest-bearing loan taken out with the parent company. USD 104 million of the loan taken out on 30 December 1983 can thus be attributed to the Danish branch's business. Compensation of approx. USD 49 million of the receivable from Textrader is thus considered used for distribution. Of this, there has been a complete settlement of the receivable listed in the head office, approx. USD 44 million and an equalization of approx. USD 5 million of the branch's receivable. The remaining part of the loan raised, USD 154 million - 104 million = USD 50 million cannot be considered to relate to the Danish branch's business because it has neither been transferred to the branch nor used to offset other debt items.

As the excess part of the loan raised, corresponding to USD 50 million is not listed as a receivable for the branch at the end of 1983, this part will also not later be considered to relate to the Danish branch's business. A reconciliation of the accounting material, on the other hand, shows that the distribution of the USD 99 mill. can only have happened by settling the receivable of approx. USD 49 million and use of the remaining part of approx. USD 50 million of the loan taken out.

‒‒‒

In the opinion of the State Tax Directorate, USD 104,758,137 of the loan taken out by the parent company can now be considered taken up and used for the branch's activity, and at the exchange rate as of the agreement date of 30 December 1983 is 9.8785, corresponding to DKK 1,034,853,256. Of the instalment at the end of 1984 USD 45,286,134, posted at a price of 11.1366, a proportionate share can be attributed to the branch's loan, corresponding to USD 27,575,459 or DKK 307,096,857.

Of the interest on the I/C (Inter Company) loan, a proportionate share can also be approved:

221,143,250 × 104,758,137/172,040,326 = 134,657,702

Together with other interest, the total interest expenses now amount to DKK 136,064,692.

Exchange rate adjustments on the loan amount to:

248,222,570 × 104,758,137 / 172,040,326 = 151,146,738

Together with other exchange rate adjustments, the total exchange rate losses amount to DKK 135,588,117. This includes a net gain on the purchase and resale of crude oil from Chevron of DKK 1.8 million. Exchange rate losses relating to the hydrocarbon business will then be 137,388,117".

The State Tax Directorate thus recognized a deduction for interest expenses and exchange rate losses of approx. 104/172 of these expenses and losses on the loan of the approx. USD 172 million corresponding to the part of the amounts estimated to be used for the operation.

In accordance with the report, the State Tax Directorate announced on 10 March and 21 May 1987 how it finally intended to submit the applicant's tax returns for 1983, 1984 and 1985 to the Tax Assessment Board. As regards 1984, with regard to interest and exchange rate losses, it states:

"As described in the audit report, the State Tax Directorate finds that Texaco, with the presentation of extracts from the accounts at the head office for 1983, has shed light on how the loan of USD 172 million raised by the parent company at the end of 1983 was raise was used. It appears from the material that the loan of USD 172 million together with the receivable of USD 49 mill. at a sister company, a total of 221 million, partly used to replace the above-mentioned interest-free debt relating to the branch, which at the end of 1983 amounted to USD 104 million and partly used for the distribution of a total of USD 117 million. The distribution is partly a distribution of equity per. January 1, 1983 at USD 99 million partly calculated interest for 1983 of USD 18 mill., as a consequence of Texaco giving the loan transaction retroactive effect to 1 January 1983. For tax purposes, interest calculated prior to the loan agreement must be considered a distribution. Of the loan of USD 172 million, in the opinion of the State Tax Directorate, USD 104 million is considered admitted to and used for the operation of the branch. The State Tax Directorate has hereby taken the position that the borrowing was first used to repay the debt of USD 104 million, so that the remaining part of the USD 172 mill. loan, USD 68 million together with the receivable of USD 49 mill. was used to finance the USD 117 million distribution, notwithstanding that according to Texaco's own description of the order of the transactions, the receivable was used in advance to reduce the debt. Interest and exchange rate adjustments are employed in proportion to the part of the loan that can be attributed to the Danish branch".

For 1985, the State Tax Directorate has carried out a similar calculation of interest expenses and capital gains after deduction of the part of the instalments on the loans that can be attributed to the branch's operations so that interest and capital gains are included with approx. 77/126.

On 22 June 1987 the State Tax Directorate informed the applicant that the Tax Assessment Board had taken a final decision on 1983, 1984 and 1985. The decision is in accordance with the State Tax Directorate's affidavits of 10 March 1987 and 21 May 1987, as referred to in the explanatory memorandum. The applicant appealed against the 1984 and 1985 decisions to the National Tax Tribunal.

On 10 January 1989, the National Tax Tribunal ruled on 1983, 1984 and 1985:

"Texaco Denmark Inc.'s branch in Denmark, which for the income years 1983, 1984 and 1985 has declared its income in accordance with Chapter 2 of the Hydrocarbon Tax Act as /DKK 121,258,957, / DKK 323,270,249 and DKK 271,895,072, respectively. as well as his income in accordance with Chapter 3 of the Hydrocarbon Tax Act as / DKK 69,485,110, / DKK 88,041,157 and DKK 193,854,537, respectively, complains that the Tax Assessment Council for the said income year has employed the taxable income in accordance with Chapter 2 of the Hydrocarbon Tax Act as DKK 163,102,521, DKK 0 (/ 245,992,614) and DKK 248,449,748, as well as income in accordance with Chapter 3 of the Hydrocarbon Tax Act to DKK 3,511,219, DKK 86,975,966 and DKK 209,818,507, respectively".

## The premises of the National Tax Tribunal are as follows:

"The National Tax Tribunal notes that the complainant company has previously financed the branch's activities in the North Sea by means of funds transferred from the head office in the USA, but that in the years 1982 and 1983 operating loans were taken out from affiliated companies, so that the company's operating loans at the end of 1983 amounted to USD 104 million. The National Tax Tribunal can accept that the Tax Assessment Council's decision has approved a deduction for interest and exchange rate losses relating to the part of the loan taken out at the end of 1983 of a total of USD 172 million, replacing the aforementioned operating loans of USD 104 million.

With regard to the remaining USD 68 million of the raised loan, the National Tax Court must, according to the information provided, assume that this part of the loan has been used to finance the distribution made to the parent company at the end of 1983, and that this

distribution must at least as a starting point be considered to relate to the company's capital situation in the USA and cannot be attributed to the establishment or operation of the activities that are subject to limited tax liability in this country.

In the court's view, deductions can only be granted for interest expenses and exchange rate losses  on the loan in question to the extent that it can be proven that the funds have been used for the branch's activity, cf. the Corporate Tax Act § 9, and the court does not find that the company has demonstrated in this connection that it has used additional funds from the refinancing carried out than approved by the Tax Assessment Council. The decision also takes into account that the approved distribution between self-financing and financing by borrowed funds according to the information corresponds to what is the case in similar companies and what must be considered reasonable and financially justifiable. There is therefore no sufficient basis for causing numerical changes to be made.

The National Tax Court can thus agree that the Tax Assessment Council in the appealed appointments for the income years 1984 and 1985 has only approved deductions for interest and exchange rate losses relating to USD 104 million of the loan taken out and then finds no basis for accepting either the principal or the subsidiary claim.

With regard to the income year 1983 in particular, the National Tax Court finds it necessary to assume that in the years 1982 and 1983 they raised operating loans totaling USD 104 million has not been interest-bearing, and that interest deductions can only be granted from the time when these loans are replaced by the interest-bearing loan at issue in the case. No actual loan documents had been prepared regarding the latter loan, which only appear from entries made in the American companies at the end of 1983, and the National Tax Court does not find on this basis to be able to approve interest deductions for any part of this year".

Following this, the National Tax Tribunal upheld the Tax Council's decision.

At the trial, explanations were given by the witnesses Sten Vberg, Robert Shepherd, Kirsten Aamand, Ole Kjær, Birgit Kjeldsen, Svend Allan Jensen and Jørgen Skou.

Sten Vberg has explained that since 1972 he has been employed by the Texaco Group as a tax adviser for Scandinavia. The occasion for his letter of 24 August 1982 was the new hydrocarbon tax. When considering allowing the branch to pay interest to the head office, one would hear whether such payments were deductible. At the meeting on January 12, 1983, the witness used the term US company. There was no doubt that it was the head office he was referring to. Office manager Birgit Kjeldsen said that the branch and head office should be set up as subsidiaries and parent companies, so that there was a right to deduct interest expenses. The right to deduct exchange rate losses on repayment of loans to the head office was also discussed, and it was confirmed that there was a right to deduct found exchange rate losses. The meeting took place in a mixture of Danish and English, with the witness translating for Robert Shepherd. At the end of the meeting, Robert Shepherd asked Birgit Kjeldsen in English if there was a right to deduct, which she confirmed in English. After the meeting, the witness and Robert Shepherd each prepared a 'memo' in which they referred to the right to deduct. The witness was not made aware of the State Tax Directorate's memorandum of 4 January 1983.

The meeting on 9 February 1983 was attended by the State Tax Directorate Kirsten Aamand and Svend Allan Jensen and from the Texaco witness, Robert Shepherd and Mr. Gale, who was in charge of the actual bookkeeping in London. At the meeting, depreciation and the size of the capital loss in 1981, which was calculated at DKK 49 million. The right to deduct the exchange rate loss was confirmed.

The witness did not point out that in the letter of 15 February 1983 the State Tax Directorate requested the name of the lender and that the State Tax Directorate announced in the audit report of 2 June 1983 that the deduction had only been approved 'so far'. He was aware that, according to the commentary on the OECD Convention, there was no right to deduct interest, but considered this to be irrelevant.

Robert Shepherd has explained that since 1981 he has been employed by Texaco's tax department in London. He attended the meeting on 12 January 1983, where Sten Vberg translated into English along the way. At one point, Vberg stated that he had received the answer that the interest was deductible. To be sure, the witness himself later asked in English and

received a similar answer from Birgit Kjeldsen. That evening, he made a 'memo' about what was stated at the meeting, and reported accordingly to Texaco's tax department that interest and exchange rate losses were deductible.

At the meeting on 9 February 1983 branch accounting was discussed. It was confirmed that realized exchange rate losses could be deducted, but the State Tax Directorate required further documentation regarding the exchange rate loss of the DKK 49 million.

Kirsten Aamand has explained that she is a certified public accountant and has been employed in the hydrocarbon department from 1 November 1982 as chief accountant. At the meeting on 12 January 1983, it was mainly Birgit Kjeldsen who spoke for the State Tax Directorate. Birgit Kjeldsen stated that the branch could not obtain an interest deduction for loans from the head office to the branch. However, deductions could be obtained if there was interest on loans taken out by the head office solely for the purpose of the branch. The meeting was held in Danish. The witness heard that Vberg translated for Shepherd. The conclusion at the meeting on 9 February 1983 was that Vberg should provide further information, as it could not be deduced from the accounting figures in the tax return how the alleged exchange rate loss had arisen. The request for further information was formulated in writing in the State Tax Directorate's letter of 15 February 1983.

The witness wrote the State Tax Directorate's report of 2 June 1983. The report did not state that the right to deduct was approved. According to Vberg's information, the State Tax Directorate could not deny that there were external loans behind the head office's loan to the branch, regardless of the fact that it did not appear in the tax return. In May 1983, the witness and Svend Allan Jensen were in London, where they reviewed the accounts. They received confirmation here that there was an interim bill between the branch and the head office. No external loan was listed. However, the witness was still in doubt as to whether there could still be an external loan behind the interim account, as Denmark's National Bank in the permit of 8 December 1982 had indicated the lender as "the parent company Texaco Denmark Inc.", while the parent company was rightly Texaco Inc.

During the meeting on 3 November 1983, the tax authorities were represented by Birgit Kjeldsen, Ole Kjær and the witness. Texaco was represented by Sten Vberg and two auditors from the auditing firm Arthur Andersen. It was especially Ole Kjær and state-authorized public accountant Jørgen Skou who spoke. The State Tax Directorate maintained that the branch could not deduct the interest.

The meeting on 22 December 1983 was attended by the tax authorities Birgit Kjeldsen, Ole Kjær and the witness. For Texaco, District Attorney Aage Spang-Hanssen, Sten Vberg and Albert E. Doyle participated. District Attorney Spang-Hanssen stated that Texaco intended to reduce equity. This prompted no comments from the State Tax Directorate.

Ole Kjær has explained that, as head of department in the State Tax Directorate, he participated in the meetings on 3 November and 22 December 1983. At the meeting in November 1983, the State Tax Directorate had received new information from Texaco, from which it was not clear whether the loans were external. At the meeting in December 1983, Texaco's representatives stated that they intended to take out a loan in the parent company, which the State Tax Directorate had no objections to, as Texaco would thereby be placed as the other participants in DUC. However, the State Tax Directorate denied that such loans could be raised retroactively, as the loans had to be raised for operating purposes in order for the interest to be deductible.

Birgit Kjeldsen has explained that she became office manager in the State Tax Directorate's hydrocarbon tax office when this was established in the summer of 1982. Prior to the meeting on 12 January 1983, the State Tax Directorate's Svend Allan Jensen's memorandum of 4 January 1983 was discussed. The witness agreed with the conclusion of the note. The memorandum was not handed over to Texaco in connection with the meeting. The witness acted as chair of the meeting and stated that there was no right to deduct interest on loans from the head office to the branch. Vberg stated that there were bank loans. The witness replied that if foreign loans were used for the operation of the branch, exchange rate losses and interest would be deductible. She did not follow Vberg's translation for Shepherd, and during the discussions she did not speak directly to Shepherd.

The reason why the State Tax Directorate in the report of 2 June 1983 recommended the deduction for 1981 approved "so far" was that Vberg had stated that there were external loans, so they would not automatically reject the right to deduct. The State Tax Directorate assumed that it was due to a misunderstanding or typographical error that Denmark's National Bank had listed the 'parent company Texaco Denmark Inc.' as the creditor and not the parent company Texaco, Inc. in the loan authorization,

Since the State Tax Administration did not believe that a money transfer from the head office Texaco Denmark Inc. to the branch could be a loan. The meeting on 3 November 1983 took place on the basis of the State Tax Directorate's letter of 21 September 1983 and Vberg's letter of 28 September 1983. It emerged here that Texaco had apparently misunderstood the State Tax Directorate. At the meeting on 22 December 1983, District Court Attorney Spang-Hanssen proposed a conversion of internal loans to external ones. The State Tax Directorate denied that this could happen retroactively.

Svend Allan Jensen has explained that he is a state-authorized public accountant and employed by the State Tax Directorate from 1 July 1982. He does not recall that during the meeting on 12 January 1983 Birgit Kjeldsen expressed other legal views than what he had stated in the memorandum. The actual discussions took place in Danish, but in connection with the end of the meeting there was a bit of informal polite talk in English.

Jørgen Skou has explained that he is a state-authorized public accountant and co-owner of the auditing firm Arthur Andersen. He attended the meeting on 3 November 1983 and expressed here that there was a right of deduction for the branch, as this had to be regarded as an independent tax entity. He was not aware of whether Texaco Denmark Inc. had taken out external loans which had been passed on to the branch.

In support of its claims, the applicant submits that, in principle, there is no difference in the tax position of companies and of the branches of foreign companies in question. According to the Corporate Tax Act § 2, para. 1 a, cf. para. 2, item 1, the branch that carries on business with a permanent establishment in this country is liable to tax in accordance with the rules of tax legislation limited to income from the permanent establishment, which is offset by a right to deduct, cf. § 9, para. 1, for expenses relating to this operation. There is nothing questionable about this legal situation, as the tax authorities have authority under the Corporate Tax Act § 12 to intervene if the dispositions between the head office and the branch operates on non-market-like terms. A corresponding limited tax liability is stated in the Hydrocarbon Tax Act. The limited tax liability to that extent entails a fiction, as e.g., sale of goods from the head office to the branch cannot be characterized as a sale under bond law, as the head office and branch are one and the same legal entity, but in the calculation of the taxable income relating to the place of business, it is necessary for tax purposes to consider it a sale. There is no logical reason to treat interest differently, as interest in this respect is merely an expression of the branch's payment for renting capital. The plaintiff is largely a financial company, while DUC is carrying out the actual work. In the period up to 1987, the applicant invested almost DKK 4 billion. DKK, and interest expenses have thus been the central expense in the company. It also appears from the preparatory work for the Hydrocarbon Tax Act that a restriction of the general right to deduct interest expenses was considered - but just waived.

With regard to exchange rate losses relating to the permanent establishment, there is a corresponding access to deductions in accordance with section 8 D of the current Tax Assessment Act, cf. from the Capital Gains Taxation Act § 6.

In particular in support of the right to deduct in 1981 and 1982, the applicant claims that the applicant disposed of confidence that interest and exchange rate losses on the loans in 1981 and 1982 were deductible and that the applicant was strengthened in that view, confirming that: perception at the meetings on January 12 and February 9, 1983. It was not until the letter of 21 September 1983 that the defendant expressed the opposite view, and the defendant must have been precluded from changing its position without giving the applicant an opportunity to adjust its dispositions in accordance with the amendment.

If the applicant's claim relating to 1981 and 1982 is upheld, the applicant's claim relating to 1983 must also be upheld.

If the applicant is unsuccessful in 1981 and 1982, it claims that, from a similar point of view, the defendant must have been barred from refusing to deduct for 1983, since it is the defendant's amended position which necessitated the applicant to take out the loan in December 1983. at the parent company.

The applicant further submits that the defendant's limitation of interest expenses, exchange rate losses and capital gains for 1984 and 1985 was unauthorized. The defendant's calculations are based on the fact that the concept of 'equity' can be applied to the branch, which is incorrect and which would not otherwise provide any guidance. The calculation of any equity specifically for the branch would depend on how quickly the applicant chose to write off the investments. The defendant's position presupposes that it is possible to follow the cash flow from the borrowing, which is, however, impossible, as there will not necessarily be any demonstrable connection between the borrowing and the investment. The defendant's position is also based on the head office's accounts, while it is the branch that must be taxed by the company in this country. Finally, the defendant does not take into account the fact that the applicant must be entitled to a certain distribution. The only rules that exist in the area are the tax assessment guidelines' rules on foreigners' real estate in this country, where an interest deduction is recognized for debts up to 80% of the property value. The defendant's position is thus an innovation that could deter foreign investors.

The allegation of the right to deduct interest on loans must also lead to the applicant having the right to deduct exchange rate losses. It follows from the Executive Order on Foreign Exchange that the branch is regarded as a foreign national, regardless of whether the company as such is considered a foreign national. Even if the right to deduct interest were to be denied on the ground that the head office and branch are the same legal entity, the applicant would have suffered a deductible capital loss, since the exchange rate losses realized are final.

In support of its action for dismissal, the defendant initially states that the correct plaintiff is formally Texaco Denmark Inc. and not the branch. This follows from the Corporate Tax Act § 2, para. 1 a, according to which the tax liability rests with the 'company' as such.

In particular with regard to 1981 and 1982, the defendant states that the applicant is not a finance company subject to special rules. The company's revenue is sales revenue as in a trading company, even though it is another company acting as an 'operator'. The problem regarding the limited tax liability is really a question of distribution of the company's tax burden on Denmark and the U.S.A. With this distribution, it is necessary to make a division of the individual income and expenditure items. Equity must also be divided. The applicant wishes to convert the branch's equity into a debt ratio, which would give rise to extended deductions in relation to what is permitted for independent companies. This is probably the reason why, according to the commentary on the OECD Convention, there is no deduction for interest expenses relating to loans from the head office. The head office and the branch are one legal entity. Deduction of interest and exchange rate losses must presuppose that the company as such has taken out a loan and that this loan is used as part of the operation of the branch and thus the earnings of the branch's taxable income.

The State Tax Directorate 's processing of the case cannot lead to a changed result, as the State Tax Directorate has not created legitimate expectations of deduction from the applicant - the company. The plaintiff must bear the risk, in so far as the plaintiff has misunderstood the information of the State Tax Directorate. The State Tax Directorate's view was made clear in the meetings. Furthermore, after the meeting on 12 January 1983, the State Tax Directorate requested further information, which would be meaningless if there were in any case a deduction for interest on loans from the head office. An expectation principle is irrelevant especially for 1981 and 1982, as the branch could not receive interest deductions for the years 1981 and 1982. Whatever the expectations of the applicant at the meeting of 12 January 1983, it was too late to change the arrangements for 1981 and 1982.

With regard to 1983, 1984 and 1985, the defendant states that the loan of USD 172 million is taken up by the company and can therefore justify deductions to the extent that the plaintiff proves that the loan has been used for the operation of the branch or for assets whose returns are subject to the limited tax liability. The loan cannot justify deductions for the period before taking it on December 30, 1983, as it may not have been used for operation prior to recording. It appears from the State Tax Directorate's calculations that at the end of 1983 the branch had used approx. USD 104 million to settle a balance with the head office, approx. USD 99 million for distribution and approx. USD 17 mill. to pay interest retroactively on the loan taken out on December 30, 1983. The capital for these dispositions has been raised using the branch's receivables of approx. USD 48 mill. at the sales company Textrader and when taking out the loan on the approx. USD 172 million. The State Tax Directorate 's calculations lead to the distribution of the USD 99 + 17 mill. alone could be financed with approx. USD 48 mill. of the branch's assets, while the rest approx. USD 68 million must necessarily be financed with the loan.

In this calculation, the State Tax Directorate has, to the greatest extent possible, taken into account the applicant, accepting that all the branch's assets have been distributed, and accepting that the interest-free balance of USD 104 million is exchanged for an interest-bearing loan. This means that interest and exchange rate losses /gains on the loan when calculating expenses for the branch's operations can only be included with approx. 104/172. To the extent that the State Tax Directorate 's statement of the use of the loan of the USD 172 mill. should be presumed to be based on an estimate, the estimate is evaded from the trial of the court, unless the estimate is clearly incorrect.

## The court must state:

For the reasons stated by the defendant, Texaco Denmark Inc. exists. to be the right plaintiff.

In assessing whether the applicant is entitled to deduct interest expenses and exchange rate losses in 1981 and 1982, account must be taken of the fact that internal capital movements between head office and branch, which are one and the same legal entity, do not entail interest income / expenses for the company. as it e.g., is the case with the branch's sale to a third party, it is necessary to make a distribution of income at the head office and branch respectively for use in the calculation of the limited taxable income for the place of business (the branch) No separate accounts have been prepared for the branch for the years 1981 and 1982. The loan as of 1 Jan 1982, according to the applicant's own loan document, was established on 27 December 1982 with effect from 1 January 1982. The applicant has not established that, in the period up to 27 December 1982, there was a balance which could be equated with a real debt relationship. A recognition of the outstanding balance as a real debt relationship in relation to the State Tax Act § 6 and the current Tax Assessment Act § 8 D would open up the possibility, that arbitrary changes in the balance were attributed tax consequences. In this context, it must be to the detriment of the applicant that the balance lacks the precision and documentability normally provided by a loan agreement concluded with an independent third party, in which situation the possibility of arbitrarily changing the transactions retroactively is cut off.

Since the applicant's argument to the contrary cannot lead to the balance being equated with a customary legally binding debt, and since the information provided by the parties in 1983 could not lead to any other result, the defendant's claim for dismissal in Case 145/1986 concerning 1981 and 1982 as a result.

On 30 December 1983 the applicant took out a loan of USD 172 million from the US parent company. Already because this loan could not have been used - neither in full nor in part - as part of the operation before the loan was taken out, the loan must be disqualified from tax law consequences in 1983. As regards the branch's balance with the head office, the applicant is also not found to have documented that, for 1983, there was a customary, legally binding debt relationship.

With regard to 1984 and 1985, it is also a precondition for taking into account interest expenses, capital losses and capital gains in determining the taxable income that the loans have been used as part of the branch's operations. It appears from the State Tax Directorate's calculation, which is used as the basis for the assessment, that USD 68 mill. of the distribution alone has been able to be financed by borrowing, so only USD 104 mill. USD 172 million of the loan can be considered as used for the branch's operations, so that only interest, capital losses and capital gains relating to these USD104 mill. can be included in the calculation of the branch's taxable income.

In those circumstances, the defendant's claim for dismissal in Case 164/1989, 1983, 1984 and 1985, must also be upheld.

———
Neither party pays any legal costs to the other party.

# Supreme Court

## Judgment of the Supreme Court.

The judgment in question has been handed down by the Eastern High Court.

Seven judges have participated in the sentencing: Pontoppidan, Kiil, Kardel, Marie-Louise Andreasen, Poul Sørensen, Melchior and Per Sørensen.

The appellant has reiterated his claims. However, the more subsidiary claim before the High Court has become the most subsidiary claim before the Supreme Court, as the appellant has more alternatively filed a claim that the case for the tax years 1982/83 (1981) and 1983/84 (1982) as well as for the income years 1983, 1984 and 1985 is remanded for reconsideration by the Tax Assessment Council on the basis that the appellant is entitled to a deduction for exchange rate losses and an obligation to recognize exchange rate gains, without this right to deduct or an obligation to recognize income being limited as happened by the Tax Assessment Council's employment.

Defendant has sought affirmation.

There is agreement between the parties on the amount of the deductions and that the appellant must be upheld for the 1983, 1984 and 1985 income years if the company's main point of view is upheld for 1981 and 1982. By transport declaration of 30 December 1983, Texaco Denmark Inc. its claim on the branch of approx. 172 million USD to Texaco Inc. The respondent does not deny that an external loan relationship was established between the appellant and Texaco Inc. in the transport declaration. on this amount.

Article III, sentence 3 of the double taxation agreement of 6 May 1948 between Denmark and the USA reads as follows:

"Where an enterprise of a Contracting State carries on commercial or business activities in the territory of another State from a permanent establishment situated therein, the permanent or commercial profit to which it could be expected to have accrued would have been attributed to such permanent establishment. has been an independent enterprise which carried on the same or similar business on the same or similar terms, and which under free conditions concluded associations with the enterprise whose permanent place of business it constitutes. The profit thus attributed to the place of business situated in the other State shall, to the extent permitted by the legislation of the latter State, be regarded as income for sources within the territory of that State."

Article 7, para. 2 and 3 of the OECD Model Agreement on Double Taxation of 1977 read in the translation submitted to the Supreme Court:

"2. Subject to the provisions of paragraph For the purposes of paragraph 3, where an enterprise of a contracting sate carries on business in the other contracting state through a permanent establishment situated therein, in each of the contracting states to that permanent establishment shall be assigned the profit which it might be expected to have obtained if had been an independent undertaking which carried on the same or similar business under the same or similar conditions and which, under completely free conditions, concluded business with the undertaking whose permanent establishment is.

3. When determining the profits of a permanent establishment, it must be permissible to deduct expenses incurred for the benefit of the permanent establishment, including expenses for management and general administration in general, whether they are incurred in the State in which the permanent establishment is situated, or other places".

The provision dates back to the 1963 OECD Model Convention and has been repeated in the 1992 Model Convention.

In the commentary to para. 3 states, among other things:

"16. Apart from what can be considered as usual costs, there are certain categories of payments between permanent establishments and head offices which give rise to particular problems and it is appropriate to deal with them here.

The following points discuss three specific cases of this nature and provide solutions for them.

Of course, it should not be concluded that it is only in relation to the three types of payments mentioned in these points that problems can arise. There may well be payments of another kind to which similar considerations apply.

17. The first of these cases concerns payments made under the name 'interest, royalties, etc.' by a permanent establishment to its head office in return for borrowed sums or in return for patents made available from it to the permanent establishment. In such a case, the payments shall not be deemed to be allowed to be deducted in calculating the taxable profit of the permanent establishment. Likewise, such payments to a permanent establishment from the head office shall be excluded from the calculation of the taxable profit of the permanent establishment. It is recognized, however, that special consideration must be given to interest payments made by different parts of a financial undertaking (e.g. a bank) and arising from short-term loans (as opposed to assets allocated to them), given the fact that granting and receiving short-term loans is closely linked to the ordinary business of such enterprises.

If an additional enterprise makes payments of interest, etc. to third parties, and these payments are partly related to the business of the permanent establishment, a proportionate part of these must naturally be taken into account in calculating the profits of the permanent establishment, in so far as they are rightly can be considered as costs incurred in favor of the permanent establishment.''

Before the Supreme Court, the appellant further argued that it follows from Article III, p. 3, in the double taxation agreement between Denmark and the USA, that a US company's branch in Denmark has the right to deduct interest and exchange rate losses on loans raised at the head office in the USA, cf. the Ministry of Taxation's guidance in circular no. 232 of 12 September 1949. The OECD's model agreement and its commentary only contain recommendations that are not binding on the Danish tax authorities. With regard to the right to deduct exchange rate losses, Denmark's National Bank 's currency provisions mean that there is a right to deduct exchange rate losses, even if there may be no right to deduct interest. The branch has an independent currency status, so that an operating grant must be regarded as a loan if, as here, it has been granted as a financial loan with a claim for repayment. When taking out the loans from the USA, the branch has had to exchange the amounts for Danish kroner, but has had to repay in dollars.

The decisive factor for whether a loss is deductible is therefore only whether the loss is linked to the branch's commercial activity.

**Supreme Court remarks.**

Six judges - Pontoppidan, Kiil, Kardel, Poul Sørensen, Melchior and Per Sørensen - say:

The limited tax liability, which under the Corporation Tax Act and the Hydrocarbon Tax Act is incumbent on foreign companies that carry on or participate in businesses with a permanent establishment in this country, also includes companies whose business is established here as a branch business. In that case, the basis for the tax calculation is the branch's income less the expenses relating to the branch's operations, cf. the Corporate Tax Act §§ 2 and 9 as well as the Hydrocarbon Tax Act §§ 4 and 12, however, with the possibility for the tax-like authorities to make an adjustment of the income statement after the arm's length principle in the Corporate Tax Act §  12, para. 2, cf. para. 1.

It must be assumed that in Danish and international tax practice - on the basis of the OECD's model agreements with the comments quoted above - it has been firmly assumed that interest on loans between a head office and its foreign branch cannot be deducted when calculating the branch's taxable profit. There is no evidence that the Corporation Tax Act, the Hydrocarbon Tax Act or the double taxation agreement between the USA and Denmark have intended to authorize the right to deduct such internal interest, and the right to deduct is not found to be a necessary consequence of the branch's tax independence. We then agree that the internal interest expenses entered in the branch's accounts cannot be deducted in the calculation of the branch's taxable income.

As exchange rate losses in connection with the money transfers between the head office and the branch are not a consequence of any debt relationship, there is no authority to deduct such losses in the calculation of the branch's taxable

income, cf. the current provision in the Tax Assessment Act § 8 D.

Finally, there is no basis for establishing that the Danish tax authorities have, with binding effect, stated that the appellant could obtain a deduction for such interest and capital losses.

The transport declaration of 30 December 1983 cannot be attributed tax effect for the period preceding that date. We therefore agree that the appellant is not entitled to deduct interest and capital losses relating to the amounts transferred up to the branch up to that point.

The loan of 30 December 1983 of approx. 172 million USD was established as part of the financing restructuring caused by the tax authorities' refusal to approve deductions for the branch's interest and exchange rate losses. In connection with the restructuring, a distribution of DKK 99 million was made to the parent company. USD, which is the basis for the tax authorities' restriction of the right to deduct. However, the appellant company operates exclusively through its branch in Denmark, and up to and including 1980 it had invested approx. 485 million DKK or approx. 81 million USD in the company. The accounting information also shows that in the years 1981-1985 a total of DKK 2,481 million was invested or approx. 276 million USD in branch operations. In these circumstances, it must be assumed that the loan in its entirety concerned the operation of the branch, regardless of whether part of the loan amount may have been used for distribution. The tax authorities have therefore not been entitled to reduce the appellant's deduction for interest expenses and capital losses relating to that loan for the period from 30 December 1983.

We then vote to pass judgment as set forth below.

**Judge Marie-Louise Andreasen - who agrees with the majority's comments on the basis for the tax calculation - states:**

The rules on limited tax liability reflect the basic view that a foreign company's branch in relation to the Danish tax liability must be equated with an independent enterprise. When implementing the tax law's independence of the branch, the tax authorities must therefore also to a certain extent accept that payments are made between the branch and the head office, even if they constitute one legal entity. Denmark's National Bank 's authorization of 8 December 1982 for the branch's borrowing from the head office was utilized by the loan agreement of 27 December 1982, which has undisputedly been entered into on usual commercial terms. The interest amounts, which at least for the time being after the date of the agreement appear as entries in the branch's accounts, relate to the sources of income whose income is taxable, and they are therefore covered by the Corporate Tax Act § 9, without there being any basis for making a correction under § 12. I do not consider that the provisions of the OECD Model Convention and the comments made thereon or the tax practices which may have arisen therefrom can lead to any other result in the present case.

I therefore vote in favor of the appellant in so far as it relates to the period after 27 December 1982.

The decision is taken by a majority of votes.

## The judgement of the court:

*The assessment of the appellant's taxable income for the income years 1983, 1984 and 1985 is remanded for reconsideration by the Tax Assessment Council on the basis that the appellant, with effect from 30 December 1983, has the right to deduct interest and exchange rate losses and the obligation to recognize exchange rate gains on the same date 172,040,328 USD.*

*Otherwise, the Ministry of Taxation is dismissed.*

*In case costs before the High Court and the Supreme Court, the Ministry of Taxation must pay DKK 2 million within 14 days after the Supreme Court has ruled to Texaco Denmark Inc., including this company's branch in Denmark.*

**Footnotes**

[1]  Cf. <u>U.1982.618</u> and <u>U.1984.957</u> H, Helkett: Statement of taxable income, 1987, p. 636, Aage Michelsen: International Tax Law p. 168 ff., Thøger Nielsen: Income taxation II p. 435, report no. 1060 of 1985 p. 222, Ole Bjørn et al .: Textbook on income tax, 6th ed., Pp. 263 and 590 ff and Engholm Jacobsen et al .: Skatteretten p. 391 f.



100 Park Avenue, 16th Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK          )
                          )                    ss:
COUNTY of NEW YORK    )

### _CERTIFICATE OF ACCURACY_

This is to certify that the attached document, "TfS 1993, 7 H" - originally written in Danish, -- is, to the best of our knowledge and belief, a true, accurate, and complete translation into English.

Dated: 4/14/2022

Sworn to and signed before ME
This 14th day of April, 2022

_____

Heather Cameron
Projects Manager
Consortra Translations

Notary Public



New York, NY  |  Washington DC  |  Houston, TX  |  San Francisco, CA  |  Hong Kong