# Exhibit 104

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
MASTER DOCKET 18-MD-2865(LAK)

```
_____
                                      )
IN RE:                                )
                                      )
CUSTOMS AND TAX ADMINISTRATION OF     )
THE KINGDOM OF DENMARK                )
(SKATTEFORVALTNINGEN) TAX REFUND      )
SCHEME LITIGATION                     )
                                      )
_____)
```

C O N F I D E N T I A L

VIDEO DEPOSITION OF
LILL DROST
Copenhagen, Denmark
Friday, October 1, 2021

Reported by: CHRISTINE MYERLY

Page 78

1  MR. OXFORD: Objection to form.
2  A  My staff became aware that there
3  was apparently an attempt of fraud with dividend
4  tax -- dividend tax reclaim. Sorry.
5  BY MR. DULBERG:
6  Q  But you knew about that in August
7  of 2015, correct?
8  MR. OXFORD: Objection to form.
9  A  No, I do not think that we did. I
10 don't know.
11 BY MR. DULBERG:
12 Q  Didn't we earlier look at an
13 e-mail from Michael Amstrup to Anne Munksgaard in
14 June of 2015?
15 MR. OXFORD: Objection to form.
16 A  Yes. I am sorry, I am mixing
17 different things. I thought that we were looking at
18 the page ending in 446 that says, "Attempted fraud."
19 THE WITNESS: Sorry.
20 BY MR. DULBERG:
21 Q  No problem at all. My question
22 for you is, what led SKAT to provide the additional
23 notification that begins on the page ending 448?
24 MR. OXFORD: Objection to form.
25 A  My staff discovered that there was

Page 79

1  more than what they had initially sent to S☐IK.
2  MR. OXFORD: He may not be saying
3  anything. Are you trying to examine the witness,
4  Drew?
5  BY MR. DULBERG:
6  Q  If you look at the page ending in
7  449, do you see that?
8  A  Yes.
9  Q  It describes information SKAT has
10 received from authorities in the UK, correct?
11 A  Yes.
12 Q  And it says -- after the sentence
13 that ends with S☐IK, it describes the purchase and
14 sale of each share, do you see that?
15 MR. OXFORD: Objection to form.
16 A  Yes.
17 BY MR. DULBERG:
18 Q  And that first sentence underneath
19 the reference to one and two, most of the way down
20 the page, refers to very large trades in Danish
21 shares, correct?
22 MR. OXFORD: Objection to the form.
23 A  I don't see -- no, it says equally
24 large -- equally large purchases and sales of the
25 individual shares.

Page 80

1  BY MR. DULBERG:
2  Q  If we look to the bottom of the
3  first page of this note ending in 448, what we are
4  talking about here are American and Canadian pension
5  plans, do you see that?
6  A  Yes.
7  Q  And the UK authorities had told
8  SKAT that American pension plans were placing very
9  large purchases, sales of Danish securities?
10 MR. OXFORD: Objection to form.
11 BY MR. DULBERG:
12 Q  Correct?
13 A  I don't see what it is that you
14 are referring to.
15 Q  Okay. Let's go to Exhibit 4017.
16 MR. OXFORD: It's the other binder.
17 Q  Sorry for all the binders.
18 Occupational hazard.
19 MR. OXFORD: We're happy to limit it to
20 one binder per deposition.
21 Q  Is this an e-mail you received
22 from Lars Neilsen?
23 A  Yes.
24 Q  And we talked about him before, he
25 worked in special control, correct?

Page 81

1  A  Yes.
2  Q  He attached a draft agenda for a
3  meeting with the IRS, correct?
4  A  Yes.
5  Q  Did you help prepare that agenda?
6  A  No.
7  Q  You did eventually attend a
8  meeting with the IRS, correct?
9  A  Yes. I participated together with
10 someone from competent authorities. It is standard
11 that you have somebody from management with you.
12 Q  Was that Bert?
13 A  Bent.
14 Q  Bent Bertelsen?
15 THE INTERPRETER: Just checking the
16 spelling.
17 Q  I believe it's B-E-R-T-E-L-S-E-N.
18 If you look at the proposed agenda for the meeting
19 with the IRS, it notes that SKAT wishes to have a
20 meeting in person with the IRS officials under the
21 J-I-T-S-I-C umbrella, do you see that?
22 A  Is everything in English?
23 Q  This is the document as we
24 received it. So it is in English, and then I
25 believe a Danish version is -- has a strike through.

Page 90

```
 1      A       I need for you to repeat it, then.
 2      Q       Hadn't Mr. Ekstrand suggested that
 3  the only purpose -- withdrawn.  Hadn't Mr. Ekstrand
 4  suggested that SKAT could not have a
 5  backward-looking purpose in meeting with the IRS?
 6          MR. OXFORD:  Objection to form.
 7      A       No, I don't think so.
 8  BY MR. DULBERG:
 9      Q       Do you recall that being an issue
10  raised by the legal department?
11          MR. OXFORD:  Objection to form.
12      A       I don't even know what we are
13  talking about now.
14  BY MR. DULBERG:
15      Q       Did you ultimately attend the
16  meeting with the IRS?
17          MR. OXFORD:  Objection to form.
18      A       Yes.
19  BY MR. DULBERG:
20      Q       That meeting took place under the
21  JITSIC umbrella, correct?
22      A       And now I can say yes to this,
23  because I can see that Lars Andersen was there
24  and -- so, I can say yes because I can see Lars
25  Andersen was there and he was under the umbrella of
```

Page 91

```
 1  JITSIC, and Bent Bertelsen, he was there from
 2  competent authority.
 3      Q       The meeting took place in
 4  Washington D.C., correct?
 5      A       Yes.
 6      Q       And can you tell me everyone who
 7  attended on behalf of SKAT?
 8      A       Yes.  So, I -- I was there,
 9  Christian Ekstrand, Lars Andersen, Bent Bertelsen
10  and Bente Frellesen.  I might have forgotten one.
11  As well as Lars Møller Neilsen.
12      Q       Six people in total?
13      A       That is what I remember.  I may
14  not remember this correctly.  This is long ago.
15      Q       Did you all fly together from
16  Denmark?
17      A       Yes.  I don't know about Lars
18  Andersen, but I think so.
19      Q       Do you know who paid for the
20  flights?
21      A       SKAT.  SKAT, I assume.  I don't
22  know.  Yes, they did.
23      Q       Certainly you did not pay for your
24  own trip to Washington D.C., correct?
25      A       No.
```

Page 92

```
 1      Q       SKAT paid, right?
 2      A       Yes.
 3      Q       Where did you stay?
 4      A       I don't remember the name of the
 5  hotel, but we have a unit in charge of booking
 6  hotels nearby the venue.
 7      Q       What do you recall in terms of the
 8  substance of the meeting with the IRS?
 9      A       So, as a manager, it is always
10  nice to go out and meet other tax authorities.  And
11  I found out that my staff also had very fruitful
12  discussions.
13      Q       At any time do you remember the
14  IRS saying that there was a problem or deficiency
15  with any U.S. pension plan?
16          MR. OXFORD:  Objection to form.
17      A       I don't remember the details, but
18  I remember that my staff had their -- some of their
19  suspicions confirmed, and that we gained a better
20  understanding of the relevant rules.
21  BY MR. DULBERG:
22      Q       Can you identify any information
23  the IRS provided that confirmed a suspicion held by
24  any member of your staff?
25      A       I don't remember.
```

Page 93

```
 1      Q       There were minutes maintained by
 2  SKAT summarizing this meeting, correct?
 3      A       I don't remember.  But usually
 4  that is what we do.
 5      Q       If you can find Exhibit 4024, I
 6  think you will find those minutes.  Do you see
 7  Exhibit 4024?
 8      A       Yes.
 9      Q       Is this an e-mail you received
10  from Bent Bertelsen?
11      A       Yes.
12      Q       You sent it to a group that
13  attended the meeting with the IRS, correct?
14      A       Yes.  Then he has cc-ed his boss.
15      Q       That is Kai Jacobsen?
16      A       Yes.
17      Q       He attached his notes from his
18  meeting with the IRS, correct?
19          MR. OXFORD:  Objection to the form.
20      A       Yes.  Well, I can't really see
21  whether it is his.
22  BY MR. DULBERG:
23      Q       Well, it is notes that he has
24  combined with comments of Lars Andersen and Lars
25  Neilsen based on his e-mail, correct?
```