# Exhibit 73

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
 2          Master docket No. 18-MD-2865(LAK)
                 Case Nos. 18-cv-09505
 3      _____
                                        )
 4      IN RE:                          )
                                        )
 5      CUSTOMS AND TAX ADMINISTRATION OF )
        THE KINGDOM OF DENMARK (SKATTEFOR )
 6      VALTNINGEN) TAX REFUND SCHEME    )
        LITIGATION,                      )
 7                                       )
        _____)
 8

 9

10

11

12

13

14       REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

15                   EXAMINATION OF

16                   RONALD ALTBACH

17              DATE: October 30, 2020

18

19

20

21

22

23

24

25          REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

Ronald Altbach - October 30, 2020

```
1      in shares of foreign companies?
2              MS. RICE:  Objection to form.  You
3          can answer.  Ron, you can answer.
4          A    Yes.
5          Q    When was that?
6          A    I don't recall.  I don't recall
7      when I learned of that strategy.  You asked
8      me about strategy.
9              I don't recall when I learned of
10     that strategy.
11         Q    Okay.  So you had mentioned earlier
12     setting up pension plans.
13              Is there a time that you learned of
14     a strategy involving setting up those pension
15     plans?
16         A    Yes.
17         Q    And when was that?
18         A    I believe it was in June of 2014.
19         Q    And how did you become familiar
20     with that strategy?
21         A    Through a very good friend named
22     John Van Merkensteijn.
23         Q    And can you just describe how he
24     introduced you to it?
25         A    I mean, unfortunately, my memory
```

Ronald Altbach - October 30, 2020

1    isn't perfect.  But I believe he mentioned

2    that that there -- that there might be an

3    opportunity or that his group was -- was

4    working on transactions that involved pension

5    plans and asked if I had any pension plans.

6            And that's how I was introduced to

7    him.

8        Q    You mentioned his group.

9            Were you referring to a specific

10   company or organization?

11       A    No.  John -- John worked with

12   others.  I visited their office several times

13   about other things before that.

14       Q    And who were those individuals you

15   worked with?

16       A    There was a man named Jerome, whose

17   last name I don't remember.  I'm sorry.

18       Q    Could that be Jerome Lhote?

19       A    It could easily be, I just don't

20   remember the last name.

21       Q    Okay.

22       A    There was a man named Rich

23   Markowitz, I believe, and another person

24   called Matt Stein or -- Mike Stein or Matt

25   Stein, I don't remember.  I'm sorry.

Ronald Altbach - October 30, 2020

1          I'm not being difficult.  I'm

2    trying to understand what you're asking me.

3        Q    No, I understand.  So when you

4    discussed setting up pension plans with

5    Mr. Van Merkensteijn, did he say if he would

6    also be setting up pension plans at the same

7    time?

8        A    No, he didn't say that.

9        Q    Did you discuss whether he would be

10   making any money from you setting up pension

11   plans?

12       A    I just want to just -- and the

13   answer to your question is yes, he said he

14   would be making money, but not from me

15   setting up pension plans.  I didn't set up

16   pension plans.

17          I'm hoping you're hearing me.

18       Q    I understand.

19          So -- and the clarification you're

20   saying is that the pension plans were set up

21   on your behalf.

22          Is that accurate?

23       A    That -- I think that's more

24   accurate, yes.

25       Q    If there's a more accurate way,

Ronald Altbach - October 30, 2020

1     point about this letter?

2          Q     Yes.

3          A     The answer is yes.  The answer to

4     that is yes.

5          Q     Okay.  How did you first interact

6     with Kaye Scholer?

7          A     Okay.  Again, you know, I've

8     been -- I'm sorry to do this to you, but

9     Kaye Scholer also represented the leveraged

10    buyout group that I played -- that I was in.

11    So I did a lot with Kaye Scholer in the '90s.

12          So are you talking about did I ever

13    do anything with Kaye Scholer, or are you

14    asking me specifically about these

15    transactions in the pension plans?

16          Q     That's a helpful clarification.

17    Thank you.

18          I'm asking about your first

19    interaction with Kaye Scholer in connection

20    with the pension plans.

21          A     The first interaction was in either

22    June or July of 2014.

23          Q     How did that interaction come to

24    be?

25          A     Why did I?  I'm sorry.  How did --

Ronald Altbach - October 30, 2020

1      Q    Prior to -- what precipitated that

2    contact?

3      A    John Van Merkensteijn introduced

4    me -- either introduced me or told me to call

5    a lawyer at Kaye Scholer who -- for these --

6    for the -- for these -- for these -- for

7    this -- these transactions.

8      Q    What lawyer did he introduce you

9    to?

10     A    As I recall -- sorry.

11          THE WITNESS:  Michelle, did you say

12    something?

13          MS. RICE:  No.

14          THE WITNESS:  It's hard to -- I'm

15    hearing you when you don't speak.

16     A    He introduced me to -- I think the

17    first introduction, John, was to Peter Wells.

18     Q    Did Mr. Wells assist in setting up

19    pension plans for you?

20     A    Again --

21     Q    Actually, let me withdraw that.

22          Did Mr. Wells assist in setting up

23    pension plans that related to you?

24          MS. RICE:  Objection.  You can

25    answer.

Ronald Altbach - October 30, 2020

1        A    I believe the answer to that is

2    yes.

3        Q    Did you ever --

4        A    Actually, I'm sorry, I'm sorry.

5    The answer to that is I don't know about the

6    setting up of the pension plans.

7        Q    Did Mr. Wells assist in any aspect

8    of the strategy relating to the pension

9    plans?

10           MS. RICE:  Objection.  You can

11       answer.

12       A    Mr. Wells -- Mr. Wells instructed

13   me as to the steps to take at every -- at

14   every stage.

15       Q    At every stage of what?

16       A    Of the -- of this -- of the setting

17   up of -- as you said, a setting up of these

18   transactions or my role in the transactions.

19       Q    Did you ever meet with Mr. Wells?

20       A    Yes.

21       Q    Do you recall when?

22       A    Well, I believe it was in the

23   summer of 2015.

24       Q    Do you recall who was at that

25   meeting?

—

Ronald Altbach - October 30, 2020

```
 1        A    I think so.
 2             (Whereupon a discussion was held
 3   off the record.)
 4             MR. MCGOEY:  Let's take a
 5        ten-minute break.
 6             MS. RICE:  We're going to be out
 7        entirely and join back in.  Will that
 8        work, maybe?  Potentially?
 9             THE VIDEOGRAPHER:  Let go off the
10        record real quick.  The time is
11        11:20 a.m. and we're going off the
12        record.
13             (Brief recess taken.)
14             THE VIDEOGRAPHER:  Stand by.  The
15        time is 11:33 a.m. and we're back on
16        record.
17        Q    Mr. Altbach, before we went off the
18   record, we were describing -- you were
19   describing a meeting in the summer of 2015 at
20   Kaye Scholer.  You testified that you
21   remembered who was present at that meeting.
22             Can you tell us who was present?
23        A    Yeah.  As I recall, it was Peter
24   Wells and I, and there may have been a
25   younger person there or another lawyer there,
```

Ronald Altbach - October 30, 2020

Page 60

```
 1      I'm not sure.  But yes.
 2          Q    Do you think potentially one other
 3      attorney?
 4          A    I'm not sure, but I think so.
 5              (Whereupon a discussion was held
 6      off the record.)
 7          Q    Mr. Altbach, did you sign an
 8      engagement letter with -- you, personally,
 9      sign an engagement letter with Kaye Scholer
10      at any point?
11          A    I don't remember doing that.
12          Q    Do you know if you ever personally
13      retained Kaye Scholer?
14              MS. RICE:  Objection.
15          A    I don't remember doing that.
16          Q    Do you know if any LLC that was
17      formed in connection with you ever retained
18      Kaye Scholer?
19              MS. RICE:  Objection.  You can
20          answer.
21          A    I'm sorry.  That, I don't remember.
22          Q    And how about the pension plans
23      that were formed that related to you?  Do you
24      know if they retained Kaye Scholer?
25              MS. RICE:  Objection.  You can
```

Ronald Altbach - October 30, 2020

1            And then I certainly did not pay

2     Kaye Scholer anything after that.  I don't

3     know if I had before.

4            I have no idea.

5      Q    Understood.

6            So it's your testimony that LLCs

7     were established before they had any

8     connection to you?

9      A    I believe so.

10     Q    And the pension plans that related

11    to you, do you know if they paid any fees to

12    Kaye Scholer in 2014 to 2015?

13          MS. RICE:  Objection.  You can

14       answer.

15     A    I don't -- I don't know.

16     Q    Did you have an understanding that

17    Kaye Scholer represented you personally in

18    2014/2015?

19          MS. RICE:  Hold on.  Ron Altbach,

20       individually, as a -- personally?

21          MR. MCGOEY:  Yes.  I said

22       personally.

23          MS. RICE:  Okay.  All right.  You

24       can answer.

25     A    I don't think so.

Ronald Altbach - October 30, 2020

1      Q    Did you have an understanding that
2  Kaye Scholer represented the LLCs that became
3  affiliated with you?
4      A    Again, I don't -- I'm not sure.
5      Q    Did you have an understanding that
6  Kaye Scholer represented the pension plans
7  that were affiliated with you?
8      A    Kaye Scholer, the firm?  I
9  believe -- I believe so, yeah.
10      Q    You believe they represented the
11  pension plans?
12      A    I believe so, yes.
13      Q    At the meeting that you attended in
14  the summer of 2015, that Peter Wells was
15  present for, and potentially one other
16  attorney, do you remember what was discussed?
17      A    As I recall, I signed power of
18  attorney, maybe.  I signed a bunch of
19  signature pages that they gave me.
20      Q    Okay.
21      A    I believe that happened in that
22  meeting.
23      Q    Was there any discussion of why the
24  power of attorney was being signed?
25      A    I don't recall that, no.

Ronald Altbach - October 30, 2020

1      Q     Did you discuss the

2    establishment -- withdrawn.

3            Did you discuss LLCs at that

4    meeting?

5      A     I don't remember that we did.

6      Q     Did you discuss pension plans at

7    that meeting?

8      A     I can only imagine that we did.

9    But I don't recall exact -- the exact subject

10   of the meeting.

11     Q     Do you have any recollection of

12   discussion about any activities your pension

13   plans would be engaged in once they were set

14   up?

15     A     No, I do not.

16     Q     Is there anything else you remember

17   about that meeting?

18           MS. RICE:  Objection.  You can

19       answer.

20     A     I'm not sure.  So the answer is I'm

21   not sure what was discussed at that meeting.

22     Q     Okay.  Do you recall attending any

23   other meetings at Kaye Scholer?

24     A     Can I ask you a question?  You mean

25   about -- about --

Ronald Altbach - October 30, 2020

1      Q    Yes, thank you.  That's a good

2    clarification.

3           Do you recall any other meetings at

4    Kaye Scholer in 2014 to 2015?

5      A    Yes, I do.

6      Q    Okay.  When were those other

7    meetings or meeting?

8      A    I'm an old guy.  You're asking

9    me --

10      Q    To the best of your recollection?

11      A    Can I just help you a little bit

12    here?  Because my wife's in the hospital

13    today and I don't want this to go until

14    10~o'clock tonight.

15           I have -- there were other subjects

16    discussed with Kaye Scholer aside from these

17    pension plans at various points -- other

18    business stuff.  I'm sorry.

19           But you're asking me about --

20    specifically about this pension plans, right?

21    And I don't recall the dates of the meetings.

22      Q    Okay.  You don't remember generally

23    when these meetings occurred?

24           And if there were meetings that did

25    not relate to the pension plans or any

Ronald Altbach - October 30, 2020

Page 66

1    activities that the pension plans engaged in,

2    you know, you don't have to describe those.

3         A    Okay.  Thank you.

4         Q    So you don't generally recall when

5    any other meetings took place?

6         A    No, no, and the -- no, I don't.

7         Q    Okay.  Do you remember what was

8    discussed at any other meetings?

9         A    Again, I can help here a little

10   bit --

11            MS. RICE:  Hold on.  Hold on.

12            These are meetings with lawyers.  You

13            cannot help him here.

14       A    The meetings took places only to

15   sign signature pages on some documents.  I

16   don't remember which documents, and they

17   weren't with the senior lawyer.

18            It was usually with some -- just --

19   it was easy for me to stop by and then easier

20   for me to do that than to go to the post

21   office and mail signature pages.

22       Q    You referenced a senior lawyer.

23            Who was that?

24       A    Peter Wells.

25       Q    Did you deal with an attorney named

Ronald Altbach - October 30, 2020

1    Michael Ben-Jacob at Kaye Scholer at any

2    point?

3        A    Excuse me, but you clarified

4    earlier that you're talking about -- these

5    questions are -- only have to do with the

6    pension plans and these transactions.

7            Right?

8        Q    Yes.

9        A    No, I did not deal with him in

10   person.

11       Q    Okay.  And stepping outside of

12   matters relating to these pension plans, did

13   you deal with Michael Ben-Jacob on other

14   matters?

15       A    Once, a little bit later, yes.

16       Q    And that -- as far as you know,

17   that matter is unrelated to this litigation?

18       A    I do know and it's completely

19   unrelated, yes.

20       Q    Okay.  So is it accurate to say

21   that any meeting you had with Kaye Scholer

22   attorneys in connection with this litigation,

23   there was no discussion on what activities

24   the pension plans would undertake?

25       A    I think that's accurate.  I believe

Ronald Altbach - October 30, 2020

Page 68

1    that's accurate.

2         Q    Okay.  Why don't we look at a

3    document?  So you should have two binders.

4         A    I see them.

5         Q    I promise we won't look at every

6    document in this binder.

7              If you could turn to Exhibit 961,

8    please, in the first binder?

9              MR. MCGOEY:  And Mike, that's Bates

10         number RA 566.

11              (Whereupon the above mentioned was

12         marked for Identification.)

13              MS. RICE:  What exhibit?  I'm

14    sorry, John?

15              MR. MCGOEY:  This is -- I'm sorry,

16         961.

17              MS. RICE:  961.

18         Q    And just let me know when you've

19    had a chance to read that.

20         A    (Witness reviewing.)

21              Okay.

22         Q    So in the e-mail on the bottom of

23    this chain, you send Mr. Van Merkensteijn

24    your address, date of birth, and some other

25    personal info, and tell him that he already

Ronald Altbach - October 30, 2020

1      A    No idea?  No idea?  I may have had

2  a vague idea, so that may not be correct.

3      Q    Okay.  Can you describe that vague

4  idea?

5      A    I can.

6      Q    Please do so.

7      A    The vague idea is that there would

8  be some kind of trading of securities.

9      Q    Okay.  Why don't we turn to

10  Exhibit 965?

11         MR. MCGOEY:  Mike, that's Bates

12         MBJ 5107.

13         (Whereupon the above mentioned was

14         marked for Identification.)

15      A    Okay.

16      Q    You had mentioned signing a power

17  of attorney at Kaye Scholer.

18         Do you recall if this is the

19  document?

20      A    I don't recall that this is the

21  document signed at Kaye Scholer.  But I can

22  read and see that I signed this document, so.

23      Q    Okay.  The notarization is dated

24  July 23, 2014.

25         Is that -- is that the time period

Ronald Altbach - October 30, 2020

1    you think you would have attended a meeting

2    at Kaye Scholer?

3        A    Again, I think I'm not a hundred

4    percent sure, but that seems to be

5    reasonable.  I think it's possible, yes.

6        Q    Okay.  So this power of attorney

7    specifically empowers Michael Ben-Jacob as

8    your agent.

9            Is that correct?

10       A    That's what it is, yes.

11       Q    Okay.  You testified that you did

12    not meet with Mr. Ben-Jacob in connection

13    with this opportunity.

14           Does this refresh your recollection

15    that -- actually, let me withdraw that.

16           Do you know if Mr. Ben-Jacob was

17    involved in this pension plan opportunity at

18    all?

19       A    Do I know whether he was involved

20    in it?

21       Q    Yes.

22       A    Well, I don't know -- I'm not sure

23    how to answer that.  I mean, he -- I signed a

24    power of attorney for him to act on behalf of

25    me.  I guess I signed it.  Interestingly

Ronald Altbach - October 30, 2020

1    answer to that is -- I believe the answer to

2    that is yes.

3         Q    Okay.  And what was that

4    understanding?

5         A    That -- my understanding was that

6    Kaye Scholer would -- would basically handle

7    all -- all details, all documents, all

8    relevant issues on behalf of the plans.

9         Q    Okay.  You mentioned relevant

10   issues.

11             What would those potentially be?

12        A    The setting up of bank accounts.

13        Q    Anything else?

14        A    That was the first relevant issue

15   because they -- that was the first relevant

16   issue.

17        Q    Was that because that was the first

18   thing that needed to happen?

19        A    Yes.

20        Q    What was going to happen after

21   those bank accounts were set up?

22        A    That, I don't actually know.

23        Q    Do you remember anything that was

24   supposed to occur after the bank accounts

25   were set up?

Ronald Altbach - October 30, 2020

1     A    From time to time, documents needed

2    to be signed, and they were prepared by

3    Kaye Scholer.  And I was given signature

4    pages, usually separate from the documents,

5    to sign.

6         Q    Whose idea was it to just provide

7    you signature pages?

8              MS. RICE:  Objection.

9         A    I have no idea.  I don't know.

10        Q    You didn't specifically request

11   that?

12        A    No.

13        Q    Okay.  The first paragraph of this

14   document --

15        A    Uh-huh.

16        Q    -- it states, "Ronald Altbach" --

17   it lists your address -- "intends to, either

18   directly or indirectly, through entities

19   beneficially owned by him or established by

20   him, including one or more limited liability

21   companies and related qualified pension plans

22   through Section 401(k) of the Internal

23   Revenue Code in 1986, enter into agreements

24   to purchase stock."

25              Did you understand that to be part

Ronald Altbach - October 30, 2020

```
1    question?
2         Q    Yes.
3         A    You're correct.
4         Q    Did you become affiliated with this
5    LLC?
6         A    Yes.
7         Q    How so?
8         A    How soon?
9         Q    How so?
10        A    Is that the -- is the second word
11   S-O?  I'm sorry.
12        Q    I'm sorry.  Yes.
13             How so?
14        A    I -- at some point, I became the
15   sole -- no, I'm sorry.  I became a member of
16   the LLC.
17             I shouldn't say "sole" because I
18   don't know that I was.  But I became a member
19   of the LLC.
20        Q    Do you have an understanding of
21   what it means to be a member of an LLC?
22        A    Yes, yes.
23        Q    What is that?
24             MS. RICE:  Objection to the extent
25        you're asking for some sort of a legal
```

Ronald Altbach - October 30, 2020

1          understanding.  You know, in his

2          layperson understanding, he can testify.

3          A    My understanding is -- my

4    understanding is it's just like being a

5    shareholder in a corporation.

6          Q    How did you become a member of this

7    LLC?

8          A    That's an interesting question.  I

9    don't recall.

10          I don't recall the process.

11          Q    Do you recall how you learned that

12    you were a member of this LLC?

13          A    Again, I'm not -- I'm not trying to

14    mock you, but I -- I recall how I became a

15    member, yes.

16          Q    Okay.  Can you describe that?

17          A    I signed -- I signed a document

18    saying that I was a member.  That's how I

19    became a member, I think.

20          Q    Okay.  And that was a document

21    provided by Kaye Scholer?

22          A    I believe so, yes.

23          Q    To your knowledge, did this LLC

24    conduct any business?

25          A    Are you asking before -- what time

Ronald Altbach - October 30, 2020

1    know the timing, if it was after the

2    litigation or before, but it was around that

3    time, I guess, in 2016, '17.

4        Q    Okay.  Yes.

5            In 2014 or 2015, were you aware of

6    your plan's submitting any claims?

7            MS. RICE:  To the Danish taxing

8        authority, correct?

9            MR. MCGOEY:  Yes.

10       A    No, I don't believe so.  I never

11   saw such a claim, as an example.  Never saw

12   it.

13       Q    Let me -- I'm going to ask you to

14   turn to Exhibit 1033?

15           MR. MCGOEY:  Mark this as 1033.

16           (Whereupon the above mentioned was

17       marked for Identification.)

18       A    Okay.

19       Q    So this is one of the claims I was

20   just referring to and just want to confirm.

21           As far as you knew, you did not

22   review this prior to it being submitted to

23   the Danish government?

24       A    I definitely did not.

25       Q    Okay.  If you could flip to the

Ronald Altbach - October 30, 2020

1    next exhibit, and to the first two exhibits

2    in the next binder, and confirm that that's

3    also the case for those two claims?

4            MR. MCGOEY:  So this is Exhibits

5        1034, 1035, and 1036.

6            (Whereupon the above mentioned was

7        marked for Identification.)

8            MS. RICE:  All in the same binder,

9        Ron.

10    Q    They're actually -- so I think the

11    latter two are the start of the next binder.

12    A    Yeah, no, I understand.

13            MS. RICE:  Okay.

14    A    But you're asking about basically

15    the first page of each, which is -- right?

16    Q    Well, just if you -- if you think

17    you reviewed any part of these documents

18    before they were submitted to the Danish

19    government.

20    A    No, I did not.  I definitely did

21    not.

22    Q    Did you become aware, at any point,

23    of the pension plans receiving payments from

24    the Danish government?  And again, I'm asking

25    in 2014 and 2015?

Ronald Altbach - October 30, 2020

1      A    No -- well, no, I didn't -- I did

2  not know that they -- the payments came from

3  the Danish government, no.

4      Q    Okay.  Did you become aware in 2014

5  or '15 of the plans receiving some sort of

6  payment?

7      A    Yes.  In 2015, not 2014.

8      Q    Okay.  And do you remember when in

9  2015 that was?

10      A    I don't remember exactly, but I

11  think -- I think the first -- I think the

12  first such payment was around June of 2015.

13  I believe.

14          I'm not sure that I'm correctly

15  recollecting, but that's what I think

16  happened.

17      Q    Okay.  And how did you learn that?

18      A    Well, money came into my -- into

19  the plan's bank account.

20      Q    Okay.  Were you -- did you receive

21  some notification from the bank or were you

22  checking the balance?

23      A    I was checking the balance.  Like a

24  hawk.

25      Q    Okay.  So speaking of banking

Ronald Altbach - October 30, 2020

1    accounts, did you, at any point, open up bank

2    accounts for the LLCs?

3              MS. RICE:  Objection.

4        Q    You can answer.

5              MS. RICE:  You can answer, yeah.

6        A    So each of the five LLCs opened a

7    bank account, yes.

8        Q    Okay.  When you used -- I

9    noticed --

10             MS. RICE:  Excuse me.

11             MR. MCGOEY:  Bless you.

12       Q    I notice you used the passive voice

13   there.

14             So do you know who opened up those

15   bank accounts?

16       A    Well, the bank account was

17   opened -- the LLC opened the bank account.  I

18   was the manager of the LLCs, and the -- so

19   the answer is, that's the answer.

20       Q    Okay.  Did you direct the opening

21   of those accounts?

22       A    Kaye Scholer directed the opening

23   of those accounts and identified the banker

24   who would open the accounts.

25       Q    Were you aware of their being

Ronald Altbach - October 30, 2020

1    opened at that time?

2        A    Sure, because I -- yes, the answer

3    is yes.  Because they had to be opened with

4    money and I had to put the hundred dollars in

5    each account.

6        Q    Okay.

7        A    On behalf of each of the -- of the

8    LLCs.

9        Q    Is it fair to say that you

10   authorized the opening of those accounts?

11       A    Yeah, I think that would be fair.

12       Q    Okay.  Why don't we -- let's turn

13   to Exhibit 1058.

14            MR. MCGOEY:  Mark this as 1058.

15            THE WITNESS:  1058?

16            MR. MCGOEY:  Yes.

17            MS. RICE:  So the second binder.

18            MR. MCGOEY:  Correct.

19            (Whereupon the above mentioned was

20        marked for Identification.)

21            MR. MCGOEY:  And Mike, that's

22        Bates RA 552.

23       A    Okay.  I got it.

24       Q    So this is an e-mail exchange

25   between you and Mr. Van Merkensteijn from

Ronald Altbach - October 30, 2020

1    the LLC bank accounts on behalf of the LLCs.

2        Q    Did you ultimately -- let me

3    withdraw that.

4            Were bank accounts for the LLCs

5    ultimately opened at Wells Fargo?

6        A    Yes.

7        Q    Were bank accounts for the plans

8    ultimately opened at Wells Fargo?

9        A    Yes.

10       Q    Did you also authorize the opening

11   of those accounts?

12       A    Yes, as trustee.

13       Q    Can you turn to -- actually, I

14   apologize.  This won't happen often, but we

15   have to go back to the first binder briefly.

16       A    Okay.

17       Q    Exhibit 596, which has been

18   previously admitted, previously marked?

19       A    596?

20       Q    Yes.

21       A    Okay.

22       Q    So the bottom e-mail in this chain

23   is from Mr. Van Merkensteijn to Richard

24   Markowitz, Robert Klugman, and it looks like

25   also he cc'd himself.