# Exhibit 87

{14353/A0678785.1}

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

CUSTOMS AND TAX ADMINISTRATION O0F THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION

MASTER DOCKET

18-md-2865 (LAK)

# EXPERT REBUTTAL REPORT OF MARCIA S. WAGNER

# CONFIDENTIAL PURSUANT TO RULE 26(C) PROTECTIVE ORDER

prudence or acceptability of the scheme as a retirement plan asset. Purported offsetting transactions in foreign securities (the precise mechanics of which not even the most sophisticated Plan participant admits to having understood)[5] undertaken at the direction of third parties to obtain dividend refunds primarily for the benefit of those third parties should not, in my opinion, be viewed as an investment strategy, let alone, a proper investment strategy for the types of 401(k) plans at issue in this proceeding. The Solo Capital transaction was qualitatively different from an aggressive nontraditional investment that might have been preferred by a sophisticated one-person plan investor, who would in fact be the person making the investment decision, generally after receiving a detailed private placement memorandum from a legitimate financial institution describing the transaction and its attendant risks and rewards. This is vastly different from the "opportunity" pursued by the Plans in this litigation in light of the number of unresolved legal and economic viability issues raised by Solo Capital's scheme that should have been recognized by the Plan sponsors and addressed by their advisors.

B. The IRS Is Not The Sole Party That Can Determine The Tax-Qualified Status of A Plan

7. The Reish Report is correct that the IRS is the federal agency with the primary authority to determine a retirement plan's tax qualified status. Contrary to the Reish Report's suggestion, it is not true that, without IRS disqualification, a plan with operational defects must be treated as qualified. While it is widely regarded as a best practice for a plan to obtain a favorable determination letter or an opinion letter confirming that the plan in form is a tax-qualified plan, there is no requirement under the Code that approval by the IRS is a necessary condition to establish its tax qualified status. Similarly, a plan can cease to be tax-qualified in the

---

[5] *See, e.g.*, R. Lehman Dep. Tr. at 223:4-17; R. Klugman Dep. Tr. at 103:24 – 104:14; R. Markowitz Dep. Tr. at 175:6-25, 273:17 - 20; J. van Merkensteijn Dep. Tr. at 69:5 – 70:21.

{14353/A0678785.1}            4

absence of an IRS determination to that effect. For example, in the bankruptcy context, a bankruptcy court can determine that a plan is no longer tax-qualified even after the IRS has issued a favorable determination letter because, as the Reish Report acknowledges, as a substantive matter a plan must be qualified in both form and operation.[6] This point was reiterated in the IRS opinion letter issued to Broad Financial, the document preparer of the RJM Capital Plan, which stated: "Our opinion on the acceptability of the form of the plan is not a ruling or determination as to whether an employer's plan qualifies under Code section 401(a) … The terms of the Plan must be followed in operation."[7] Therefore, the fact that the IRS has not formally disqualified a plan does not necessarily mean that it should be treated as tax-qualified. Given that the IRS does not review the vast majority of plans, the contrary view espoused by the Reish Report would permit sponsors and investment providers who successfully avoid plan audits to run amok, despite their disregard of substantive rules.

        C.      <u>IRS Audits Do Not Address All Potential Qualified Plan Violations</u>

8.      Reish's Report indicates his familiarity with what an IRS audit of a qualified plan ordinarily entails. In my opinion, the scope and depth of an audit differs in every situation, but if the full range of the Plans' operational lapses in this case were disclosed to the IRS, along with the circumstances surrounding the Plans' formation and use, the likely result would be Plan disqualification in every instance.

9.      The Reish Report assumes that because an IRS audit of the RJM Capital Plan ("RJM Plan") resulted in a "no change" letter and, in the course of this audit, the IRS reviewed certain documents related to other Plans, neither the RJM Plan nor the other Plans had

---

[6] *See*, *In re Plunk*, 481 F. 3d 302 (5th Cir. 2007); *In re Blais*, 220 B.R. 485 (S.D. Fla. 1997); *In re Willis*, 104 AFTR 2d 2009-5669 (Bkrtcy. Fla. 2009).

[7] WH-MDL-00356531.

{14353/A0678785.1}              5

plans are nevertheless entitled to seek relief under EPCRS, in my opinion, the participants in such plans were not the intended beneficiaries of such relief and this would eliminate any tolerance or forbearance in the conditions for correction under EPCRS that they could expect.[17] Moreover, most errors that occur in the operation of one-person plans that might be eligible for EPCRS relief are not comparable to the multitude of egregious uncorrectable violations in the Plans at issue in this litigation.

     E.     <u>A Prohibited Transaction Violation Does Not Preclude Plan Disqualification</u>

16.     The Reish Report states that if a plan engages in a prohibited transaction, the remedies for the prohibited transaction are separate and apart from plan disqualification. While my Initial Expert Report did not suggest that a prohibited transaction necessarily results in the disqualification of a plan (and Reish does not assert that these remedies preclude disqualification), nevertheless the Reish Report, in my opinion, does not accurately describe the relationship between prohibited transactions and plan disqualification where pervasive violations of qualified plan and other legal requirements occurred in every phase of activity (including, formation, administration, "investment" and termination) relating to the 193 Plans engaging in DWT refund claims.[18] The operational violations were ubiquitous, even though not every Plan violated each and every condition for qualified-plan status cited in my Initial

---

[17] Egregious violations are subject to limited relief under EPCRS. One type of egregious violation is a defined contribution plan in which a contribution is made on behalf of a highly compensated employee that is several times greater than the dollar limit under Code Section 415(c). As discussed in greater detail in the discussion of improper funding, it is likely that type of violation would have been among the numerous Plan sponsor actions that the IRS would consider as a basis for plan disqualification.

[18] In <u>Wingers Department Store</u>, 82 TC 869 (1984), the Tax Court provided a more accurate explanation of this relationship as follows: "Nor do we believe that the excise tax in [Code] Section 4975 [triggered by a prohibited transaction] was intended to preempt the sanction of disqualification under the exclusive benefit rule in the case now before us. We are not here dealing with an isolated prohibited transaction described in Section 4975. Rather, our decision that the petitioner's trust did not operate for the exclusive benefit of employees is based on the totality of the transgressions that occurred and pervaded the entire operation of the Trust. The fact that some of these transactions are described specifically in Section 4975 and subject to an excise tax are merely fortuitous."

{14353/A0678785.1}          10

Expert Report, although some did. This disregard of norms meant that the Plans were never qualified notwithstanding simultaneous application of the prohibited transaction rules and the fact that many of the factors indicating violation of both the qualified plan and prohibited transaction rules overlapped.

F.  Improper Investment Strategy Can Result in Plan Disqualification

17. The Reish Report indicates that broad language in a trust agreement insulates the plan from disqualification based upon the investments that it selects. I disagree and, in my opinion, the Reish Report ascribes too much significance to the buffer provided by investment language in Plan instruments by ignoring the fact that such language cannot override fundamental plan standards, such as the operation of a plan for the exclusive benefit of its participants.[19] As a virtually universal norm in the retirement industry, a version of the exclusive benefit rule is present in all of the Defendant Plan documents I have reviewed[20] and limits the scope of any permissive plan investment language on which the Reish Report may be relying. Moreover, as I have previously pointed out, the Solo Capital transaction was not a real investment, since it did not require monetary contributions from the Plans; it was, therefore, a transaction outside Plan investment provisions.

---

[19] In IRS Revenue Ruling 73-532, 1973-2 C.B. 128, the Service held that a retirement plan trust that provided the trustee with complete power to invest trust funds without regard to whether investments may be new, speculative, hazardous, adventurous, or productive of income is not designed for the exclusive benefit of employees and does not qualify under Code Section 401(a). In Westchester Plastic Surgical Associates, P.C., T.C.M. 1999-369, the Tax Court stated that "there is no question that improper trust administration and investment policies may result in violations of the exclusive benefit rule." In Ada Orthopedic, Inc., T.C.M. 1994-606, the Tax Court held the exclusive benefit rule was violated when a plan invested in a tax shelter that would generate significant losses for a period of years before obtaining capital gains treatment. The Tax Court concluded that the sole purpose of the investment was to provide an additional source of capital to an enterprise controlled by the plan's trustee and family members.

[20] See, e.g., Article XII.B of the RJM Capital Pension Plan Trust which requires a Plan fiduciary, such as a Plan sponsor or investment manager, to "discharge his or her duties with respect to the Plan solely in the interests of the Participants and Beneficiaries and 1. For the exclusive purpose of (a) Providing benefits to Participants and their Beneficiaries; (b) Defraying reasonable expenses of administering the Plan; …" WH_MDL_00356217 – 00356218.

{14353/A0678785.1}                                  11

contribution to the Plans, since the only third-party contributions to a plan that are allowed are restorative payments to correct a breach of fiduciary duty or securities law by the third party making the contribution. No Plan funding by Solo Capital, its affiliates or counterparties in the derivative transactions with the Plans could reasonably be characterized as a restorative payment.[23]

    I.    <u>A Plan's Investment in A Partnership Is Impermissible if It Violates The Exclusive Benefit Requirement</u>

20.    The Reish Report states that it is not impermissible for a plan to invest in a partnership and receive its allocable share of partnership profits. Although accurate in the abstract, this statement is both misleading and irrelevant. First, it obfuscates the question of what portion of the Solo transaction's proceeds was paid to non-Plan parties. As discussed, the Plans were not participating in an investment, let alone a typical investment opportunity, and most of the refund proceeds received by the Plans due to their status under the Treaty were passed on to entities controlled by Sanjay Shah. The sole reason for the Plans' participation in partnerships was to divert the bulk of the proceeds remaining after Solo Capital's and Ganymede's fees to other members of the partnerships. In other words, while the putative earnings consisted solely of tax refunds premised on the Plans' tax-qualified status, most of what was left of these earnings after fees was routed to others. This is not some innocuous misdemeanor involving a "general or vague concept of propriety," as stated in the Reish Report[24] but an attempt to establish and operate a Plan for the benefit of third parties having no relationship to providing retirement income for the benefit of a Plan participant.

---

[23] Treas. Reg. 1.415(c)-1(b)(2)(ii)(C). See also Treas. Reg. 1.415(c)-1(b)(4), providing the Commissioner with discretion to treat certain allocations to participants' accounts as annual additions.

[24] The Reish Report, paragraph 32.

multiple plans[32] in order to participate in its transactions with a specified allocation of the transaction to each Plan, its representations to Plan sponsors that they did not risk their own or their Plan's assets by participating therein and Solo's execution of the transactions without Plan money all indicate that Solo, with the complicity of the Plan sponsors, was using the Plans for a purpose entirely unrelated to retirement benefits.   In determining whether an arrangement of any type is a genuine retirement plan, it is necessary to look holistically at such factors which indicate its true purpose.

27.   In contrast, the Reish Report seeks to silo various rules applicable to tax-qualified plans (one-person plans are permissible, nontraditional investments are permissible, investment by plans in partnerships is permissible) without providing any context for any of those propositions.  For example, the Reish Report does not address the fact that many sponsors of Plans that engaged in the scheme established multiple Plans to do so.  Arguments that this multiple plan structure would have been entirely permissible under the Code, so long as all of the restrictions that would be applicable to an individual plan applied to each of the other plans, would be unavailing, even though technically accurate, since they would lack any context for the

---

[32] *See, e.g.*, the number of Plans maintained by the following list of certain Plan sponsors:

| Defendant | Number of Plans | Citation |
|---|---|---|
| Klugman | 6 (one did not submit reclaims to SKAT) | ELYSIUM-05822425 |
| Lerner | 5 | ELYSIUM-05822425 |
| Doston Bradley | 7 | ELYSIUM-05822425 |
| Monica Bradley | 5 | ELYSIUM-05822425 |
| Joanne Bradley | 7 | ELYSIUM-05822425 |
| Matthew Tucci | 6 | ELYSIUM-05822425 |
| Danielle Tucci | 5 | ELYSIUM-05822425 |
| Hayden Guli | 5 | ELYSIUM-05822425 |
| Lehman | 5 | ELYSIUM-05822425 |
| Altbach | 5 | ELYSIUM-05822425 |
| Richard Markowitz | 6 (also co-participant in another 3 plans) | ELYSIUM-05822425 |
| van Merkensteijn | 6 (also co-participant in another 3 plans) | ELYSIUM-05822425 |
| Gavin Crescenzo | 6 | ELYSIUM-05822425 |

actions taken by the Pension Plans in this case. Similarly, Reish relies on the possibility of correcting Plan mistakes without noting that certain operational errors were not correctable, such as the diversion of Plan assets to a now defunct entity or the failure of a liquidated Plan sponsor to have ever conducted a trade or business that generated income.

28. While each of Reish's conclusions, taken in isolation, have a veneer of truth, the presence of numerous related plan sponsors with duplicative minimally funded retirement Plans claiming ownership of massive amounts of publicly-traded Danish securities also needs to be considered in determining whether the Plans were qualified or just a sham. Similarly, (i) the extraordinary degree of debt in the Solo transactions, (ii) the participants' lack of concern about the financial strength of the counterparties in the complex derivative transactions that, when aggregated, purported to constitute purchases of millions of dollars of Danish stocks or the broker-custodians' ability to settle these transactions, (iii) general indifference to the tax advantages associated with the Plans, (iv) inattention to the merits of the particular stocks in which the Plans purportedly invested, including the potential for market gains or losses, (v) the Plan sponsors' treatment, in many cases, of the Plans as personal savings accounts rather than as separate entities whose assets were subject to significant protective restrictions, (vi) the frequent commencement of transactions before Plan assets were actually transferred to the custodian, (vii) the lack of knowledge, in many cases, whether the Plans continued in existence after they ceased trading, and (viii) with few exceptions, the general disregard of recordkeeping requirements, all must be taken into account in determining whether the Plans were no more than unsatisfactory imitations of arrangements intended to provide retirement benefits.

29. There may be no bright line test as to the circumstances under which a tax-qualified plan would be treated as a sham, and there could conceivably be close cases. However,

in my opinion, the present litigation does not present a close case, and the Plans should be treated as arrangements calculated to rapidly obtain a high return with no effort or risk other than a small outlay for LLC and Plan documentation with most of the return going to the scheme's promoter. This was unrelated to the only legitimate purpose of a retirement plan which is the gradual accumulation of benefits to support plan participants in retirement. Because of their widespread departures from standards embraced by the retirement plan industry, the Plans in this case simply were not what they purported to be.

* * * * * * *

This Rebuttal is executed this first day of February 2022 at Boston, Massachusetts.

*[signature]*

Marcia S. Wagner