# Exhibit 49, Part 3 of 4



North Channel Bank
Privatbank seit 1924

North Channel Bank GmbH & Co. KG · Einheit: 1 · Turm B · 55118 Mainz

Margaux Ventures Pension Plan
99 John Street Apt. 1710
New York, NY, 10038
USA

**Dividend credit**
for non-resident tax payer status

| Par value no. | Security description | ISIN | (WKN) |
|---|---|---|---|
| Share 1,025,500 | COLOPLAST AB | | |
| | NAVNE-AKTIER B DK 1 | | |

| | | | | |
|---|---|---|---|---|
| Payment date | 11.05.2015 | Dividend per unit | 4.50 | DKK |
| Holdings as at | 06.05.2015 | Country of origin | | Denmark |
| Ex-date | 07.05.2015 | Type of dividend | | interim dividend |
| Financial year | 01.10.2014 - 30.09.2015 | | | |
| Exchange rate | EUR / DKK  7,4880 | | | |

| Dividend income | 4,614,750.00   DKK | 616,286.06+ EUR |
|---|---|---|
| Conversion in EUR | | 616,286.06   EUR |
| Overseas tax deducted at source 27 % on 4,614,750.00 DKK | | 166,397.24-  EUR |
| Dividend subject to withholding tax | | 616,286.06   EUR |

| Actual payment | | 449,888.82+ EUR |
|---|---|---|

We will credit the amount with value date 13.05.2015 to the account no.

Not a tax certificate.

This is valid without invoice.
For reverse side please attention to the back side.

| North Channel Bank GmbH & Co. KG | Amtsgericht: Mainz | Persönlich haftende Gesellschafterin: | Geschäftsführer: |
|---|---|---|---|
| Einheit 1 | HRA 41054 | North Channel GmbH | T2 |
| Bonifaziusturm B | | Amtsgericht Mainz | |
| 55118 Mainz | | HRB 43622 | |
| Telefon: +49 6131 6663-0 | | | |
| Fax:       +49 6131 6663-200 | | www.northchannelbank.de | |

[fine print legal text block]

Det håndskrevne beløb er efter det oplyste påført af V6.

North Channel Bank udstedte samme dato en Debit Advice til Claghan Capital Limited.

**790**

Den 11. maj 2015 indgik Claghan Capital Limited og Sherwood Enterprises Limited en aftale om, at Sherwood Enterprises Limited

på afviklingsdatoen (ligeledes den 11. maj 2015) udlåner aktierne med udbytte til Claghan Capital Limited mod kontant sikkerhedsstillelse. Da aktierne leveres uden udbytte, foretager Sherwood Enterprises Limited en kompensationsbetaling til Claghan Capital Limited. Afviklingen af aktieudlånet er dokumenteret ved en ordre fra Sherwood Enterprises Limited om overførsel af aktierne til Claghan Capital Limited.

Ligeledes den 11. maj 2015 indgik Margaux Ventures Pension Plan og Sherwood Enterprises Limited en aftale om, at Margaux Ventures Pension Plan udlåner de pågældende aktier med udbytte til Sherwood Enterprises Limited mod kontant sikkerhedsstillelse. Da aktierne leveres uden udbytte, foretager Margaux Ventures Pension Plan en kompensationsbetaling til Sherwood Enterprises Limited. Afviklingen af aktieudlånet er dokumenteret ved en ordre fra Margaux Ventures Pension Plan om overførsel af aktierne til Sherwood Enterprises Limited.

Den 13. august 2015 var forward settlement date i det konkrete eksempel. På denne dato modtog Claghan Capital Limited i henhold til forward-aftalen aktierne fra Sherwood Enterprises Limited og tilbageleverede aktierne til Sherwood Enterprises Limited i henhold til aktielånet. Samme dag fik Margaux Ventures Pension Plan tilbageleveret aktierne fra Sherwood Enterprises Limited i henhold til aktielånet og leverede aktierne til Sherwood Enterprises Limited i henhold til forwardaftalen.

Den 26. maj 2015 sendte reclaim-agenten Goal TaxBack Ltd. følgende skrivelse til SKAT:



goal

FORTROLIGT

SKAT
Postboks 60
2630 Taastrup
DANMARK

Vores ref.:
Skatteref.:

26. maj 2015

Vedr. A/C Margaux Ventures Pension plan MAR01

Vedhæftet hermed en blanket til ansøgning om refusion af skat samt dokumentation for betaling og skattefradrag betalt på ovennævnte kundes værdipapirer.

Sørg venligst for, at refusionsbetalingen krediteres Goal TaxBack Limiteds konto med nedenstående oplysninger:

NatWest Bank
High Street Branch Croydon Surrey

Angiv venligst reference

Bekræft venligst modtagelse af denne refusionsansøgning ved at sende en e-mail til GTB@goalgroup.com eller ved at underskrive vedlagte kopi af dette brev og sende det tilbage til den adresse, der er vist nedenfor.

Med venlig hilsen

[Underskrevet]

[Udtydelig brevtold]

Den vedlagte ansøgningsblanket 06.003 ENG var udfyldt således:



Vedlagt var et certifikat fra de amerikanske skattemyndigheder dateret den 13. april 2015, som i dansk oversættelse lyder således:



**791**

Endvidere var der vedlagt følgende fuldmagt til Goal TaxBack Ltd.'s skrivelse til SKAT, som i dansk oversættelse lyder således:

»*Margaux Ventures Pension Plan 99 John Street Apt 1710 New York, NY 10038*

*Fuldmagt*

DENNE FULDMAGT, som er udfærdiget denne 25. dag i april 2014 af Margaux Ventures Pension Plan (»Selskabet«), BEVIDNER SOM FØLGER:

1. Selskabet udpeger hermed Goal TaxBack, (»GTB«) som Selskabets befuldmægtigede og til i Selskabets navn og på anden vis på Selskabets vegne og som Selskabets ret og gerning at underskrive, forsegle, udføre, levere, fuldende og udfærdige alle dokumenter, instrumenter, handlinger og ting, som kan være påkrævet (eller som GTB anser for nødvendige) for eller i forbindelse med leveringen af skatteydelser til Selskabet til enhver tid, herunder ansøgning om refusion fra enhver skattemyndighed i enhver jurisdiktion (alt efter omstændighederne) beløb med hensyn til betalinger foretaget til Selskabet eller gennem GTB på vegne af Selskabet. Selskabet bemyndiger også GTB til at fastsætte proceduren for inddrivelse af de krævede beløb.

2. Selskabet ratificerer og bekræfter alle transaktioner indgået, dokumenter udført og ting foretaget af GTB eller dets delegerede i kraft af fuldmagten givet i punkt 1 i dette dokument, medmindre det er bevist, at GTB eller dets delegerede har handlet uagtsomt, med forsætlig misligholdelse eller svig.

3. Selskabet accepterer at holde GTB skadesløs for alle omkostninger, forpligtelser og udgifter, herunder (uden begrænsning) alle rimelige advokatsalærer og udbetalinger, som direkte eller indirekte opstår som følge af udøvelse eller påstået udøvelse af GTB's beføjelser i henhold til dette dokument, DOG SÅLEDES AT GTB ikke holdes skadesløs for sådanne forpligtelser, omkostninger og udgifter, som opstår som følge af GTB's eller enhver udpeget persons eller agents eller delegerets egen forsætlige misligholdelse, uagtsomhed eller svig.

4. Selskabet erklærer, at enhver person, der handler med GTB, ikke skal være bekymret for at se eller forespørge om ejendomsretten eller hensigtsmæssigheden af nogen handling, noget dokument, noget forhold eller nogen ting, som GTS måtte gøre eller udføre i Selskabets navn i kraft af dette dokument.

5. Dette dokument kan ophæves ved Selskabets ensidige handling, forudsat at GTB gives mindst fem arbejdsdages varsel om en sådan ophævelse. Bestemmelserne i punkt 2 og 3 fortsætter efter ophør af dette dokument.

6. Dette dokument er underlagt og fortolkes i overensstemmelse med engelsk ret, og Selskabet underkaster sig hermed uigenkaldeligt de engelske domstoles ikke-eksklusive jurisdiktion.

…

TIL BEKRÆFTELSE heraf er dette dokument udført af Selskabet og påtænkes at blive leveret og leveres hermed på ovennævnte dato.

*Udførelse af et dokument af et selskab stiftet uden for Storbritannien.*

*Dokumentet udført af -*

*Selskabets navn: Margaux Ventures Pension Plan*

*Ved: Y*

*Behørigt bemyndiget*

*tegningsberettiget/bemyndigede*

*tegningsberettigede:*

»

Det er oplyst, at Y har underskrevet fuldmagter for samtlige 27 pensionsplaner, som er omfattet af denne sag.

Der er fremlagt andre eksempler på certifikater fra de amerikanske skattemyndigheder, som bærer vandmærket »void« (ugyldig). I den forbindelse har de amerikanske myndigheder i mail af 27. januar 2022 til O fra SKAT oplyst følgende:

»It is our understanding that form 6166 is issued on a special paper which protects it against inter alia being copied by changing the watermark to »void«. Sending form 6166 without the void-watermark would thus have required - we understand - the pension plans to apply for several forms.

Your understanding of the watermark of Form 6166 and its intended purpose to prevent copying is correct.«

*Forholdene i SKAT*

I Problemkatalog - Udbytteskatten af 7. november 2006 peges på en række udfordringer i udbytteskatteadministrationen. Blandt andet beskrives det, at anvendelsen af internettet og nominee-depoter - dvs. depoter, hvor de deponerede aktier ejes af andre end den registrerede depotindehaver - gør det sværere at kontrollere handlen med værdipapirer mv.

Den 10. maj 2010 afgav Intern Revision i SKAT (SIR) en revisionsrapport benævnt »Undersøgelse af Provenuet fra kildebeskatningen af udlændinge - udbytteskat«. Formålet med rapporten var at undersøge den problemstilling, at det ikke kunne udelukkes, at der blev refunderet for megen kildeskat via den såkaldte refusionsordning. I rapporten fremkom Intern Revision med en anbefaling om, at der etableres et overordnet ansvar for hele processen til håndtering af udbyttebeskatningen, at der etableres et kontrolmiljø, som sikrer overensstemmelse mellem angivelse og indberetning, og at der foretages en fornyet vurdering af en tidligere etableret arbejdsgruppes problemkatalog for udbytteskat.

Den 30. maj 2013 afgav Intern Revision en rapport benævnt »Revision af udbytte- og royaltyskat for 2012«.

**792**

Formålet med revisionen var at vurdere, om SKAT havde tilrettelagt regnskabsfunktionen på en tilfredsstillende måde, herunder etableret forretningsgange og interne kontroller, der medvirker til at sikre en korrekt regnskabsaflæggelse, og om de initiativer, som SKAT havde iværksat som følge af Intern Revisions rapport fra 2010, var tilstrækkelige og dækkende. I rapporten konkluderes det, at det på baggrund af den gennemførte revision er Intern Revisions samlede vurdering, at forvaltningen af udbytte- og royaltyområdet havde fungeret ikke helt tilfredsstillende. Det fremgår blandt andet videre, at der er behov for, at SKAT sikrer sig bedre mod uretmæssig refusion af udbytteskat, hvilket er angivet med vigtigheden 2 på en skala fra 1-3, hvor 1 er det vigtigste. Det fremgår endelig, at der er behov for, at der i forretningsgangene for udbetaling af refusion af udbytteskat beskrives, hvad der skal kontrolleres/påses, forinden anmodning imødekommes, hvilket er angivet med vigtigheden 3.

Den 16. juni 2015 modtog underdirektør V13 en henvendelse fra en dansk skatteadvokat. Af mailen fremgik følgende:

»Kære V13

Under henvisning til vores telefonsamtale for lidt siden skal jeg hermed pr. mail orientere SKAT om en formodet svindel ved udbetaling af indeholdt udbytteskatter i størrelsesorden op til 500.000.000 kr. Svindlen foregår angiveligt gennem udnyttelse af DBO mellem Danmark og Malaysia, gennem skuffeselskaber registreret som hjemmehørende på en ø ved navn Labuan. Et større antal selskaber (18?) har under foregivende af, at eje aktier i danske børsnoterede aktier, gennem ialt 4 udenlandske selskaber der er specialiserede i at tilbagesøge indeholdte udbytteskatter, formået SKAT til at udbetale skatterne. Svindlen består angiveligt i at der er tale »lånte« aktier som cirkulerer rundt mellem at antal selskaber,

der alle er kontrolleret af en eller måske ialt tre engelske statsborgere, men som vist alle bor i Dubai. Hovedpersonen er angiveligt en mr. B som ejer Solo Capital concernen, som har selskaber i Uk og Dubai.

De fire reclaim selskaber der indsender blanketter til SKAT - og som derfor må figurere på listen over dem, der anmoder om udbetaling af udbytteskatter er ifølge det oplyste: Goal Taxback Ltd, Tim Partners, acupay's, SEB Futures og SynTax GIS.

Jeg har modtaget kontoudskrifter fra min klient - som af frygt for repressalier - ønsker at være anonym, som viser et lille udpluk af transaktioner fra ultimo 2014 primo 2015, hvor flere af de navne jeg anfører ovenfor fremgår, med angivelse af beløb mv, og som både vedrører Danmark og Belgien.

Jeg vil sende disse i morgen, når jeg returnerer fra London - jeg anmoder dog om at jeg ligeledes kan betragtes som anonym anmelder, indtil der måtte være klarhed over sagen.«

V13 videresendte samme dag mailen til blandt andre V3 og Ø.

Den 17. juni 2015 sendte samme advokat en mail til V13 med følgende indhold:

»Kære V13

Tak for din mail og som lovet fremsender jeg kontoudtog for perioden 16. december 2014 - 15. januar 2015 i såvel DKK som i Euro. Udover at det fremgår at B modtager 7,8 mio Euro, fremgår det at de fire nævnte reclaimagenter har modtaget betalinger - Goal Trueback LIM, Syntrue GIS Ltd, The TIM Partnere og ACUPAY. Jeg kan yderligere oplyse at B's to partnere er og - som oprindeligt er uddannede som revisorer med speciale i skat (hos KPMG og/eller E & Y) ejer angiveligt sammen et firma ved navn Agrius Management Ltd - som ifgl det oplyste har stået for stiftelsen af en lang række af de selskaber der har sået som »købere« at børsnoterede aktier, som der efterfølgende er ansøgt om betaling af indeholdte udbytteskatter, selv om de ikke var ejere af aktierne.

Angiveligt ejer B sammen med andre følgende firmaer som formentlig er med i cirkuleringen af aktier: Bl. a Solo Capital Dubai ltd og Solo V.S. Pension (fund), samt Ganymede, Caymann Ltd, Leda Caymann ltd, Matis Caymann Ltd, Athena Equity Trading, Pallas Equity Trading og Pandia Equity Trading.

Jeg håber disse oplysninger kan være med til at få lidt mere overblik over denne meget specielle sag. - Du er velkommen til at kontakte mig telefonisk for at gennemgå de oplysninger jeg har fremsendt, idet jeg kan oplyse at jeg har en af mig håndskreven liste over de selskaber der angiveligt har optrådt som fiktive ejere af aktierne, som de 4 - 5 reclaimagenter har indsendt begæringerne om udbetaling af indeholdte ubbytteskatter.

Jeg er på vej til et heldagsmøde og har derfor først tid i morgen, men du er velkomme til at kontakte mig telefonisk i løbet af i dag, således at vi kan aftale det videre forløb.«

Den 18. juni 2015 sendte samme advokat en mail med følgende indhold til V13 :

»Kære V13

I fortsættelse af min mail forleden fremsender jeg hermed en fortegnelse over de udenlandske selskaber, som angiveligt har stået som den formelle ejer af de aktier som Reclaim agenterne har repræsenteret i forbindelse med deres anmodning om udbetaling af indeholdte udbytteskatter.

Jeg har skrevet listen af i hånden efter en af min klient håndskreven liste, hvorfor jeg ikke ved om navne mv er korrekte, eller stavet korrekt:

…

Jeg er i besiddelse af lidt yderligere oplysninger om de angivelige »sælgere« af aktier til de ovennævnte 25 selskaber, men min klient har bedt mig om at vente med

**793**

at oplyse disse, da han som tidligere anført frygter for, at der vil kunne afsløres hvem der muligvis står bag anmeldelsen.

Jeg har selvfølgelig forståelse for, at der påhviler SKAT en streng fortrolighed om sagens videre forløb, men af hensyn til min klient og hans personlige sikkerhed, så jeg meget gerne om jeg kunne få et »hint« om, at man har taget anmeldelsen alvorligt og videresendt den til SØIK, således at han kan gøre sig klar til at beskytte sig selv bedst muligt.«

Det fremgår af sagen, at SKAT den 27. juli 2015 modtog en telefonisk henvendelse fra HM Revenue & Customs, der orienterede om fremsendelsen af oplysninger vedrørende formodet svindel med udbytteskat mod den danske stat. SKAT (Særlig Kontrol) modtog henvendelsen skriftligt den 30. juli 2015. Den 6. august 2015 modtog SKAT en mail fra de engelske myndigheder med oplysninger om 184 navngivne selskaber, som angiveligt kunne være benyttet til at tilbagesøge udbytteskat.

Den 6. august 2015 blev der afholdt et møde i SKAT om sagen, og samme dag blev der indført øjeblikkeligt stop for tilbagebetaling.

Den 24. august 2015 indgav SKAT en anmeldelse til SØIK om formodet svindel mod den danske stat omfattet af straffelovens § 279 ved uberettiget tilbagesøgning af indeholdt udbytteskat for perioden 2012 til 2015 for ikke mindre end 6,2 mia. kr.

Den 24. september 2015 afgav Intern Revision en rapport om SKAT's administration af udbytteskat og refusion af udbytteskat. Det fremgår heraf blandt andet, at der har været en væsentlig stigning i refusionsprocenten fra 11,6 pct. i 2012 til 47,2 pct. juni 2015. Ligeledes fremgår det, at gennemsnitsbeløbet pr. refusionsanmodning er øget fra 47.197 kr. i 2013 til 250.466 kr. i juni 2015. Stigningstakten i det gennemsnitlige refusionsbeløb var for blanketordningen væsentligt større end for bankordningen i perioden 2012 til 2015, mens ordningerne var på niveau i perioden fra 2010 til 2012. Det konkluderes i rapporten blandt andet, godkendelseskontrollen i begrænset omfang har omfattet en efterprøvning af, hvorvidt de modtagne refusionsanmodninger kan henføres til et aktionærforhold, samt om refusionsanmodningen kan henføres til en forudgående indeholdelse af udbytteskat. Det konstateres endvidere, at opfølgningen på regnskabsdata i forbindelse med den løbende regnskabsgodkendelse har været mangelfuld. Det fremgår endvidere, at der ikke i SKAT har været placeret et overordnet ansvar for hele processen vedrørende udbytteskat, og at SKAT endnu ikke har implementeret tidligere anbefalinger om etablering af et overordnet ansvar, sikring mod uretmæssig refusion af udbytteskat samt afstemning mellem angivelse og indberetning.

Den 16. november 2015 indgav SKAT en anmeldelse til SØIK om formodet svindel med refusion af udbytteskat for yderligere 2,9 mia. kr.

Borger- og retssikkerhedschefen i SKAT fremkom i februar 2016 med en faktuel redegørelse om administrationen af udbytterefusion i perioden 2010-2015. Redegørelsen blev udarbejdet som led i en intern undersøgelse af SKAT's administration af udbytteområdet, som blev iværksat efter Intern Revisions rapport af 24. september 2015. Redegørelsen omfatter blandt andet den organisatoriske placering af opgaven, ledelsesmæssige beslutninger om opfølgning på rapporterne fra 2010 og 2013 fra Intern Revision, interne retningslinjer og processer for administration at området samt eventuelle advarsler internt fra organisationen om problemet med administration af området.

Rigsrevisionen afgav i februar 2016 en beretning til Statsrevisorerne om SKAT's forvaltning af og Skatteministeriets tilsyn med refusion af udbytteskat. Det fremgår heraf blandt andet, at Rigsrevisionen samlet vurderer, at SKAT's forvaltning af og Skatteministeriets tilsyn med refusion af udbytteskat har været meget kritisabelt, at SKAT har ført en helt utilstrækkelig kontrol med udbetalingerne af refusion af udbytteskat, og at Skatteministeriets tilsyn med området har været særdeles mangelfuldt. Det fremgår videre, at SKAT i hvert fald siden 2010 har været vidende om, at der var problemer med refusion af udbytteskat, men at SKAT først blev opmærksom på den formodede svindel, da SKAT modtog oplysninger herom udefra. Det fremgår endelig, at Rigsrevisionen må konstatere, at Skatteministeriets tilsyn har været fragmenteret og reaktivt, idet Skatteministeriet ikke har sammenholdt de oplysninger, som ministeriet fik som led i sit almindelige tilsyn, med de øvrige indikationer på problemer med refusion af udbytteskat, som ministeriet løbende modtog gennem årene. Havde Skatteministeriet ført et mere proaktivt tilsyn, herunder sammenholdt de oplysninger, som ministeriet fik på forskellig vis, ville det klart have peget på behovet for en nærmere undersøgelse af området.

Som svar på Rigsrevisionens beretning fra februar 2016 anførte skatteministeren i ministerredegørelse af 4. maj 2016 til Statsrevisorernes beretning nummer 11/2015 om SKAT's forvaltning af og Skatteministeriets tilsyn med refusion af udbytteskat blandt andet, at han var enig i, at sagsbehandlingsprocessen omkring refusion af udbytteskat ikke havde været tilrettelagt forsvarligt.

Den 24. august 2016 indgav SKAT anmeldelse til SØIK for svindel med tilbagesøgning af udbytteskat for yderligere 3,2 mia. kr. Der fremgår følgende af anmeldelsen:

»…

*Yderligere anmeldelse om svindel med tilbagesøgning af Udbytteskat for kr. 3,2 mia.*

**794**

SKAT har i perioden 24. august - 13. november 2015 indgivet anmeldelse om formodet svindel med tilbagesøgning af indeholdt udbytteskat for perioden 2012 - 2015 på kr. 9,1 milliarder.

SKAT har tidligere anmeldt følgende udenlandske selskaber/Custodians.

- SOLO CAPITAL PARTNERS LLP
- OLD PARK LANE CAPITAL PLC
- TELESTO
- WEST POINT

Selskaberne har benyttet følgende professionelle virksomheder - såkaldte reclaimagenter til at tilbagesøge udbytteskatten gennem.

- SYNTAX GIS LTD
- ACUPAY
- GOAL TAXBACK

SKAT har efterfølgende gennemgået alle udbetalinger til ovenstående agentvirksomheder og har på det foreliggende grundlag fremfundet yderligere 81 selskaber/pensionsplaner hjemmehørende i bl.a. USA, der kan have tilknytning til eller der er formodning om har benyttet samme eller lignende metoder, som selskaberne i de foregående anmeldelser.

Af beløbet på kr. 3,2 milliarder, kan kr. 2,0 milliarder henføres til ovenstående 3 agentvirksomheder.

Ved gennemgangen, er det endvidere konstateret, at flere af anmodningerne fra … og North Channel Bank kommer fra reclaimagenten …. De resterende kr. 1,2 milliarder kan derfor henføres til denne agent.

Af materialet fremgår det, at der fortrinsvis er tale om Amerikanske pensionsplaner og enkelte Canadiske Pensionsplaner, der har benyttet sig af følgende custodians/brokervirksomheder:

1. …
2. …
3. …
4. …
5. NORTH CHANNEL BANK GMBH & CO. KG
   Erthalstrasse 1

Bonifaziusturm B
55118 Mainz

Agentvirksomheden

6.    …

Bemærkninger til ovenstående:

Ad 1 og 2)

SKAT har fra … modtaget oplysninger om meget store handler med danske aktier foretaget tæt på udbyttedagen af … og … Oplysninger er tillige tidligere fremsendt til SØIK.

Af oplysningerne fremgår, at alle handler »går i nul«, idet der er foretaget lige store køb og salg af den enkelte aktie, hvilket på papiret gør broker/custodianvirksomhedeme i stand til at udfærdige meget store ansøgninger om refusion af indeholdt udbytteskat.

SKAT har i forbindelse med sagsbehandlingen af modtagne men ikke udbetalte ansøgninger forespurgt om yderligere dokumentation i sager hvor … er benyttet som custodian. SKAT har ikke modtaget yderligere materiale til sagen.

Vedrørende … skal blot bemærkes, at der er en vis lighed mellem … og … udforming af deres Credit Advice (CDA).

Ad 3)

… er en custodian/broker virksomhed beliggende … har blot foretaget tilbagesøgninger for 2 amerikanske pensionsplaner og 1 engelsk pensionsplan. Der er dog tale om tilbagesøgninger for mere end 300 mio. kroner, svarende til et udbytte på kr. 1,6 mia..

SKAT har i forbindelse med sagsbehandlingen af modtagne men ikke udbetalte ansøgninger forespurgt om yderligere dokumentation. SKAT har bl.a. forespurgt om originale CDA'er, Købs- og Salgsbilag og bankkontoudskrifter.

CDA'erne indeholder bl.a. forkerte ISIN numre på aktierne. Der er ikke modtaget dokumentation for pengestrømmene etc.

Det af … anførte telefonnummer kan ved opslag henføres til en bank …

Trustee i den engelske pensionsplan er … resident i … … har dog også adresse i … Ved googlesøgning på … er det konstateret, at denne har været tilknyttet …

SKAT har endvidere forespurgt de Amerikanske Skattemyndigheder (IRS) om den skattemæssige status på de 2 amerikanske pensionsplaner. IRS har oplyst, at der er tale om planer fra 2012 og 2013 med aktiver under $ 250.000. Den modtagne udbytterefusion kan derfor ikke være tilgået pensionsplanerne.

Ad 4)

… udfærdiger Tax Voucher for en stor del af de Amerikanske og Canadiske pensionsplaner. Dokumenterne ligner til forskel fra North Channel Bank ikke en »rigtig« depotoversigt, men en bekræftelse på at pensionsplanen har modtaget udbyttet.

Til forskel fra alle andre nævnte custodians/brokervirksomheder er … registreret med depoter af danske aktier i VP Securities.

SKAT har i forbindelse med sagsbehandlingen af modtagne men ikke udbetalte ansøgninger forespurgt om yderligere dokumentation. SKAT har bl.a. forespurgt om originale CDA'er, Købs- og Salgsbilag og bankkontoudskrifter. SKAT har ikke modtaget tilstrækkelig dokumentation for forholdende og ingen pengestrømme er til dato dokumenteret.

Der er også her tale om forholdsvis nye pensionsplaner med begrænsede midler, der foretager investeringer i milliardklassen.

Ad 5)

Der er tale om en tysk Broker/bank, der har ageret som mellemled mellem de amerikanske pensionsplaner

**795**

og reclaimagenterne. Udformningen af dokumentationen ser meget anderledes ud end de øvrige broker/custodianvirksomheder, idet

der her tale om en »rigtigt« udseende depotoversigt/udbyttemedelelse.

North Channel Bank (NCB) har udfærdiget mange CDA og der har været tilbagesøgt gennem alle reclaimagenter med hovedvægten lagt på … og …

SKAT har dog ikke på baggrund af oplysninger modtaget fra VP Securities om udenlandske ejerandele (depot) af danske aktier, kunnet finde NCB anført med depoter af danske aktier.

SKAT har i forbindelse med sagsbehandlingen af modtagne men ikke udbetalte ansøgninger forespurgt om yderligere dokumentation for pengestrømme, men har heller ikke her modtaget den ønskede dokumentation.

SKAT fra IRS modtaget informationer om hovedparten af de i anmeldelsen nævnte pensionsplaner. Informationerne indeholder oplysninger om stiftelsestidspunkt, adresse, selvangivelsesstatus. Enkelte pensionsplaner er der tillige modtaget kopi af indsendt selvangivelse, oplysninger om trustee eller andet.

Eksempel:

… pension Plan … stiftet feb. 2014. … er anvendt som agent. NCB som custodian.

April 2015 indsendes 8 ansøgninger om tilbagesøgning af indeholdt udbytteskat på kr. 37 mio. og et brutto udbytte på kr. 138 mio.

NCB har oplyst, at de har krediteret Pensionsplanens konto i NCB for det modtagne udbytte. Der er søgt tilbage på 8 forskellige aktier. Hovedparten af udbyttet kommer fra en investering i Novo Nordisk på omkring kr. 3 mia.,12 måneder efter pensionsplanens stiftelse. Investeringen og Cashflowet skulle ifølge ovenstående være foregået over pensionsplanens konto i NCB.

Ifølge IRS er der umiddelbart tale om en pensionsplan med aktiver under $ 250.000.

Ad 6)

… er en forholdsvis nystiftet virksomhed. (stiftet nov. 2014). Det bemærkelsesværdige ved … er, at de fra 20 april 2015 til 23 juli 2015 indsender anmodninger om refusion for i alt kr. 1,2 mia.

… anmoder om refusion på baggrund af CDA udarbejdet af … og NCB.

Også her er mønstret nystiftede pensionsplaner med meget store investeringer og tilbagesøgninger, hvilket ikke stemmer overens med de modtagne oplysninger fra IRS.

Afslutningsvist skal det bemærkes at de er det samme personsgalleri, der går igen som trustee i mange af planerne.

Bilagsmateriale og dokumentation for de i anmeldelse anførte iagttagelser, vil blive fremsendt løbende til SØIK.

…«

I foråret 2016 fremsendte SKAT flere bistandmodninger til de tyske skattemyndigheder til brug for SKAT's undersøgelse af den formodede svindel.

Den 10. oktober 2016 sendte SKAT's kontaktperson hos Finanzamt für Steuerstrafsachen en mail til O, som varetog SKAT's kontakt med de tyske myndigheder om sagen. Af mailen fremgår følgende:

»Kære hr. O

…

Der foreligger for vores kontor oplysninger om Cum-Ex-transaktioner, som er gennemført via en tysk bank som depotbank.

Der er handlet med følgende danske aktier over udbytteregistreringsdagen:

Aktievolumen
A.P. Møller-Mærsk A-S (B) 250.600
Danske Bank A/S 51.100.000
Tryg A-S 4.279.500
DSV A-S 200

TDC A-S 117.200.000

Pandora A-S 11.082.000 Coloplast A-S (B) 19.890.000

Novo Nordisk A-S (B) 304.700.000 (i hvert enkelt tilfælde halvdelen køb og halvdelen salg)

Der foreligger også erklæringer fra advokatkontorerne Bech-Bruun, København, London og Jones Day, der har bekræftet, at den tyske bank har forholdt sig legalt.

Der er udelukkende tale om transaktioner, der har fundet sted i 2014. Man må imidlertid gå ud fra, at der også i 2015 er gennemført tilsvarende transaktioner.

Det er amerikanske pensionsfonde [US Pension Plans], der har anmodet om refusion af den danske udbytteskat.

Navnene på de pågældende pensionsfonde og yderligere materiale foreligger på vores kontor og kan videregives, såfremt det har interesse.«

Den 23. maj 2018 blev V6 idømt fængsel i 5 år for bedrageri af særlig grov beskaffenhed ved i 2007 i forening med en medtiltalt i 14 tilfælde retsstridigt at have tilbagesøgt ca. 37 mio. kr. i indeholdt udbytteskat ved at gøre brug af urigtige oplysninger.

Den 29. maj 2018 anmodede SKAT's tyske advokat det tyske finanstilsyn BaFin om aktindsigt i sagsakterne vedrørende den eksterne revision af North Channel Bank, subsidiært i den af KPMG udarbejde rapport af 29. juli 2016. Den 27. juni 2018 fremsendte BaFin KPMG-rapporten til SKAT's tyske advokat. Jones Days og Bech-Bruuns legal opinions var medtaget som bilag hertil.

Der er under sagen dokumenteret uddrag af forklaringer afgivet af V17, V4, V3, V18, V19, V20, V21, V1, V22, V7, V8, V9, V10, V11, V12, Ø, V13, V14, V15 og V16 for Undersøgelseskommissionen vedrørende SKAT som gengivet i delberetning om forholdene vedrørende SKAT's udbetaling af refusion af udbytteskat 2021.

**796**

*Tabsopgørelse og forlig*

Den 2. april 2020 fremsendte Skatteforvaltningen et påkrav til Bech-Bruun om betaling af 748.749.586 kr. med tillæg af renter, i alt 1.191.060.338,22 kr., inden 10 dage.

Det er ubestridt, at der er udbetalt i alt 1.135.775.442,18 kr. til 27 pensionsplaner i refusion af indeholdt udbytteskat i perioden fra den 17. juni 2014 til den 6. august 2015 i henhold til ansøgninger, der var vedlagt en udbyttenota udstedt af North Channel Bank. Det er endvidere ubestridt, at udbetalingerne var uretmæssige. Af dette beløb er 282.329.482,50 kr. udbetalt forud for den 4. august 2014, hvor A underskrev sin legal opinion, og 317.898.703,83 kr. er udbetalt efter den 16. juni 2015, hvor SKAT modtog anmeldelsen fra den danske skatteadvokat.

Skatteforvaltningen har den 28. maj 2019 indgået en forlig med 61 pensionsplaner, 56 fysiske personer og 102 selskaber. Forliget vedrører et samlet krav på 2.937.851.407 kr., der også omfatter et beløb på 1.086.466.021 kr., som ubereettiget blev udbetalt til 26 af de 27 pensionsplaner, hvis ansøgninger var baseret på North Channel Banks medvirken. Forliget er fremlagt i uddrag under sagen. Skatteforvaltningen har reduceret kravet mod Bech-Bruun med et beløb på 413.485.128,41 kr. i anledning af betalinger i henhold til forligsaftalen, hvorefter kravet er opgjort til 722.290.313,77 kr. Skatteforvaltningen har oplyst, at ca. 40,9 pct. af betalingerne i henhold til forliget efter en forholdsmæssig fordeling vedrører kravet mod Bech-Bruun.

Skatteforvaltningen har endvidere den 28. maj 2019 indgået en aftale med ejerne af North Channel Bank, som indebærer, at Skatteforvaltningen vil modtage mindst 50 mio. kr. i tilfælde af, at North Channel Bank bliver solgt i fri handel, og banken ikke går konkurs.

Den 4. september 2019 indgik Skatteforvaltningen en betinget interkreditoraftale med North Channel Bank og den belgiske stat.

Aftalen er fremlagt i uddrag under sagen. Det følger af aftalens pkt. 2.1.2., at Skatteforvaltningen forpligter sig til ved modtagelse af 86,97 pct. af købsprisen ved salg af North Channel Bank at betale den bøde, som North Channel Bank vedtog i et retsmøde i Retten i Glostrup den 23. september 2019, og resten af forligsbeløbet skal dække det civilretlige krav.

Det er under hovedforhandlingen oplyst af Skatteforvaltningen, at der endvidere er indgået forligsaftaler med to af de reclaimagenter, som er omfattet af denne sag, for et beløb på i alt 26 mio. kr., hvoraf en mindre del relaterer sig til denne sag. Som følge heraf kan kravet mod Bech-Bruun ifølge Skatteforvaltningen nedskrives med yderligere 3,7 mio. kr.

*Øvrige oplysninger*

I december 2017 afsluttede Bech-Bruun sin advokatundersøgelse benævnt »Undersøgelse af forholdene vedrørende SKATs udbetaling af refusion af udbytteskat«.

Den 21. december 2018 indgav Skatteministeriet en adfærds- og salærklage til Advokatnævnet med påstand om, at Bech-Bruun havde tilsidesat god advokatskik ved at have påtaget sig hvervet som uvildig undersøgelsesadvokat på trods af, at Bech-Bruun havde repræsenteret tre canadiske pensionsplaner i sager om forhold, som Bech-Bruun havde undersøgt som uvildig undersøgelsesadvokat. Advokatnævnet fandt, at fire navngivne partnere fra Bech-Bruun havde tilsidesat god advokatskik ved at påtage sig at udføre advokatundersøgelsen, og at Bech-Bruun ikke havde krav på salær herfor.

Advokatnævnets kendelse af 4. juli 2019 blev indbragt for domstolene af Bech-Bruun. Østre Landsret afsagde dom i sagen den 23. juni 2021, hvorefter Advokatnævnets kendelse blev opretholdt for så vidt angår adfærdsklagen vedrørende de fire partnere, og Skatteministeriet blev frifundet for Bech-Bruuns salærkrav. Dommen er anket til Højesteret, som endnu ikke har truffet afgørelse i sagen.

## 3. Forklaringer

Der er afgivet forklaring af V1, A, V2, V3, V4, V5, og V6.

*V1*

*V1* har forklaret blandt andet, at han ved sin tiltræden som departementschef i 2012 havde to hovedarbejdsopgaver: at føre organiseringen af skattevæsenet tilbage til en klassisk myndighedsstruktur med et »smalt« departement og fagstyrelser frem for den hidtidige enhedsforvaltning i SKAT samt at fortsætte effektiviseringerne i overensstemmelse McKinsey-rapporten. McKinsey-rapportens overordnede konklusion var, at der var et betydeligt effektiviseringspotentiale i SKAT opgjort til en lille mia. kr. Den analyse var der på daværende tidspunkt ingen, der stillede spørgsmål ved.

Skatteministeriets Interne Revisions rapporter indgår som en del af Skatteministeriets overordnede koncerntilsyn. Skatteministeriets departement er ikke og må ikke være inddraget i den konkrete skattesagsbehandling. Direktionen i SKAT havde til opgave at udarbejde handleplaner for kontrolindsatserne på de enkelte områder i lyset blandt andet af rapporterne fra Skatteministeriets Interne Revision (SIR). Der var en klar fremgangsmåde for, hvordan man skulle forholde sig i SKAT, når der blev modtaget en rapport fra SIR. En rapport blev således altid sendt til den ansvarlige direktør og økonomichefen samt til Rigsrevisionen, ligesom der blev udarbejdet en handleplan for opfølgning mv. Rapporterne fra SIR angav gennem farvekoderne rød, gul og grøn, hvilket behov der var for reaktion på konklusionerne i rapporterne, men rapporterne sagde ikke selv noget om risikoen for svig. Et gult punkt kunne godt

**797**

lukkes i handleplanen, selvom det ikke var løst, men man skulle forholde sig til problemstillingen.

Den omstændighed, at der i 2013 alene skete forelæggelse af 3 rapporter fra SIR for vidnet, indebærer ikke, at de almindelige procedurer ikke er blevet fulgt i forhold til forelæggelse for de ansvarlige direktører og direktørområder mv. Der var jo tale om driftsrelaterede problemstillinger, der under alle omstændigheder skulle afklares i de enkelte driftsenheder. I 2015 fik vidnet på baggrund af en ændring af arbejdstilrettelæggelsen, der ikke havde sin baggrund i udbyttesagen, forelagt 43 ud af 45 rapporter fra SIR.

Rigsrevisionen byggede i vidt omfang sit arbejde på de interne revisionsrapporter mv., der blev udarbejdet af SIR. Der var et meget massivt revisionstryk i SKAT. Han havde et møde med rigsrevisor … om hendes bekymring for kvaliteten af det arbejde, der blev udført af SIR. Drøftelserne førte blandt andet til et kompetenceløft i SIR og ansættelse af flere medarbejdere. I 2014 blev der også ansat en ny chef for SIR. Sidenhen er de såkaldte § 9-aftaler blevet opsagt, således at Rigsrevisionen generelt har hjemtaget revisionen. Det gælder også for andre ministerområder.

Han blev ikke ved sin tiltræden eller i perioden frem mod 2015 gjort opmærksom på, at der var problemer i forhold til udbytteskatteområdet. Han hørte således første gang om svig på udbytteskatteområdet i august 2015. Perioden omkring august 2015 var stærkt kaotisk. Når han ser på forløbet i dag, burde man nok have været lidt mere forsigtig i sine konklusioner dengang, fordi man stadig var i den indledende afdækningsfase. Som han også har forklaret i undersøgelseskommissionen, blev han orienteret om sagen den 18. august 2015, og han fik, så vidt han husker, samtidig at vide, at der var iværksat et udbetalingsstop. Han var således ikke involveret i beslutningen om et udbetalingsstop. Det var en meget vidtgående beslutning, og han er ikke bekendt med, at der tidligere er blevet truffet en sådan beslutning på andre områder. Han er enig i V13's udsagn over for undersøgelseskommissionen om, at man ikke tidligere end sket havde mulighed for at iværksætte udbetalingsstoppet.

Det danske skattesystem bygger i høj grad på en tillidsbaseret selvangivelsesmodel. Tredjemandsdokumenter og oplysninger hidrørende fra tredjemand tillægges desuden generelt høj bevismæssig værdi ved skattemyndighedernes administration. Det omfatter f.eks. oplysninger fra banker, forsikringsselskaber og realkreditinstitutter. Sådanne oplysninger anses generelt for valide. Personskatteområdet er i dag i vidt omfang baseret på tredjepartsindberetninger, der som udgangspunkt bliver lagt til grund for skatteligningen. Momsområdet bygger også på selvangivelser (momsangivelser), og der er tale om meget store beløb i såvel positive som negative momstilsvar. Negative momstilsvar udbetales uden brug af tredjepartserklæringer. Der er mange svigssager på momsområdet, hvilket har ført til iværksættelse af en vis kontrol, men det har ikke ført til udbetalingsstop, hvilket formentlig heller ikke ville være muligt på grund af EU-reguleringen på området.

Han hæftede sig i 2012 ikke særligt ved Skatteudvalgets betænkning af 11. juni 2012 til lovforslag nr. L 173, og lovforslaget havde heller ikke specifikt noget at gøre med udbytterefusion, men omhandlede et konkret sagskompleks vedrørende gennemstrømningsselskaber. Lovforslaget havde derfor intet at gøre med generelle problemstillinger og udbytteområdet. Han var ikke inddraget i behandlingen af lovforslaget, da dette blev varetaget af den tidligere konstituerede departementschef. Han læste først lovforslaget i august/september 2015 i forbindelse med, at man foretog en gennemgang af de seneste års lovændringer på udbyttebeskatningsområdet. Der var ikke nogen mistanke om svig på udbytteskatteområdet i 2012/2013, men der blev foretaget nogle regelændringer efter, at en arbejdsgruppe havde anbefalet en styrkelse af kontrollen på området.

Han fik ikke forelagt SIR's rapport af 10. maj 2010 om undersøgelse af provenuet fra beskatning af udlændinge - udbytteskat ved sin tiltræden i 2012. Han har efterfølgende læst rapporten, der ikke kan karakteriseres som specielt kritisk. På baggrund af rapporten blev der nedsat en arbejdsgruppe, der fremkom med nogle relativt klare anbefalinger og retningslinjer.

Han fik ikke forelagt SIR's rapport af 30. maj 2013 om revision af udbytte- og royaltyskat for 2012 i forbindelse med, at den blev afgivet, og har således først haft lejlighed til at læse den efter august 2015. Hverken rapporten generelt eller delkonklusionen under pkt. 3.2. om regnskabspraksis havde en ordlyd, der kunne give anledning til særskilt bekymring. Metodemæssigt bygger rapporten på et solidt fundament. SIR's rapport fra 2013 stod på skuldrene af rapporten fra 2010 og kunne læses uafhængigt af den tidligere rapport. Han forstod det anførte om gennemgang af Regnskab 2's forretningsgange under pkt. 3.4, herunder i delkonklusionen, således, at SIR vurderede, at blanketordningen fungerede fornuftigt, mens der var bekymring i forhold til regnearksordningen (bankordningen). Han må også læse det sådan, at oplysningerne om stigning i refusioner ikke gav SIR anledning til bekymring. Under pkt. 3.7. om organisering og ansvar på udbytteområdet var det i delkonklusionen SIR's vurdering, at der var mange aktører og procesejere på udbytteområdet, og at der burde etableres et overordnet ansvar med ledelsesmæssigt fokus. Det kunne således være hensigtsmæssigt med en entydig procesejer. Det anførte i delkonklusionen var ikke noget, som han ville have fæstnet sig særligt ved. Et delt procesejerskab indebærer jo ikke, at der ikke er

**798**

et overordnet ansvar, og kan heller ikke bruges til at drage en konklusion om, at man med et entydigt procesejeransvar kunne have undgået svig. Han opfatter ikke delkonklusionen under pkt. 3.8. om opfølgning på SIR's rapport fra 2010 således, at der ikke var en tilstrækkelig opfølgning. Den samlede konklusion i pkt. 4.1. er ikke en alarmerende konklusion på SKATs område. Havde SIR været bekymret for svig, var man gået direkte til SKAT's direktør. SIR er ikke langt oppe på kritikskalaen i denne rapport. Den gule markering vedrørende refusion af udbytteskat under pkt. 4.2. i rapporten relaterer sig udelukkende til bankordningen. Forelæggelsen den 7. juni 2013 af SIR's rapport for SKAT's direktion fulgte den sædvanlige fremgangsmåde. Havde der i den forelagte rapport været en konkret mistanke om svig, ville det have fremgået af forelæggelsen. SIR's rapport fra 2013 gav du heller ikke på daværende tidspunkt anledning til iværksættelse af konkrete tiltag rettet mod svig.

Det er meget sjældent, at konklusionen i SIR's rapporter ligger i de to øverste kategorier, hvor konklusionen vedrørende det reviderede område er »meget tilfredsstillende« eller »tilfredsstillende«, da der jo er en grund til, at området bliver udtaget til kontrol.

SIR's rapport af 27. juni 2014 om SKAT's opfølgning på SIR's anbefalinger og identificerede, ikke-korrigerede fejl fra tidligere år førte til, at der blev iværksat retningslinjer for særskilt opfølgning på SIR's rapporter. Der er imidlertid tale om en generel rapport, der ikke specifikt omhandler udbytteskat. Der blev desuden udarbejdet en større, generel turnusanalyse, hvis resultat forelå i sommeren/efteråret 2015. Den påviste bredt set over SKAT's område nogle forbedringspotentialer.

SIR's rapport af 24. september 2015 om SKAT's administration af udbytteskat og refusion af udbytteskat blev udarbejdet på kort tid i lyset af udbetalingsstoppet og på et tidspunkt, hvor man så ind i en kæmpe svindelsag. Rapporten blev udarbejdet på foranledning af den daværende skatteminister og bar præg af, at man »kiggede bagud«. Der var nogle klart andre konklusioner end i rapporten fra 2013, men nu var man jo også opmærksom på, at der var blevet

begået svindel, og konteksten var derfor en helt anden. Det afspejlede sig også i konklusionerne, der var præget af mange efterrationaliseringer. Det var i forbindelse med denne rapport, at han blev klar over, at kontrolfunktionerne på udbytteskatteområdet var mangelfulde. Man skal imidlertid være opmærksom på, at den anførte i pkt. 9.6. om, at der ikke foretages en efterprøvelse af, om udbyttemodtagerne er rette ejer, er skrevet i lyset af, at man nu var blevet klar over, at der var begået omfattende svindel. Han er enig i det anførte i delkonklusionen i rapportens pkt. 10.5. om den manglende konsolidering af procesejeransvaret, men det må læses under hensyntagen til, at de enkelte direktørområder mv. under SKAT jo fortsat var ansvarlige for en samlet og effektiv udbytteproces, således som det også fremgår af delkonklusionen. Delkonklusionen under pkt. 8.1. om »forsvarslinjer« indeholder en meget generel og overordnet beskrivelse, der ikke siger så meget.

Rigsrevisionens beretning fra februar 2016 til statsrevisorerne om SKAT's forvaltning af og Skatteministeriets tilsyn med refusion af udbytteskat var meget kritisk og bar præg af at være udarbejdet i den kontekst, at der var konstateret svig. Skatteministeriet var på lange stræk ikke enige i den kritik, der blev fremsat af Rigsrevisionen. Da Rigsrevisionens beretning forelå i 2016, måtte ministeriet imidlertid tage beretningen til efterretning, også selvom ministeriet ikke var enig i alle konklusioner. Beretningen indeholdt nogle efterrationaliseringer, som førte til en kritik, der efter hans opfattelse ikke er helt berettiget og ret unuanceret. Dette blev også afspejlet i SKAT's ministerredegørelse af 4. maj 2016 vedrørende beretningen. Ministerens bemærkninger i pkt. 1 i redegørelsen udtrykker dog naturligvis ministerens og ministeriets holdning. Han er enig i de konklusioner, der fremgår af ministerredegørelsen, men redegørelsen skal naturligvis læses i lyset af den meget kritiske beretning fra Rigsrevisionen. Man bør derfor også være varsom med at tage enkeltkonklusioner ud fra redegørelsen. Han er ikke helt enig i Rigsrevisionens bemærkninger under pkt. 44 i beretningen, der jo er indsat i den kontekst, at man ved, at der var begået svindel. Det kunne man efter hans opfattelse ikke se i realtid, og desuden havde medarbejderne i udbytteadministration som begrundelse for udviklingen i tallene på udbytteområdet jo henvist til, at der havde været en stigning i aktiekøb fra amerikanske pensionskasser. Den grafiske fremstilling i beretningen under pkt. 64 med angivelse af indikationer til Skatteministeriet på problemer med refusion af udbytteskat i perioden 1. januar 2010 til 5. august 2015 er efter hans opfattelse stærkt misvisende. Indikation 1 i form af SIR's rapport fra 2010 så han slet ikke som kritisk, og der blev desuden fulgt op på rapporten. For så vidt angår indikation 2 og 3 kom henvendelserne fra V4 ham bekendt ikke videre op gennem systemet, idet V4 ikke formåede at overbevise sine foresatte om problemet. Det er en helt sædvanlig fremgangsmåde, at man går til sin chef, som herefter vurderer, om det er et anliggende, man skal gå videre med. Det var usædvanligt, at V4 rettede direkte henvendelse til Skatteministeriet som ansvarlig for udformningen af lovgivningen på området. Indikation 4 i form af SIR's rapport fra 2013 så han slet ikke som kritisk. I Rigsrevisionens beretning under indikation 5 blev udbytte kort skitsereret, men ikke nævnt som et problem. Opfølgningsrapporterne fra SKAT indeholdt heller ikke advarselssignaler. Indikation 7 relaterede sig ikke til

**799**

udbytteskat. Den »early warning«, der er nævnt under indikation 8, vedrørte desuden en helt anden problemstilling om aktielån og havde ikke noget med udbytteskat at gøre. Der er således stærkt misvisende at konkludere, at det vælter ind med problemindikatorer. Hvis Rigsrevisionen havde fundet grundlag for det, kunne der også på grundlag af SIR's rapport fra 2013 være taget en forbehold

i Statsregnskabet. Det fandt Rigsrevisionen imidlertid ikke anledning til.

Han fik ikke forelagt regnskabsgodkendelser, herunder heller ikke regnskabsgodkendelsen fra maj 2015, hvor det vedrørende refusion af udbytteskat blandt andet er anført, at en del af stigningen i den udbetalte refusion af udbytteskat kan henføres til, at amerikanske pensionskasser foretager opkøb i danske selskaber. Han erindrer ikke noget om, at han på daværende tidspunkt skulle have hørt herom. SKAT indsendte regnskabsgodkendelserne til departementet til brug for opgørelsen af de såkaldte indtægtslister til Folketinget. Departementet modtog således regnskabsgodkendelserne for at kunne følge området ud fra en konjunkturmæssig synsvinkel.

Tabel 7.1. i SIR's rapport fra 2013 viste, at både indtægter og refusioner var stigende. På de meget volatile skattearter, f.eks. udbytteskat, selskabsskat og pensionsbeskatning, er det imidlertid svært at skønne over indtægtsudviklingen. Der var ikke i de tal, som Skatteministeriet sendte til Folketinget, indikationer i realtid på, at der var noget galt i perioden fra 2005-14. Både indtægterne og refusionerne vedrørende udbytteskat steg i perioden. Man kunne ikke bare have lavet en analyse i 2014 og fundet ud af, at der var noget helt galt. En analyse udarbejdet på månedstal eller kvartalstal er desuden mere usikker. Der var ikke nogen, der havde noteret sig, at stigningen i refusioner var så skævrtsikkert stor, at det, også i lyset af det anførte om de amerikanske pensionskassers opkøb, gav anledning til tiltag. Der er desuden heller ikke nogen nødvendig indbyrdes sammenhæng mellem en stigning i udbytteskatter og en stigning i udbytterefusioner - afgørende er, hvor mange udenlandske købere der er.

SKAT genoptog udbetalingen af refunderet udbytteskat i marts 2016. Der var ikke tale om en hurtig genoptagelse af udbetalingerne, og i begyndelsen var der også kun tale om ganske få udbetalinger. Sagsbehandlingstiden i sager om refusion af udbytteskat er øget væsentligt, og det er svært at overholde sagsbehandlingsfristen på seks måneder. Skattemyndighederne har for tiden omkring 90.000 anmodninger under behandling dækkende over anmodninger om refusion for flere mia. kr. I dag er ansvaret for udbytteområdet opdelt på en anden måde end tidligere, og der er udpeget en underdirektør med ansvar for den samlede proces i Skattestyrelsen.

Perioden, hvor udbetalingsstoppet stod på, var præget af, at man arbejdede på at få etableret et kontrolregime, der sikrede, at svigen ikke kunne gentage sig. Han var involveret i tilrettelæggelsen af den nye strategi. Der blev hen over årene tilført godt 100 årsværk, ligesom der blev oprettet et årsværk i en analyseenhed. Der er nu etableret et exceptionelt højt kontroltryk på dette område. Det kommer særligt til udtryk, hvis man sammenligner med kontrollen på momsområdet, hvor et tilsvarende kontroltryk ville indebære ansættelse af flere tusinde yderligere medarbejdere. Etableringen af det omfattende kontrolregime skal ses i lyset af, at det blev vurderet, at det ville være altødelæggende, hvis der kom en sag til af lignende karakter. Det var et komplekst stykke arbejde at få udarbejdet en ny udbytteadministration. SIR's rapporter fra 2010 og 2013 gav ikke noget relevant grundlag for indførelse af et tilsvarende regime allerede på daværende tidspunkt, hvor man ikke var bekendt med svindlen. Det var slet ikke et spørgsmål, man havde anledning til at overveje i 2013, og det ville heller ikke have været muligt at indføre en sådan kontrol, idet ressourcerne i givet fald dengang skulle være taget fra et andet område i SKAT.

Der blev ikke etableret et ejerregister i forbindelse med indførelsen af det nye kontrolregime. Et sådant register ville under alle omstændigheder ikke kunne stå alene i forbindelse med kontrollen, idet man ikke på tidspunktet for udlodning af udbytte var i besiddelse af oplysninger om »beneficial owner«. Et ejerregister ville også kunne have negativ betydning for investeringslysten i Danmark.

En nettoindeholdelsesmodel har også været under overvejelse, og der arbejdes fortsat hermed. Der er imidlertid tale om et meget kompliceret område.

Han havde ikke nogen konkret viden om administrationen af udbytteområdet, herunder kontrollen på området, før august 2015, og han havde ikke forud herfor forholdt sig til, om administrationen af området blev anset for en ren taste- og bogholderiopgave, således som borger- og retssikkerhedschefen har anført i sin faktuelle redegørelse fra februar 2016 om administrationen af udbytterefusion i perioden 2010-2015.

Han er bekendt med regnskabsinstrukserne og med, at der skal føres kontrol ud fra kriterier om risiko og væsentlighed. I forhold til de sager, han har set, har de ægte dokumenter været til stede, men de har haft et urigtigt indhold. Han mener derfor, at man har levet op til de formelle krav vedrørende kontrol af ægthed og gyldighed af tredjepartserklæringer. SIR vurderede i rapporten fra 2013, at kontrollen på blanketordningen var tilstrækkelig. Der foretages ikke materiel kontrol på særlig mange skattearter, og der er ikke noget krav om, at man skal foretage en gennemgribende kontrol. Det anførte om materiel kontrol i § 38 i Skatteministeriets regnskabsinstruks udgør et stiliseret billede af, hvordan kontrol kan foretages. Skulle en sådan materiel kontrol foretages i alle tilfælde, ville der være tale om et helt

**800**

andet antal medarbejdere i skattevæsenet. Det var op til direktionen i SKAT at vurdere, hvordan kontrolressourcerne nærmere skulle anvendes.

På tidspunktet for SKAT's notat af 25. august 2015 om mistanke om omfattende økonomisk kriminalitet begået mod SKAT havde han ikke nogen viden om, hvorvidt SIR's tidligere fremsatte anbefalinger var blevet fulgt. Det var det, man skulle undersøge.

Han har ikke set bilag 16 til opfølgningsprotokol 12-014 om Revision af udbytte- og royaltyskat, og han har forholdt sig til det heri anførte notat af 17. august 2015 om aktuel status.

Han har ikke nærstuderet begrundelsen i Østre Landsrets dom i straffesagen mod V6, men han er nok i det efterfølgende forløb blevet gjort bekendt med, at udbetalinger fra skattemyndighederne på udbytteskatteområdet ville kunne ske på foranledning af én enkelt ansat. Det er ikke hans forståelse, at der ikke var en reel kontrol på udbytteområdet, idet der jo var en reel kontrol af, at den fornødne dokumentation var til stede. Generelt har skattemyndighederne tillid til de oplysninger, man modtager fra tredjepart, og det gør sig særligt gældende, når der ikke er et konkret risikobillede.

Han har først efter september 2015 set eksempler på konkrete ansøgninger om refusion af udbytteskat. Beløbsstørrelserne varierede meget i de enkelte ansøgninger. I det nye system, der er etableret efter svigssagen, foretages der kontrol ved ansøgninger på beløb over 250.000 kr. Dette skal ses i lyset af, at man hverken administrativt eller politisk kan tåle nye sager af denne karakter. Han har ikke haft anledning til at forholde sig til enkelte dele af ansøgningerne eller bilagene hertil, f.eks. underskrifter og stempler.

Refusionsbeløbet i Goal Groups ansøgning af 28. maj 2014 vedrørende KB Ventures Pension Plan kan ikke anses for usædvanligt. Brevet fra North Channel Bank dokumenterer, at der er udbetalt udbytte, og at der er sket fradrag for indeholdt skat. Denne dokumentation måtte på daværende tidspunkt som udgangspunkt anses for solid og valid, da den byggede på en oplysning fra en uafhængig tredjepart i form af en bank undergivet det tyske finanstilsyn. Det var således det bedste bevis for rette modtager af udbytterefusionen.

Han har ingen viden om »gengangere« for så vidt angår selskaber og aktiestørrelser i de konkrete ansøgninger. Han er først blevet opmærksom på navnet »Y« i forbindelse med den efterfølgende behandling af sagskomplekset.

Han har først efter august 2015 set Skatteministeriets notat af 17. september 2007 om forceret tilbagebetaling af indeholdt dansk udbytteskat mv. Hvad der står i et dokument fra 2007, er efter vidnets opfattelse irrelevant. Havde der på daværende tidspunkt været en bekymring for svig, ville det også være kommet frem i de rapporter mv., der blev udarbejdet efterfølgende.

Skattestyrelsens status af 30. oktober 2018 om bankordning og aktieudlån på udbytteområdet er udtryk for, at man foretager nogle efterrationaliseringer i lyset af den svindel, som man jo ikke tidligere havde kendt til.

Opgaverne i tilknytning til retsopgøret efter udbyttesagen, herunder søgsmålet i Storbritannien, varetages af Skattestyrelsen, men han bliver løbende orienteret. Han blev i forbindelse med søgsmålet i London orienteret om, at der var rejst et forældelsesspørgsmål.

Han var involveret i udbuddet omkring nedsættelse af den advokatundersøgelse, som endte med at blive forestået af Bech-Bruun. Der var i forbindelse med udbuddet en relativt generel formulering om, at Bech-Bruun havde ydet rådgivning omkring udbytteområdet, men det var ikke noget, der gav anledning til særskilt bekymring på det møde, der blev holdt den 22. februar 2017. Oplysningen herom kom fra Bech-Bruun. North Channel Bank blev ikke nævnt i den forbindelse. Hvis ministeriet havde vidst, at Bech-Bruun havde ydet rådgivning til North Channel Bank, ville man formentlig have reageret anderledes. Der var imidlertid meget, man ikke vidste i 2017.

*A*

*A* har forklaret blandt andet, at han i 2014 og en periode på ca. 5 år forud herfor beskæftigede sig en del med udbytteskat i forskellige sammenhænge. Ud over ham beskæftigede også N og indtil 2012 tillige I sig med udbytteskat hos Bech-Bruun. Han har tidligere rådgivet om skattearrangementer, hvor formålet formentlig har været at opnå en skattebesparelse - også i relation til udbytteskat og refusion af udbytteskat. Han har ikke tidligere rådgivet i tilfælde, hvor formålet med at eje aktier var at opnå ret til refusion af udbytteskat. Når han rådgiver, overvejer han altid realiteten i det arrangement, som han rådgiver om. Hvis et arrangement er rent proforma, er der ingen realitet, og så stopper rådgivningen der.

Det i e-mail af 3. februar 2014 fra ham til H anførte om, at cum/extransaktioner tidligere har været foreslaget for dem, skal ikke forstås således, at han tidligere har rådgivet om cum/ex-transaktioner. Denne type transaktioner var ikke noget, som man anvendte i Danmark. Problemet er, at cum/ex-transaktioner formelt legitimerer to personer til refusion af udbytteskat. Han forstår en cum/ex-handel således, at aktier købes med udbytte, men leveres uden udbytte, og at der så senere falder en kompensationsbetaling. Med udsagnet »generelt problematiske ud fra juridisk perspektiv« i samme e-mail mente han, at det er udelukket med dobbelt refusion, da det ville være ulovmedholdeligt. Mailen var en høflig afvisning.

Han var då rådgivningstidspunktet bekendt med VP Securities' registrering af værdipapirer og aktier. Han var nok også bekendt med, at der var omnibusdepoter

**801**

registreret i VP Securities. Han ved ikke, hvilke oplysninger VP Securities har om ejeren af en given aktie. Det er nok banken og ikke ejeren, der er registreret i VP Securities. Han kan ikke sige, om han i 2014 vidste, om der var et ejerregister i VP Securities. Han vil antage, at man i VP Securities kunne se, hvem der ejede børsnoterede aktier, og han ved ikke, om der fandtes sådanne registre andre steder. På rådgivningstidspunktet vidste han, at udbytter blev udbetalt fra det udloddende selskab til den registrerede ejer tre dage efter generalforsamlingen. Ex-datoen ligger efter generalforsamlingsdatoen.

I rådgivningen af North Channel Bank var hans fokus på det skatteretlige ejerskab, da dette var afgørende for, hvem der var berettiget til udbetaling af refusion af indeholdt udbytteskat. Han fokuserede ikke på det civilretlige ejerskab.

Han skrev i e-mail af 18. februar 2014 til K og H, at det forekommer usædvanligt, at North Channel Bank vil afgive en erklæring om retmæssig ejerskab, idet en bank normalt ikke vil erklære sig om det skattemæssige ejerskab, da der ikke ligger en kvalifikation. Det skattemæssige ejerskab var stadig centralt for hans rådgivning, uanset at banken ikke var ansvarlig for at kvalificere dette. Hvis banken forholdt sig til det skattemæssige ejerskab, ville banken gå videre, end hvad en bank normalt gør. Jo mere viden banken har, desto større risiko har den for at ifalde ansvar.

Efter hans opfattelse overgår den civilretlige ejendomsret til aktier, når der er indgået en købsaftale, således at man er ejer fra aftaletidspunktet og ikke leveringen. Ved aktielån er låntager ejer af aktierne i civilretlig henseende, fordi det reelt er »lån til eje«. I skattemæssig henseende forbliver ejerskabet hos långiver, indtil låntager eventuelt videreoverdrager aktierne.

Indgåelse af kurssikringsaftaler har ikke nødvendigvis betydning for ejerskabet. Problemet i forhold til det skattemæssige ejerskab er, at registreret legalt ejerskab ikke nok, da man da ikke nødvendigvis er »beneficial owner«. En kurssikringsaftale, der indebærer fuld risikoafdækning, fjerner substansen i ejerskabet, da man ikke længere bærer nogen risiko. Hvis der er tidsmæssigt sammenfald mellem overdragelserne, vil man se strengere på det.

En »dividend advice« er en erklæring fra en depotbank om det udbytte, der er blevet betalt på en given aktie. Der er ikke nogen bestemt modtager af erklæringen, da det er bankkunden, der benytter erklæringen til brug for en ansøgning om refusion af indeholdt udbytteskat. Man skal selv bede sin bank om at lave sådan erklæring. Bankens grundlag for at udstede erklæringen er, at banken kan se, at der er blevet betalt et udbytte på nogle aktier. Han kan ikke forklare, hvordan banken rent teknisk kan se, at der er udbetalt udbytte. Bankkundens aftalepart sender et beløb til bankkunden, som betegner beløbet som udbytte. Banken kan kontrollere, at det rent faktisk er udbytte, gennem kundens aftaleparts bank. Det er nødvendigt for, at banken kan spore beløbet tilbage til den, der har udloddet udbyttet. Han ved ikke, hvor megen dokumentation en bank kræver. I punkt 4, nr. 7, i udkast til legal opinion af 21. juli 2014 har han brugt betegnelsen »standardejerskabsdokumentation« som et standardbegreb, da banken skulle gøre, hvad den plejede. Han vil antage, at begrebet omfatter en »dividend advice«. Hvis banken afviger fra, hvad den plejer at gøre, vil det tyde på, at noget ikke er, som det skal være.

Han er tidligere blevet bedt om at rådgive om en »dividend stripping-transaktion« som anført i e-mail af 3. februar 2014 fra H til V5. Han har ikke rådgivet om opnåelse af dobbelt refusion, som der blev henvist til i samme e-mail, men han kendte til fænomenet. Han er tidligere blevet spurgt om risikoen for at ifalde strafferetlige sanktioner på skatteområdet, men han husker ikke, om det også har været forud for gennemførslen af et givent arrangement. Han husker ikke, om han havde hørt noget om strafbare forhold i Tyskland, men det var ikke noget, som han relaterede til Danmark. Det var oplagt, at Jones Day skulle tage sig af tyske lovgivningsmæssige forhold.

Han hæftede sig ikke ved, at H i e-mail af 5. februar 2014 til ham og V5 skrev »en af parterne i cum/ex-transaktionen«. Han modtog mailen på et tidligt stadie, så han vidste ikke, hvad det egentligt gik ud på.

En »should-opinion« er en juridisk vurdering med en vis grad af sikkerhed. Man opererer med kategorierne »will«, »should« og »more likely than not«. »Will« angiver den højeste grad af sikker-

hed, mere end 90 pct., og »more likely than not« angiver en sikkerhed på mindst 51 pct. »Should« er et sted midt imellem. Det er sædvanligt, at man accepterer »should«-niveau, når man spørger til strafansvar, også selv om vurderingen vedrører banker og transaktioner, der endnu ikke er gennemført. Han er tidligere blevet spurgt af banker om risikoen for at ifalde strafansvar.

Han skrev i e-mail af 7. februar 2014 til H, at han skulle have et fuldt overblik over transaktionen og klientens rolle for at kunne foretage vurderingen, da dette var nødvendigt for at kunne tage stilling. På dette tidspunkt vidste han ingenting. Man skal ikke lægge så meget i ordvalget, da det blot er en e-mail. Han husker ikke, om han på daværende tidspunkt vidste, hvad det var, han skulle rådgive om, men det ser ikke sådan ud. I havde den samme grad af overblik over transaktionerne, som man normalt har, når man rådgiver. Han læste primært I's konklusion. I's tax opinion er også en should-opinion, da det ikke var helt klart, hvornår der var ejerskab. Han lagde I's konklusion til grund.

**802**

Han skrev i e-mail af 11. februar 2014 til H, at han var enig i, at »den beskrevne transaktion ikke afslører et faktuelt mønster, som med sikkerhed indebærer en cum/ex-handel«. Han husker ikke, hvorfor han valgte denne formulering, men pointen var, at modellen ikke længere lignede en cum/ex-transaktion. Formuleringen i samme mail om, at »vi også typisk har set i cum/ex-handlerne«, hentyder blot til, at de tidligere har set cum-/ex-handler, og at det konkrete element i handlerne ligner cum/ex-handler. Man kan ikke læse så meget ud af e-mail. Han husker ikke, hvad han henviste til med udsagnet om, at de tidligere har kunnet finde en løsning for så vidt angår den korte ejerperiode, men han har tidligere drøftet med kunder, om en ejertid kunne gøres længere. Han er ikke tidligere blevet forelagt en ejertid på et splitsekund. Han skrev, at han ville tøve med at fremsætte sin mening om et køb og salg, som begge sker på registreringsdatoen, fordi jo kortere ejertiden er, des større er risikoen for, at der ikke er skatteretligt er et ejerskab.

De modtog opdraget med K's e-mail af 13. februar 2014. Han lagde ikke så meget i ordvalget, da K ikke var skatteekspert. Det anførte om, hvad de kunne antage, var vigtigt, herunder definitionen af bankens rolle. Han fandt ikke opdraget påfaldende, da det lå i naturlig forlængelse af, at banken havde besluttet at påtage sig rollen som depotbank. På dette tidspunkt virkede opgaven ikke specielt kompleks, og der var heller ikke lagt op til det store salær. Transaktionsbeskrivelsen i punkt 3 i udkast til legal opinion af 18. februar 2014 var kopieret fra I's tax opinion. Han vurderede, at I's tax opinion var korrekt. Beskrivelsen i punkt 5 indebærer, at der kunne være ned til en dags ejertid. Han kan ikke svare på, hvorfor der var forskel på afviklingsdatoen ved pensionsplanens henholdsvise køb og salg af aktier. Han tænkte, at der var en grund til at gøre sådan. Det var en fravigelse af »T+3«, men han overvejede ikke, at der gav anledning til misbrug. Han havde ingen mening om, hvad der var sædvanligt i udlandet. Han ved ikke, om »T+3« var normen på alle børser. Han havde ikke noget indtryk af, at man kendte de parter, der skulle lave handlerne. Det var hans udgangspunkt, at der ikke var nogen relation mellem parterne. Det behøver dog ikke være et problem, at parterne ikke er uafhængige af hinanden. Han kan ikke forklare, hvorfor aktierne skulle udlånes som beskrevet i udkastets punkt 3.6, når de skulle købes og sælges samme dag, men det kan han være, at parterne havde en grund. Det forekommer, at kunder kender til transaktioner, som han ikke selv kender. Han havde tillid til Jones Day. Der var tale om en tysk bank og et velrenommeret advokatselskab, som ikke gav han grund til mistro.

Det centrale i forudsætning 5 i udkast af 18. februar 2014 er, hvem der er ejer af udbyttet. Det ville ikke være naturligt at lægge ind

Copyright © 2024 Karnov Group Denmark A/S

U.2024.746H - SKM2024.123.HRH

som forudsætning, at pensionsplanen var retmæssig ejer, da banken så ville indvende, at den jo ikke kunne vide dette. For så vidt angår forudsætning 10 er det naturligt i en ansvarsvurdering at lægge vægt på, om banken bare gjorde som den plejede, hvilket ikke omfattede bedrageri. Forudsætning 13 er også taget fra K's mail. I udkast til opinion af 20. februar 2014 tilføjede han på eget initiativ »grund til at antage« i forudsætning 13, fordi »burde viden« er af betydning i dansk ret. Han kunne ikke skrive som forudsætning, at der ikke var andre end pensionsplanen, der indgav ansøgning om refusion af udbytteskat, fordi banken så ville indvende, at den ikke kunne vide dette.

Beskrivelsen af højesteretsdommen fra 1999 i afsnittet om retsgrundlaget i udkast til opinion af 18. februar 2014 var et standardforbehold, som de indsatte ved rådgivning, der handlede om banker og skat. Han husker ikke, om han havde dommen fremme, da han skrev afsnittet. Afsnit 6.3.2. i samme udkast henviser til bankens kunders eventuelle skattesvig.

Ændringen i arrangementet fra futures til forwards havde ikke nødvendigvis nogen betydning. Man havde bedre mulighed for med en forward at fjerne en risiko ved handlen, så man kunne lave en »perfect hedge« i modsætning til ved en future-aftale. Han kender ikke future-instrumentet i detaljer. Han forstod futures som en standardiseret kontrakt i modsætning til OTC, hvor parterne kan forhandle, som de vil. I OTC er parterne typisk hinanden bekendte i modsætning til ved futures.

Ved mail af 10. april 2014 fremsendte K et »opdateret diagram«. Vidnet havde dog ikke forinden set noget diagram. Han er aldrig til brug for en legal opinion blevet præsenteret for en transaktionsbeskrivelse som den tyske. Normalt får han kun en tekst. Han er ikke bekendt med, at der var nogen, der rådgav på tysk i Bech-Bruun. Han ved ikke, hvem X og Z, som K nævner i mailen, er. Han husker ikke, om han spekulerede på, hvorfor K brugte betegnelserne X og Z.

Han skrev i mail af 14. april 2014 til K, at hans tyskkundskaber ikke var tilstrækkelige til at forstå den tyske transaktionsbeskrivelse, fordi han ikke forstod den. Han forsøgte et par gange at kigge på den for at se, om den gav mening, men han er helt sikker på, at det ikke var noget, som han havde forstået. Han havde tysk i 7.-9. klasse samt to år i gymnasiet. Han foreslog tre forskellige løsninger. I første omgang valgte Jones Day den første løsning, hvor man brugte den hidtidige beskrivelse og udskiftede futures med forwards.

Udsagnet »Gennemgang af transaktionsdiagrammet« som anført i salæropgørelsen af 23. juni 2014 henviser formentligt til det tyske diagram. Han har selv bidraget til udarbejdelsen af opgørelsen. Han brugte energien på den engelske beskrivelse og ikke den tyske. Han nævnte den tyske beskrivelse i opgørelsen, da fakturaen blev

**803**

udfordret, og man så tager det hele med. Han husker ikke, om han ved afregningen forventede at skulle arbejde mere på sagen, men legal opinion var på dette tidspunkt ikke underskrevet. Når man underskriver, skal man sikre sig, at en opinion stadig er korrekt.

Hans mail til K af 10. april 2014 umiddelbart efter modtagelsen af det tyske diagram er udtryk for, at han på det tidspunkt forventede at ville kunne forstå det tyske, men sådan gik det ikke. Han talte ikke med K om det tyske diagram. Han forstår måske enkelte udtryk i beskrivelsen, men det er afgørende at forstå hele dokumentets sammenhæng. Han kan hverken nu eller dengang se af diagrammet, at der var tale om et shortsalg. Det er meget atypisk med en »sildebensopstilling«, men han har set det før. Han har ikke overvejet brokerens interesse i at deltage i arrangementet. Han er enig i, at det ikke giver mening, at man starter udlodningen med en debitering af den bank, der skal modtage dividenden, men det havde han ikke forstået dengang.

Han bad om en anden beskrivelse, hvilket han fik. Han forholdt sig ikke til, om den adskilte sig fra den tyske beskrivelse, og han undrede sig ikke over, at den engelske var meget kortere end den tyske. Han kunne ikke sammenligne de to beskrivelser, når han ikke forstod den ene.

Han kom næppe så langt som til at se de seks nuller nederst på side 5 og side 7 i det tyske diagram, men det er heller ikke sikkert, at han i givet fald havde set problemet heri. Han husker ikke, hvor langt han nåede med den tyske transaktionsbeskrivelse. Han har aldrig lagt et tysk dokument til grund for sin rådgivning.

Han forstod mailen af 15. april 2014 fra K således, at den engelske beskrivelse svarede til det tyske diagram. Han husker ikke, hvordan han skabte sig et overblik over transaktionsforløbet, men det er muligt, at han tegnede det for sig selv. Punkt 5 a i den engelske beskrivelse adskiller sig fra I's tax opinion. Det kunne have betydning for hans legal opinion, at aktierne anskaffes via sælgerens lån af aktier. Det er væsentligt at sikre sig, at sælgeren har adkomst til de aktier, som erhverves af køberen. Han fæstnede sig også ved, at både sælger og køber var kunder i banken, og det har han også berørt i sin opinion. Der var ingen indikation i den engelske transaktionsbeskrivelse på, at der ikke ville være aktier i arrangementet. Han hæftede sig navnlig ved ordet »leveret«. Det, at der var en broker involveret, gjorde han sig ikke mange tanker om. En broker var én måde at gøre det på, og det fandt han ikke mærkeligt, eftersom North Channel Bank kun var depotbank. I mail af 11. februar 2014 til H skrev han, at han for at være sikker normalt også ville indbygge en forudsætning om, at sælgeren af aktierne til den amerikanske pensionsfond faktisk selv var ejer af de cum udbytteaktier, som i sidste ende bliver leveret, på salgstidspunktet eller i det mindste på udbytteregistreringsdatoen. Han tilføjede ikke en tilsvarende forudsætning om, at sælgeren var ejer af aktieudlånene, fordi han vurderede, at det ikke var nødvendigt. Hvis der ikke var noget ejerskab på generalforsamlingsdagen, ville både tax opinion og hans legal opinion være forkerte.

Pensionsplanens udlån af aktier skulle ifølge tax opinion ske uden udbytte, mens det efter den engelske transaktionsbeskrivelse skulle ske med udbytte. Han husker ikke, om han overvejede, om dette havde en betydning. Det kunne måske have den betydning, at som pensionsplan ikke længere var skattemæssig ejer af udbyttet, hvis låntager videresolgte aktierne. Han kan ikke svare på, om en sådan manøvre gjorde det lettere at lave fiktive handler. At banken ved noget på både sælger og køber gør at, at banken kommer tættere på. Dette kunne have betydning for bankens eventuelle strafansvar.

I mail af 16. april 2014 skrev han til K, at han læste den nye beskrivelse således, at der var en indikation af, at transaktionen er en cum/ex-transaktion, hvilket var deres oprindelige bekymring, fordi cum/ex-handler øger risikoen for dobbelt refusion af indeholdt udbytteskat. Afsnittet skal dog læses i sammenhæng med resten af mailen. Han spekulerede ikke på, hvorfor man havde ændret på, hvornår købet skulle ske. Han husker ikke andre overvejelser, end hvad der fremgår af mailen. Han skrev i samme mail, at det ville gøre det endnu vanskeligere for North Channel Bank at distancere sin rolle i forhold til transaktionen, at North Channel Bank handler for sælgeren og pensionsplanen og kender karakteren af transaktionen. Hermed mener han, at de fra starten fik at vide, at North Channel Bank skulle spille en meget lille rolle, hvilket således ikke længere var tilfældet. Det gav dog ikke grund til at tro, at banken havde en meget stor rolle. Han husker ikke, om han spurgte, om banken kendte transaktionernes tredjeparter.

Han syntes, at det var lidt underligt, at klienten ønskede indsat en forudsætning om, at udbyttegodkendelsesdatoen var identisk med udbytteregistreringsdatoen som anført i L i mail af 22. april 2014, som det reviderede resumé af transaktionsbeskrivelsen var vedhæf-

tet. Han overvejede ikke, hvorfor afviklingsdatoen skulle være efter det sædvanlige tidspunkt. Ordningen indebar, at der var en risiko for dobbeltrefusion, fordi der var to, der fik en »credit advice«, men det lå i hans legal opinion, at der ikke skete dobbelt refusion. Den danske stat ville kunne lide et tab, hvis I's tax opinion var forkert. Han forholdt sig ikke til, om det var tredjemand, der med urette fik udbetalt refusionen. Det var fjernt for ham at tro, at sælger uberettiget ville søge refusion, uanset om vedkommende havde en »credit advice«. Sælger skulle i så fald snyde. Han vidste nok, at også banken vidste, at der var to, der havde den formelle legitimation til at få udbetalt refusion af udbytteskat.

**804**

For så vidt angår afsnit 3.4. i udkast til legal opinion af 23. april 2014 var det helt centralt, at pensionsplanen modtog udbyttet, og at dette bekræftes af banken. Han husker ikke, hvad han konkret tænkte om afsnit 3.6.2 om forwardtransaktioner, men det viser, at han lagde til grund, at man modtog aktier uden udbytte. Forwardaftalerne er uden udbytte. Det var ikke forudsat, at tredjemand, der havde lånt aktierne af pensionsplanen, kunne sælge aktierne videre. Tilføjelsen i punkt 3.8 skyldes forskellen til tax opinion.

I udkast til legal opinion af 23. april 2014 ændredes »udbytte« til »Udbytte« i punkt 4, nr. 5, for at præcisere, at det var det samme udbytte, der var tale om. Punkt 6.1.1. var en generel beskrivelse af VP-formatet i Danmark, og han tænker, at det var affødt af den generelle drøftelse, der var med Jones Day. Man havde hos Jones Day svært ved at forstå sondringen mellem »Dividend Approval Date« og »Dividend Record Date«, hvoraf førstnævnte var det afgørende i en dansk kontekst. Det nye afsnit, der blev indsat i afsnit 6.2.2., skyldtes, at der var kommet flere oplysninger til, så det var nødvendigt at præcisere, hvad ansvarsvurderingen var baseret på.

I udkast til legal opinion af 2. maj 2014 med Jones Days bemærkninger var der indføjet en særlig »forward settlement date« og en »equities settlement date«. I afsnit 3.9 var der indsat en tilføjelse, som beskriver ændringerne i forhold til tax opinion. Det gav ikke anledning til yderligere forbehold fra ham. I udkastet blev der på s. 8 slettet en bemærkning om SWIFT. Diskussionen om SWIFT berørt i hans e-mail af 5. maj 2014 til K vedrørte beskrivelsen af de generelle regler, som han ikke mente, at man skulle ændre i. Så måtte man hellere ændre i den konkrete beskrivelse, men det var en mindre ting.

Det i punkt 3.5.1. i udkast til legal opinion af 21. juli 2014 anførte om, at tredjepart ikke er relateret til sælger, er ikke noget, han har skrevet. Det fremgik af Jones Days beskrivelse. Han kan ikke svare på, om det havde nogen betydning. Hvis parterne ikke er relaterede, øges sandsynligheden for, at der handles på armslængdevilkår. Han kan ikke forestille sig, at tredjeparterne i de to forwardaftaler kunne være den samme. Han forestillede sig, at der var fire parter i alt i de to forwardaftaler, og han antog, at de alle forfulgte egne interesser. Han vurderede ikke, om pensionsplanen havde en forretningsmæssig interesse i arrangementet, men det kunne der ligge i aftalerne med tredjemand. Hele formålet var, at pensionsplanerne kunne udnytte adgangen til refusion af udbytteskat, hvis de købte aktier fra en part, som ikke havde samme adgang til refusion, hvilket han dog ikke kunne vide. Han kunne ikke vide, om der også var andre formål. Der var i den forstand tale om et skattearrangement. Pensionsplanen købte aktier af sælger og skaffede finansiering ved at udlåne aktierne og samtidigt indgå en forwardaftale, men det afhænger af de konkrete aftaler, om pensionsplanen kunne tjene på arrangementerne. Han er ikke bekendt med, om det forekommer, at et dansk børsnoteret selskab ikke foretager den udlodning, som bestyrelsen har foreslået. Pensionsplanens risiko bestod alene i, at udlodningen ikke skete som forventet. Det står ikke i beskrivelsen, om risikoen er fuldt afdækket ved

forwardaftalerne, og han bad ikke om at få den viden, da hans opgave var at afdække bankens risiko. Han foretog ikke en analyse af, hvordan de forskellige aktører kunne tjene penge, og han mener ikke, at det var nødvendigt. Han kan ikke svare på, om levering efter registreringsdagen er en fravigelse af markedsvilkår. Det er muligt, at det er en fravigelse af danske markedsvilkår.

Han havde ikke grund til at tro, at Jones Day ikke ønskede at give ham det fulde billede af arrangementet. Han kan udelukke, at Jones Day telefonisk har sagt til ham, at der i hele transaktionen kun indgik tre parter, for det ville han have reageret på. Hvis der kun var tre parter, ville arrangementet være cirkulært med risiko for, at der var tale om et proforma-arrangement, og så ville han ikke have rådgivet som sket.

Forudsætning 5 i samme udkast af 21. juli 2014 om »ubetinget ejerskab« stammer fra I's tax opinion, så der menes hermed det skatteretlige ejerskab.

Med »retsmæssige ejerskab« i forudsætning 7 menes »beneficial ownership«, mens »den juridiske ejer« henviser til den civilretlige ejer. Han kan ikke svare på, hvordan man kan registrere, at aktierne leveres til banken samme dag, når de går ud af banken samme dag. Forudsætningerne i en legal opinion gør det tydeligt for modtageren, hvordan man opfatter de faktiske forhold. Forudsætninger kan ikke være løsrevet fra virkeligheden. Forudsætningerne skal kunne efterprøves af modtageren. Han blev bedt om at indsætte forudsætning 9 om, at den påtænkte transaktion ikke blev struktureret af North Channel Bank. Det kunne godt gøre en forskel, om man havde struktureret arrangementet og ikke blot havde fuldt kendskab til det. Forudsætning 11 blev indsat, fordi det set i lyset af selskabstømmersagerne kunne have betydning for bankens ansvar, om banken har modtaget et normalt gebyr. Han har svært ved på stående fod vurdere betydningen af, at man fjerner den enkelte forudsætning.

Han skrev i punkt 5.2., nr. 3, i samme udkast, at North Channel Banks rolle i den påtænkte transaktion ikke kunne sammenlignes med de ansvarlige parter i selskabstømmersagerne, fordi det var hans vurdering, at disse havde en højere grad af viden end North Channel Bank i det forudsatte arrangement. Med »de ansvarlige parter« mente han rådgivere, advokater, revisorer og især banker. Han er ikke enig i, at North Channel Bank

**805**

kunne se, at der ikke var et forretningsmæssigt formål med arrangementet for pensionsplanerne.

Han havde en forventning om, at SKAT ville foretage en kontrol ved modtagelse af en ansøgning om refusion af indeholdt udbytteskat.

Det er stadig hans opfattelse som forklaret for landsretten som gengivet på s. 199 i dennes dom af 23. juni 2021, at »tax fraud« er et bredt begreb, og at »dividend stripping transaction« ikke er et fast defineret begreb, men vedrører udbyttearbitrage. Når han samme sted forklarede, at han ikke tog det så tungt, når dispositioner beskrives med ordet »abusive« eller karakteriseres som kriminelle, skal det forstås således, at han reagerede på det, men at han forventede at få flere oplysninger.

Formuleringen af punkt 7.1. i legal opinion af 4. august 2014 er en typisk opinion-formulering, da man bærer ansvaret frem til denne dato. Kunderne kan normalt ikke bruge et udkast til en legal opinion til noget. Der kunne komme regelændringer. Det er ikke unormalt, at man senere genbekræfter en opinion.

Han modtog formentlig H's e-mail af 15. juli 2015 i sin sommerferie. Genbekræftelsen blev underskrevet den 24. juli 2015 af N, som var hans partnerkollega i skatteafdelingen. Han var ikke selv inde over genbekræftelsen. Hans rådgivning af North Channel Bank sluttede den 4. august 2014, da han underskrev sin legal opinion.

Copyright © 2024 Karnov Group Denmark A/S

Han husker ikke, at han sendte en e-mail den 18. marts 2016 til H og K med en orientering om den seneste udvikling i forhold til ansøgninger om refusion af udbyttekildeskat. Det var en generisk mail, som han sendte til flere. Han husker ikke, om han tænkte over, at North Channel Bank kunne være involveret.

Det nyhedsbrev, som H den 22. juni 2017 videresendte til blandt andre T1 og T2, havde vidnet sendt til mange, herunder H. Han husker ikke, om han tænkte, at North Channel Bank kunne være involveret.

Der var bestemt ikke nogen indikationer på svindel. Der var heller ikke indikation for, at der kunne være svindel i arrangementet, men svindel var mulig. Hvis man holdt sig til forbeholdene, kunne der ikke begås svindel i arrangementet.

*V2*

*V2* har forklaret blandt andet, at han tiltrådte som direktør i North Channel Bank den 1. januar 2017, efter at den ekstraordinære revision udført af KPMG på foranledning af BaFin havde ført til, at den hidtidige ledelse ikke længere kunne anses for »fit and proper«.

Han læste først KPMG's rapport om den ekstraordinære revision i sin helhed efter sin tiltræden. Forud herfor havde han ved ejerkredsen fået udleveret uddrag fra rapporten. Konklusionerne i rapporten rejste ingen »røde flag« i forhold til cum/ex-transaktioner, men havde i stedet fokus på, at banken ikke havde overholdt procedurer i forbindelse med, at depotforretningen blev indført som nyt produkt i 2014, ligesom man ikke havde foretaget den fornødne kundeundersøgelse inden for rammerne af hvidvasklovgivningen i forbindelse med »on boarding« af pensionsplanerne.

Selskabsstrukturen i North Channel Bank er fortsat som angivet under pkt. 3.1 i KPMG's rapport. Der er tale om en gængs ejerstruktur i Tyskland, dog er den ikke så meget anvendt på bankområdet. Konstruktionen giver blandt andet mulighed for, at der indgås »profit-and-loss sharing agreements« med et skattemæssigt sigte.

North Channel Bank blev grundlagt i 1924 som en »family and friends«-bank under navnet Bankhaus Oswald Gruber. Banken ændrede navn til North Channel Bank, da den i 2009 blev købt af nogle nordamerikanske investorer. North Channel Banks tre hovedaktionærer købte ham bekendt banken i 2012. Banken lavede fra begyndelsen af 2014 forretning med aktier handlet omkring udbyttetidspunktet. Bankens eneste anden reelle forretning var finansiering af livsforsikring.

Han er bekendt med henvendelsen af 24. marts 2017 fra den tyske indskydergarantiordning, og herunder at der i den forbindelse også blevet rettet henvendelse til Jones Day og Bech-Bruun om den tidligere ydede rådgivning. Der er imidlertid nogle ting, der bliver blandet sammen i forhold til udbyttesagen. Umiddelbart efter sin tiltræden i banken erfarede han således, at der var en låneportefølje med SPV'er inden for en mellemstruktur med et stort antal selskaber. Låneporteføljen svarede næsten til bankens egenkapital og havde tilknytning til en person med tilknytning til ejerkredsen. Han tilkendegav over for indskydergarantiordningen, at han ikke kunne lave en due diligence herpå, og at der var behov for en ekstraordinær revision. Allerede i 2017 kom indskydergarantifonden til den konklusion, at der skulle ske hensættelser svarende til størrelsen af låneporteføljen på SPV'erne, hvilket ville føre til, at banken ikke kunne drives videre. I 2018 blev det afgjort, at ejerkredsen ikke var »fit and proper« til at drive bank, og fra dette tidspunkt har han som direktør i North Channel Bank udelukkende varetaget bankens interesser og således ikke ejerinteresser.

Han erindrer ikke at have set advokat N's brev af 5. april 2017 til advokat Å hos Jones Day.

Finanzamt Mainz Mitte tog i februar 2017 kontakt til North Channel Bank om en retshjælpsanmodning fra de danske myndigheder vedrørende refusion af udbytteskat. T2 og T1 fra den tidligere

**806**

over KPMG's rapport fra den ekstraordinære revision i 2016.

Han går ud fra, at han har set advokat U's brev af 2. april 2019 til SØIK og Kammeradvokaten. Det var en brat opvågnen, da North Channel Bank i juni 2017 blev ransaget på grundlag af anmodninger fra danske og tyske myndigheder. Alt materiale vedrørende depotforretningen blev beslaglagt i den forbindelse, og forløbet førte til sagsanlægget mod banken ved High Court of Justice i London. North Channel Bank blev først bekendt med sagsanlægget i oktober 2018, selvom stævningen forelå i forsommeren 2018. Betalingskravet på omkring 1,1 mia. kr. var af en sådan størrelse, at going concern ikke var muligt uden en ordning med de involverede parter. Overvejelserne gik på, at man i stedet for at erklære North Channel Bank konkurs skulle prøve at få solgt banken i fri handel. North Channel Bank var klar over, at der, i modsætning til hvad der er muligt efter amerikansk ret, ikke kunne laves en »deal« med myndighederne i Danmark, der også omfattede det strafferetlige ansvar. SØIK ønskede, at der blev afsagt dom over banken, og at der skulle være tale om en »synlig« bøde. Formålet med advokat U's brev var at illustrere over for SØIK, at man kunne risikere, at det ville gå ud over mulighederne for at få tabet begrænset, hvis SØIK gik for hårdt frem. I 2018 havde banken kontakt til mange myndigheder, herunder blandt andet Bundeskriminalamt (BKA), og det stod klart for banken, at der måtte arbejdes proaktivt, hvis banken skulle overleve. Han havde som arbejdshypotese at opnå en løsning, som indebar, at bødebetalingen skulle udsættes, således at betalingen kunne tages af provenuet ved et salg af banken. På den måde ville banken trods en stor bøde kunne overleve i tiden frem til et salg. Det lykkedes da også at få en aftale i stand om, at bøden ikke skulle betales her og nu.

Det »Letter of intent«, der blev udarbejdet, var et vigtigt dokument til brug for forevisning for revisionen ved årsafslutningen, idet dokumentet var afgørende for, om bankens regnskab kunne godkendes. Det materiale, som myndighederne fik adgang til i henhold til pkt. 4.1. og 4.2. i »letter of intent«, var det due diligence-datarum, der skulle sættes op til brug for potentielle købere af banken. North Channel Bank så ingen grund til ikke at være fuldstændig transparente over for de danske og belgiske myndigheder, og derfor fik blandt andet Kammeradvokaten adgang til datarummet. Visse dele af materialet var dog på sædvanlig vis ekstraheret af hensyn til persondatareglerne og reglerne om bankhemmelighed. Der var imidlertid tale om en ubegrænset adgang til materialet, således det var gjort tilgængeligt i datarummet. Han erindrer ikke, om man på dette tidspunkt havde drøftelser med Bech-Bruun eller Jones Day om adgangen til materialet.

North Channel Banks amerikanske ejere var i 2017 og 2018 meget interesserede i at få at vide, hvem banken havde kontakt med hos de danske myndigheder. North Channel Bank har ikke noget kendskab til indholdet af de amerikanske ejeres aftaler med de danske myndigheder.

Han er ikke blevet anmodet om at attestere størrelsen af de gebyrer, som North Channel Bank har modtaget, men banken har udarbejdet en opgørelse over de indtægter, som banken har haft i forbindelse med depotforretningen. Han kan ikke huske, om opgørelsen skete på anmodning af Kammeradvokaten eller SØIK, men opgørelsen dannede grundlag for bødefastsættelsen under straffesagen ved Retten i Glostrup.

Både banken og bankens ejerkreds havde interesse i, at bøden skulle indgå i det samlede forligsbeløb, som banken skulle betale, men motiverne var forskellige. For banken var det af afgørende betydning for bankens egenkapital og muligheden for going concern, mens ejerkredsen alene var interesseret i bundlinjen.

North Channel Banks brev af 1. april 2019 til SØIK skal læses i lyset af, at SØIK havde anmodet banken om at udarbejde en opgørelse over, hvor smertegrænsen lå i forhold til bankens mulighed for at betale bøde og kompensation, og brevet indeholder således en simulation over forskellige scenarier. Simulationen viste, at bankens smertegrænse lå på 3 mio. euro i forhold til going concern. Det ville have været yderst vanskeligt for banken at betale en bøde på 110 mio. kr. Den samlede kompensation, der omtales i brevet, dækker over både bøde og erstatning. Også forud for det i brevet af 1. april 2019 omtalte møde den 22. marts 2019 havde der fra bankens side været bestræbelser på at komme i dialog med de rette personer og myndigheder om sagen.

I den betingede interkreditoraftale fra september 2019 var der aftalt gensidig fortrolighed mellem parterne. Parterne kan fritage banken for fortrolighedskravet, men det vil kræve meget gode grunde. Han ved ikke, om banken er blevet spurgt ind til muligheden for at ophæve fortroligheden i forhold til Bech-Bruun, men det vil han gå ud fra. Aftalen indeholder ikke en samarbejdsforpligtelse, f.eks. om at rejse krav mod andre, men der er fastsat en række rammer for, hvad banken kan foretage af dispositioner som led i den almindelige forretningsmæssige drift frem mod et salg mv. Spørgsmålet om deling af dokumenter og data med skattemyndighederne er reguleret i Letter of Intent.

Han er bekendt med, at Kammeradvokaten har modtaget et stort antal dokumenter fra North Channel Bank, men han ved ikke, om tallet er 58.000. Persondatareglerne er blevet iagttaget i den forbindelse. Bech-Bruun er blevet nægtet adgang til de samme dokumenter under henvisning til persondatareglerne, men han har ikke i øvrigt noget kendskab til baggrunden herfor. Han er

**807**

ikke bekendt med, at der skulle være givet Bech-Bruun adgang til 12.000 dokumenter, og banken har ikke produceret dokumenter til Bech-Bruun.

Bankens pressemeddelelse af 7. december 2021 skal læses i lyset af, at prisen for banken i 2018 blev vurderet til at ligge mellem 40 og 58 mio. euro. Det har siden vist sig, at dette beløb var sat for højt, og den korrigerende prissætning er nu mellem 20 og 35 mio. euro. Det er korrekt, at der er angivet en prissætning mellem 50 og 70 mio. euro i North Channel Banks brev af 1. april 2019 til SØIK. Det har været en meget broget skare, der har vist interesse for at købe banken, f.eks. har en gammel engelsk investeringsbank været på banen som mulig køber. Der har også været meget useriøse henvendelser. Nu er der en investor med rod i ejendomssektoren, der ønsker at komme ind på bankmarkedet. Den pågældende investor anses for seriøs og er allerede godkendt til køb af BaFin i anden sammenhæng. En afgørelse forventes i løbet af sommeren. North Channel Bank har fuld banklicens. Salget af banken er betinget af, at BaFin godkender køber, og at procestilvarslingen under denne sag fra Bech-Bruun tilbagekaldes. Hvis banken ikke bliver solgt, har BaFin tilkendegivet, at bankens drift skal ophøre.

Ved brev af 8. oktober 2019 til de danske skattemyndigheder gav North Channel Bank afkald på advokat-klient-privilegier i forbindelse med sagen, således at bankens rådgivere blev fritaget for deres tavshedspligt. Der er således tale om et forhold, der er aftalt sidenhen, og som ikke indgår som en del af interkreditoraftalen. Brevets indhold er afstemt mellem advokat U og Kammeradvokaten, og banken er ikke gået ind i en dybere vurdering af, hvem der skulle fritages og hvorfor.

North Channel Bank har været optaget af at give fri adgang til oplysninger i processen for at sikre åbenhed. Banken har hele tiden samarbejdet med myndighederne, men i begyndelsen var fokus på andre problemer end cum/ex-transaktionerne i bankens depotfortretning.

Han har ikke tidligere set pressemeddelelsen af 16. december 2021 fra ReedSmith. Advokat H fra Jones Day har haft en rolle i forbindelse med rådgivning af North Channel Bank om købsaftalen, men der har ikke været tale om rådgivning om væsentlige forhold. Han har ikke selv haft en drøftelse med H om, hvorvidt H kunne afgive vidneforklaring under denne sag, men det er blevet drøftet mellem hans kollega … og H. Når North Channel Bank har udtalt sig imod, at H afgiver vidneforklaring, skyldes det, at man er nervøs for, at en vidneforklaring vil kunne skade banken fremadrettet i lyset af den procestilsvarsling, som Bech-Bruun har foretaget af banken under denne sag. Det er også det, der fremgår af advokat Jakob Lentz' brev af 20. december 2021 til advokat U, hvor advokat Lentz gengiver advokat U's tilkendegivelse herom.

Han blev opmærksom på, at der var en problemstilling med cirkulære transaktioner og cum/ex-transaktioner i løbet af 2. halvår 2017. I efteråret 2017 blev T2 og T1 presset ud af den overordnede koncernstruktur, og North Channel Bank fik herefter adgang til ydereligere oplysninger. North Channel Bank iværksatte herefter grundige undersøgelser af betalingsstrømme mv. i banken. I løbet af 2018 blev de klar over, hvad der var foregået. Der var næsten 500 transaktioner. Det afdækkede setup havde intet at gøre med bankdrift. Når man så på bankens betalingssystemer, så man ingen betalinger. Det var en lukket forretning, helt klart kun med et formål - at udstede Dividend Credit Advices.

Hele setuppet med de amerikanske pensionsplaner bar præg af, at der ikke var nogen forretningsrisiko, og at dividenderne kørte i et kredsløb rundt om de samme aktører. En konstruktion, hvor både køber, sælger og broker opererer inden for den samme bank, er helt utænkelig. Der er ingen tvivl om, at North Channel Bank har været instrument i et veltilrettelagt bedrageri rettet mod flere stater.

Han er bekendt med det transaktionsdiagram, som K sendte til A med mail af 10. april 2014. Hans indtryk som bankmand er, at det indeholder en meget tydelig beskrivelse af, hvad der skal foregå, også selv om man ser alene på den grafiske illustration. Det angiver, at der er tale om et lukket kredsløb, hvor alle kontrahenter inklusive brokeren har konti i North Channel Bank, og at transaktionerne går i nul. Dividenden vandrer således rundt i en cirkel, og det simuleres, at North Channel Bank har fået dividenden ind. Man kan se, at ingen tjener penge på konstruktionen, og at der hverken er et arbitrage- eller forretningsmæssigt formål. Hele arrangementet er automatiseret. Det er også derfor, at North Channel Bank har accepteret at betale en bøde.

Hvis man kan læse tysk, vil man også kunne se, at der er en meget høj grad af grundighed i forhold til beskrivelsen af blandt andet rapporteringspligt og lignende. Hvis man blot ser på den enkelte konto, ser transaktionen ægte nok ud, men det er ikke tilfældet, når man ser på det samlede transaktionsmønster. Hvis der havde været realitet i arrangementet, ville man i øvrigt være begyndt med en kreditering og ikke som i denne sag en debitering. Arrangementet bygger blandt andet på anvendelse af WP2-systemet og anvendelse af Dwpbank (Deutsche WertPapierService Bank) som serviceprovider. Dwpbank anvendes således som clearingsbank for en række tyske banker, og der foretages ingen selvstændig prøvelse i Dwpbank af overførsler, der foretages af banken via WP2-systemet.

North Channel Banks brev af 11. maj 2015 til Campbellpur Pension Plan er et eksempel på et almindeligt »Dividend Credit Advice«. Der er imidlertid tale om en erklæring med et positivt forkert indhold. Havde

**808**

dokumentet indholdsmæssigt været korrekt, således at der rent faktisk havde været aktier og var skat en betaling af udbytte, ville der jo have været overført penge inden for Target/SWIFT-systemet, og det pengespor findes ikke i sagen.

Der er ud over letter of intent, interkreditoraftalen og afkaldet på advokatklient-privilegier ikke indgået aftaler mellem Skatteforvaltningen og North Channel Bank.

*V3*

*V3* har forklaret blandt andet, at enheden Særlig Kontrol blev etableret i 2013. Der var dengang ca. 100 medarbejdere. Han var en del af underopgaven Projekt Enkeltsager. De modtog sagerne fra Øvrig Indsats. Det var et krav, at der var tale om komplekse svigsager, og at svigen var omfattet af straffelovens § 289. De måtte ikke selv finde sager. Deres undersøgelser var i sagens natur primært bagudrettet. De fleste ansatte i Særlig Kontrol var skatterevisorer. De var generalister med næse for kontrol. Særlig Kontrol havde ikke selvstændig kompetence til f.eks. at standse udbetalinger af refusion af udbytteskat.

Forud for juni 2015 havde han ingen kompetencer inden for udbytteområdet, og det var der heller ikke andre i Særlig Kontrol, der havde. Han var en del af projektledelsen og var således med til at fordele sager. Typisk var der én sagsbehandler pr. sag. Han fik første gang en sag om refusion af udbytteskat den 17. juni 2015, da han modtog en anmeldelse herom gennem V13.

Da han talte med V13 den 17. juni 2015, havde de ikke andre oplysninger, end hvad der fremgik af advokatens anmeldelse af 16. juni 2015. Han havde da endnu ikke set advokatens mail af 11. juni 2015, idet han var på kursus. På mødet den 17. juni 2015 blev han og V13 enige om, at sagen skulle placeres hos ham. De afventede yderligere oplysninger fra advokaten, som kom den 18. juni 2015. Han begyndte sit arbejde med sagen den 18. juni 2015. Henvendelsen fra advokaten var kun usædvanlig på grund af beløbets størrelse, om end den nok var lidt mere detaljeret end den typiske henvendelse.

Det første, som han gjorde, var at læse henvendelserne igennem og identificere aktørerne. Han søgte på alle navnene i deres daværende journalsystem, Captia, og i SKAT's afgørelsessystem. En reclaimagent ville ikke være oprettet som part i systemet. Han søgte også på dele af navne for at gøre søgningen så bred som muligt, men han fik ikke et eneste hit. Han søgte også efter pensionsplanerne på internettet, men han fandt ikke noget. De manglende hits gjorde ikke, at han ikke opfattede henvendelsen som seriøs. Næste skridt var at kigge på dobbeltbeskatningsoverenskomsten med Malaysia, og han undersøgte, hvordan processerne egentlig var.

På et møde den 22. juni 2015 talte han med blandt andre V13 om sagen. Derefter kontaktede han fagkontoret, fordi han ikke selv kunne komme videre. Han havde ikke indtryk af, at der var en brændende platform. Han fandt gennem personalefortegnelsen frem til V6 som han sendte en mail den 24. juni 2015, hvor han bad om at få forklaret, hvordan processen var. Han tog ikke kontakt til advokaten, da det var V13 der havde kontakten, og advokaten i øvrigt gerne ville have sagen overdraget til SØIK. Det virkede desuden, som om advokaten havde afgivet alle oplysninger i sin besiddelse.

Han kendte til eksistensen af systemet 3S, hvor man kan slå selskabers selvangivelser op. Han vidste ikke, at man brugte 3S til at behandle sager om refusion af udbytteskat. Der er formentlig mere end 100 IT-systemer i SKAT. Det var ikke naturligt på det tidspunkt at gå i 3S. Hvis han var gået i 3S på dette tidspunkt, og han havde de relevante rettigheder, ville han ikke have fået nogen hits på de første aktører, men han ville have fået hits på nogle af pensionsplanerne. De kontoudtog, som advokaten medsendte, kunne ikke

bruge til så meget, herunder da man ikke kan se, hvad beløbene vedrører.

V6 reagerede ikke på hans henvendelse af 24. juni 2015. Han rykkede derfor V6 telefonisk og lagde en besked. Omkring den 30. juni 2015 kontaktede han en kollega til V6 som henviste til V6. Han hørte dog fortsat ikke fra V6. Han kunne ikke rigtigt gøre mere på egen hånd, så han var i venteposition. Han opfattede ikke sagen som hastende. Han mindes ikke, at V13 fortalte ham, at hun fik at vide, at der sad en mand i Taastrup, der var involveret i svindlen. Han blev ikke på daværende tidspunkt orienteret om, at V13 havde været i kontakt med V17 og han hørte derfor heller ikke om V17's tilkendegivelse om, at der ikke var noget at komme efter.

I perioden fra den 2. til den 27. juli 2015 var der sommerferie. Hvis han havde ment, at der var en brændende platform, ville han have overdraget sagen til en anden i ferieperioden.

Han modtog henvendelsen fra HM Revenue & Customs den 30. juli 2015. Han orienterede ikke straks sin chef herom, da det var i ferieperioden. Nogle af oplysningerne i henvendelsen havde de allerede fra advokaten, men der var derudover en detaljeret beskrivelse af aktørerne og det overordnede setup. Henvendelsen fra HM Revenue & Customs var klart mere detaljeret end henvendelsen fra advokaten, idet der blandt andet indgik flere navne. Listen med de 180 navne fik de først den 6. august 2015. SKAT har ikke udbetalt penge direkte til Solo Capital. Han forbandt straks henvendelsen fra HM Revenue & Customs med advokatens henvendelse.

Han rykkede på ny V6 den 30. juli 2015. Da han ikke hørte noget, ringede han til V18 den 3. august 2015. Han fortalte hende om sagen, og hun henviste igen til V6. V18 bad ham sende nogle oplysninger og foreslog

**809**

et møde den 6. august 2015 i Høje-Taastrup. Han foretog ikke yderligere søgninger, da der nu var hul igennem til fagområdet. V18 sagde, at de skulle bruge navnene på de endelige modtagere. Man kunne have udfundet udbetalingerne til reclaimagenterne, da de bogføres i økonomisystemet SAP38, hvor man dog kun ville kunne se bruttobeløbene. Han ville skulle have hjælp til at søge i SAP38.

Til stede på mødet den 6. august 2015 i Høje-Taastrup var to personer fra Store Selskaber, … som var procesejer for udbytte, V18, V6, en elev og vidnet. På mødet fremlagde han problemstillingen. Han havde fået oplyst fra sin kontakt i HM Revenue & Customs, at der ville komme et nyt angreb, hvilket han fortalte V18. V18 ville gå til V17 med henblik på et generelt udbetalingsstop. Det var hendes beslutning, og han syntes, at det var fornuftigt, selv om det er et voldsomt indgreb.

Efter mødet gik de ned på V6's kontor. På bordet lå der store papirbunker, som han bladrede i og fik øje på navne fra listen. Bunkerne bestod af ansøgninger med bilag i fysisk form. Sagsarkivet for det aktuelle år befandt sig også på V6 kontor, mens arkivet for tidligere år var i kælderen. I V6's regneark indgik kun navne på aktører, men ikke udbetalingerne. V6 viste ham, hvordan man finder udbyttemodtagere i 3S.

Han var udlånt på deltid til SØIK fra den 1. september 2015 til juni 2016. Han skulle bistå med sin viden som skatterevisor. Det betød ikke, at han havde fri adgang til SØIK's materiale. Han fik stillet konkrete opgaver, som han skulle løse. Han havde tavshedspligt med hensyn til SØIK's efterforskning. Rent praktisk sad han oftest hos SØIK, når han arbejdede for SØIK. Han tog ikke oplysninger fra SØIK med fysisk til SKAT. Samarbejdet mellem SKAT og SØIK foregik på den måde, at der blev holdt statusmøder ca. en gang om måneden. SØIK kunne ikke udtale sig om efterforskningen, så det var mere oplysninger fra SKAT til SØIK. Så vidt

han husker, handlede møderne primært om, hvor SKAT var henne i gennemgangen af materialet.

Han hørte første gang om KPMG-rapporten omkring august 2018 fra Kammeradvokaten. Han havde hverken set den i sin egenskab af skattemedarbejder eller SØIK-medarbejder. Han hørte omkring samme tidspunkt første gang om, at Bech-Bruun havde afgivet North Channel Bank. Politianmeldelsen nævnte ikke KPMG-rapporten, fordi de ikke kendte den. Havde de kendt til den på daværende tidspunkt, ville de klart have henvist til den i anmeldelsen. Han var ikke involveret i SØIK's begæringer om ransagning og edition indgivet til Retten i Lyngby.

Han er bekendt med internt notat af 8. januar 2016 fra Særlig Kontrol. Det var den 6. august 2015, at der kom en mail fra Storbritannien med en liste på 184 navngivne selskaber, hvoraf der var sammenfald med navne fra listen i advokatens anmeldelse - nu angivet med korrekt navn.

Det fremgår af den første politianmeldelse vedrørende de 6,2 mia. kr., at det drejede sig om 126 selskaber, der havde indsendt 2120 anmodninger om refusion. Tallene blev udfundet ved hjælp af en IT-mand på baggrund af listen modtaget fra Storbritannien. De efterprøvede oplysningerne, men de kunne ikke på dette tidspunkt konstatere, at der var tale om svindel. De fandt de konkrete ansøgninger frem, da disse skulle overleveres til SØIK. Anmeldelsen gik derfor på »formodet svindel«, men det var nødvendigt at efterforske sagen for at kunne vurdere dette. Hurtigt efter anmeldelsen blev de sendt hjem fra SØIK og bedt om at komme igen med en bedre belyst sag. Næste skridt var at se, hvad der var på de fire nævnte custodians. De lavede på et tidspunkt et regneark med de enkelte ansøgninger og pensionsplaner mv. De indtastede alle de informationer, de kunne finde, herunder ansøgningsdato, reclaimagent, custodian, aktier, antal, udbytte pr. aktier, totalt udbyttebeløb, den indeholdte skat, refusionsbeløbet og udbetalingsdato. Der var også oplysninger om »ex date« og »payment date«.

Det var også ham, der indgav den anden politianmeldelse i november 2015. De yderligere 2,9 mia. kr. fremkom på baggrund af yderligere undersøgelser vedrørende de pågældende fire custodians. Den tredje politianmeldelse vedrørte et beløb på 3,2 mia. kr. KOI blev opdaget, fordi den i SKAT blev nedsat en task force, som stødte på KOI, og det lignede det, som man allerede var bekendt med. Det var vigtigt, at man fik det hele med. De var på dette tidspunkt bekendt med det samlede beløb, som knyttede sig til North Channel Bank.

Der blev i perioden fra den 1. januar 2012 til den 6. august 2015 udbetalt ca. 14,2 mia. kr. i blanketordningen, hvoraf 12,7 mia. kr. menes at være svindel. Differencen på ca. 1,5 mia. kr. vurderedes ikke at være svindel, hvilket var baseret på en sandsynlighedsvurdering, fordi man ikke kunne efterprøve underliggende data.

Han har ikke tidligere set den stævning, som SKAT har udtaget mod Solo Capital m.fl. i England. Han er enig i, at punkt 25 indeholder en opregning af de udbetalinger, som tilsammen udgør de ca. 12,7 mia. kr., som er politianmeldt. I punkt 5.b. angives de ni depotbanker, som er anmeldt til politiet. Han kan ikke sige, hvornår Særlig Kontrol blev bekendt med North Channel Banks involvering i svindlen. De fandt frem til North Channel Bank gennem de reclaimagenter, som var genstand for deres undersøgelser.

Han er bekendt med notat af 1. september 2016 benævnt »Nærmere redegørelse for SKAT's anmeldelser til SØIK med fokus på de kontrolhandlinger, der er foretaget mellem de forskellige anmeldelser«. På dette tidspunkt havde man gennemgået ansøgninger fra de

**810**

berørte reclaimagenter og custodians. De formodede, at der ikke ville blive anmeldt yderligere. Man fandt dog senere yderligere én

reclaimagent. Den eneste tyske bank var North Channel Bank. Det var også den eneste custodian, der angav at være en bank.

Han genkender mailen af 9. august 2016 fra O sendt til … vedhæftet en xlm-fil. Han husker det anførte om, at North Channel Bank angiveligt handler som mægler for mindst 24 små amerikanske medarbejderpensionsfonde, som alle er unge og ikke har nogen stor økonomisk volumen. O er den eneste, der er udnævnt som kompetent myndighed, så alle anmodninger gik gennem ham.

Han husker at have læst mailen af 9. september 2016 fra C til V13. Han husker ikke, om han undrede sig over, at tyskerne skulle have oplysninger om danske cum/ex-sager. V13's svar til C samme dag skal ses i lyset af, at der på dette tidspunkt var sendt en anmodning til Tyskland. Han ved ikke, hvilken dialog svaret henviser til. Han husker ikke nærmere om opfølgningen. Han ved, at han og V13 har talt om Tyskland, og at det var svært at få oplysninger.

O videresendte mailen af 10. oktober 2016 fra Finanzamt für Steuerstrafsachen til ham. Identiteten på den tyske bank fremgik ikke, men de forsøgte ihærdigt over en lang periode at få oplysningen fra de tyske myndigheder, men det lykkedes ikke. Oplysningen må være tilgået politiet i stedet. Han overvejede ikke, hvem den tyske bank kunne være. Han noterede sig blot oplysningerne. Han ved ikke, om V13 eller andre blev orienteret om mailen. De undersøgte ikke nærmere på baggrund af denne mail, da de havde anmeldt det, der var at anmelde i sagen. Om de brugte oplysningerne i forhold til aktuelle sager, husker han ikke.

Han fulgte ikke specielt med i udbuddet af advokatundersøgelsen i december 2016, men han afleverede nogle dokumenter til brug herfor. Opdraget var alle dokumenter fra perioden, der kunne være relevante for svindelsagen. Han vidste, at Bech-Bruun vandt udbuddet. Han var ikke med til at finde materiale til andre undersøgelser, bortset fra SIR's rapport fra september 2015.

Det skal nok passe, at der i 2015 var en gennemsnitlig sagsbehandlingstid mellem otte dage og to måneder i sager om refusion af udbytteskat.

*V4*

*V4* har forklaret blandt andet, at hendes arbejdsplads fysisk var placeret i Ballerup og Høje-Taastrup, selvom ledelsen havde kontorer i Jylland.

Hun har ikke udarbejdet notat af 5. september 2007 om udbytteadministrationen i Ballerup. Hun erindrer ikke at have set notat af 17. september 2006 om forceret tilbagebetaling af indeholdt dansk udbytteskat mv., men hun er bekendt med den problemstilling, der omtales i notatet.

Hun er bekendt med Skatteministeriets notat af 14. november 2007 om tilbagebetaling af dansk udbytteskat til begrænset skattepligtige. Hendes enhed skulle altid gøre meget for at overbevise resten af organisationen om, at der var reelle problemer på udbytteskatteområdet. Hendes fokus var i begyndelsen rettet mod vanskelighederne i forbindelse med overholdelse af den regel på 30 dage, der gjaldt i forhold til rentebetaling. Det var efter hendes opfattelse ikke problemstilling, der kunne løses med omlægning af de administrative procedurer, således som Skatteministeriet lagde op til. I forbindelse med en lovændring i 2012 blev der da også indført en otte måneders regel.

Hun har afgivet en dækkende forklaring i Undersøgelseskommissionen vedrørende SKAT om SIR's revisionsundersøgelse fra 2009 af provenuet fra kildebeskatningen af udlændinge. Hun har ligeledes afgivet en dækkende forklaring i undersøgelseskommissionen om sin vurdering af konklusionen i SIR's rapport fra 2010. I SIR's rapport fra 2010 var det anført, at det var muligt at udstede flere udbyttenotaer vedrørende det samme udbytte, når der var tale om omnibusdepoter. Hendes fornemmelse var dog ikke, at det var sådan, det forholdt sig, men det er rigtigt, at der var en risiko for det.

Der kom ikke noget ud af det notat, som hun fremsendte til V8 med mail af 28. oktober 2010, idet Danmark på daværende tidspunkt var dybt engageret i drøftelserne i OECD.

Hun har i forbindelse med sin forklaring i undersøgelseskommissionen givet en dækkende beskrivelse af spørgsmålet om kontrollen med udbytteområdet. For hendes enheds vedkommende var der tale om en bogholderi- og tasteopgave. De havde forgæves søgt om at få midler til at foretage kontrol. Hun er således enig i den beskrivelse af opgaven med administration af udbytteskat, der er foretaget i pkt. 3 i borger- og retssikkerhedschefens redegørelse fra februar 2016.

Hun opfattede det anførte i SIR's rapport fra 2013 således, at der blev ført formel, men ikke materiel, kontrol under blanketordningen. For så vidt angår regnearksordningen (bankordningen) var forholdet nærmere det, at bankerne gjorde det arbejde, som egentlig hørte under hendes enhed. De var trygge ved bankernes varetagelse af opgaven.

Hun har afgivet en dækkende forklaring i undersøgelseskommissionen om den fortsatte aktualitet af SIR's rapport fra 2010 også efter afgivelsen af SIR's rapport fra 2013.

Når hun i undersøgelseskommissionen har forklaret, at »enhver overordnet chef« kendte til problemet med, at der reelt ikke var nogen mulighed for at føre kontrol med refusion af udbytteskat, sigter hun blandt andre til V8, V19 og V17.

Hun har givet en dækkende forklaring i undersøgelseskommissionen om forløbet af dialogmødet med V20

**811**

den 24. oktober 2013. Det anførte i hendes forklaring vedrørende »hullet vedrørende refusioner« sigtede til, at der ikke var nogen kontrolmulighed, og at man måtte forlade sig på det materiale, der blev modtaget fra tredjemand.

Når hun i mail af 4. oktober 2011 sendte et notat direkte til kontorchef D i departementet, skyldtes det, at departementet på dette tidspunkt ikke var adskilt fra SKAT. V8 var bekendt med, at hun havde rettet henvendelse til departementet. D videresendte henvendelsen til E der imidlertid fuldstændig afviste den. Det er i det lys, at hendes mail af 21. november 2011 til blandt andre E skal læses. Hun kan ikke huske, om hun fik noget svar på mailen.

Ansøgningerne i blanketordningen blev modtaget med almindelig post. V22 stod for at åbne og visitere posten. V22 gik på pension den 1. november 2013, og hun fulgte selv efter den 1. december 2013.

Alle ansøgninger blev som udgangspunkt lagt til V6. I 2013 begyndte det at gå ned ad bakke med antallet af medarbejdere. Hun kan ikke huske, hvem der stadig var i enheden, da hun gik på pension. Det skal nok passe, at V6 i 2007 og de følgende år behandlede omkring 90 pct. af alle ansøgninger om udbytterefusion. Sagsbehandlingen skete i 3S-systemet, hvorfra der blev genereret lister til brug for udbetalingerne. Alt blev gemt i bundter, så de havde godt styr på dokumentationen.

Hun har afgivet en dækkende forklaring i undersøgelseskommissionen om adgangen til udbetaling af refunderet udbytteskat og om kontrasignatur. Kontrasignatur blev afskaffet i 2011, da de efterhånden var så få medarbejdere tilbage, at de ikke kunne opretholde en funktionsadskillelse. Bogholderiet fik alene overdraget listen over udbetalinger, ikke selve ansøgningsmaterialet.

Hun har afgivet en dækkende forklaring i undersøgelseskommissionen om lokal regnskabsgodkendelse. Det foregik som anført i …'s mail af 14. maj 2014.

I forhold til gyldigheden af de dokumenter, som de fik forelagt, kunne de ikke gøre andet end at se på tilsendte og forlade sig på, at materialet var ægte og oplysningerne korrekte. Det var et krav, at blanketten skulle være attesteret og underskrevet af den udenlandske skattemyndighed, således at de kunne vide, hvilken dobbeltbeskatningsoverenskomst der var tale om. Manglede attestation og underskrift, blev ansøgningerne sendt retur. Det skete ofte, og man gik ikke bort fra denne praksis i hendes tid. På et tidspunkt skete der dog en ændring i forhold til ansøgninger fra USA, således at det var tilstrækkeligt, at der blev vedlagt et certifikat fra de amerikanske myndigheder. Hun kan ikke huske, hvem der besluttede, at det var tilstrækkeligt til at opfylde dokumentationskravet.

Hun er bekendt med, at der blev anvendt reclaimagenter. Denne ordning opstod en gang efter 2010, hvor der blev indført nulskat på pensioner i USA. Ansøgningerne om udbytterefusioner fra amerikanske pensionsplaner begyndte så småt at blive indsendt fra 2010. De brugte meget »krudt« på at finde ud af, hvad pensionsplaner overhovedet var for en størrelse. Hun husker ikke, at der var tale om så store beløb, som man f.eks. ser i ansøgningen af 12. maj 2014 fra Goal Group. Hun var i øvrigt ikke bekendt med denne reclaimagent. I hendes tid lå de store beløb i bankordningen, således som hun også har forklaret over for undersøgelseskommissionen. Brugen af reclaimagenter foregik kun på blanketordningen. Gennem bankordningen var der jo ikke brug for agenter.

North Channel Banks »dividend advice« af 9. april 2014 til Vanderlee Technologies Pension Plan er et eksempel på et udbyttenota. Hun kan ikke genkende den håndskrift, der er påført notaen. Hun har over for undersøgelseskommissionen afgivet en dækkende forklaring om, hvorvidt der blev stillet formkrav til en sådan udbyttenota. Udbyttenotaen var helt central for sagsbehandlingen. Hun stolede på bankerne. Denne sag kan kun være blevet så stor, fordi der var nogen, som de ellers stolede på, der svindlede. En bank, der har udstedt en udbyttenota, har ikke mulighed for at se, om der rent faktisk er indeholdt udbytteskat i det udloddende selskab, ligesom banken ikke har mulighed for at afgøre, hvem der er rette »beneficial owner«. Udbyttenotaen skal dokumentere, at der er udbetalt udbytte til den angivne modtager. Udbyttenotaerne blev udstedt af banker, som pengene løb gennem, og bankerne havde i hvert fald mulighed for at følge pengestrømmen. Pengene skulle jo havne hos udbyttemodtageren. Et refusionsbeløb på 37 mio. kr. var ikke unormalt. De havde ikke oplevet svindel med udbyttenotaer, men de tænkte da på, hvad der kunne ske undervejs i denne proces.

Hun erindrer ikke at være stødt på navnet Y som blandt andet fremgår af fuldmagten af 15. april 2014 udstedt af Vanderlee Technologies Pension Plan.

Hun har ikke set særligt mange certifikater svarende til certifikat af 7. april 2014 udstedt til Vanderlee Technologies Pension Plan af det amerikanske Department of Treasury. Brugen af disse certifikater var i sin vorden i hendes tid i SKAT. Den udenlandske skattemyndighed skulle i overensstemmelse med kravene i den relevante dobbeltbeskatningsoverenskomst attestere, at den refusionssøgende var skattepligtig i det pågældende land. Hun er ikke stødt på certifikater, hvor det af vandmærket fremgår, at certifikatet er »void«. Det ville hun have undret sig over.

Hun husker ikke Solo Capital.

Ved deres gennemgang af ansøgningerne prøvede de at sikre sig, at der reelt var tale om en amerikansk pensionskasse. De skulle imidlertid alene forholde sig til de formelle forhold, og hvis blanketten så ud til at være i

**812**

orden, havde de ikke så mange andre muligheder end at udbetale den refunderede udbytteskat. Kravet i henhold til dobbeltbeskatningsoverenskomsten om, at mindst 50 pct. af de begunstigede skulle være hjemmehørende i USA, blev ikke efterprøvet nærmere, og det blev således forudsat, at det forholdt sig således. Havde man

haft en underskrift fra de amerikanske myndigheder på blanketten, ville de amerikanske myndigheders underskrift også omfatte en attestation af dette forhold.

For så vidt angår præmisserne på s. 19, første afsnit, i Østre Landsret dom af 23. maj 2018 i ankesagen mod blandt andre V6, var det ikke en sædvanlig fremgangsmåde, at der ikke blev kontrasigneret. V22 foretog en grundig gennemgang af ansøgningerne ved modtagelsen af sagen, og allerede på dette tidspunkt blev flere ansøgninger afvist. Herefter blev ansøgningen registreret i 3S. Listen fra 3S skulle kontrasigneres af V22 inden den gik videre til bogholderiet, og på dette tidspunkt så V22 ikke på ansøgningerne en gang til. De var meget få ansatte, og mængden af ansøgninger steg meget. De havde en enorm arbejdsbyrde, så de kunne ikke kontrollere alt muligt, hvad de jo heller ikke måtte, for så ville alt gå i stå. Kontrasignaturen inden overgangen til bogholderiet var derfor en formssag. I bogholderiet skulle der også være to underskrifter. Hun mener, at der var en særlig procedure i bogholderiet ved udbetalinger over en vis grænse. Hun kan ikke huske, om man i 2011/2012 gik bort fra kravet om kontrasignering. Hvis det så rigtigt ud, skulle de honorere udbetalingsanmodningen. De skulle ikke foretage andet end formel kontrol.

I 2011 rettede Skattecenter Holbæk, der havde til opgave at føre kontrol med skatteforholdene for ansatte i SKAT, henvendelse til hende med oplysning om, at man havde en verserende sag vedrørende V6. Hun fik imidlertid aldrig at vide, hvad sagen drejede sig om. Hun havde afgjort tillid til G der stod for at udvikle udbyttedelen i 3S-systemet og i øvrigt var fantastisk dygtig til sit arbejde. Hun var fuldkommen målløs, da hun fandt ud af, at V6 havde begået kriminalitet.

Hun var med til at udarbejde problemkataloget i 2006. Udbytteskat udgør en meget lille del af skattesystemet, og provenuet er ikke stort. Derfor var der nok ikke så mange, der interesserede sig for området. Man besluttede i sin tid, at administrationen af udbytteskatten skulle ske sammen med rentesystemet, hvilket ikke var hensigtsmæssigt, da udbytte jo kun kommer til udbetaling en gang årligt. Det var et problem, at der ikke skete nogen afstemning mellem det, der blev indberettet, og det, der blev selvangivet.

Udbytteadministrationen fik altid anmærkninger fra SIR, fordi man ikke kunne nå at udbetale den refunderede udbytteskat inden 30 dage. Det betød, at der løb renter på beløbet. Dette blev senere ændret, således at der først pålød renter efter seks måneder, og denne problemstilling blev også afbødet gennem indførelse af bankordningen.

Hun sa lovændringen i 2009 som en stor forbedring. Lovændringen i 2012 førte ikke til, at sagsbehandlingen på udbytteområdet blev grundigere, men nu kunne man afslutte sagsbehandlingen inden for fristen for betaling af renter.

Udfordringerne vedrørende omnibusdepoterne var et globalt problem, og Danmark lagde meget energi i arbejdet i OECD. Hun var også involveret i dette arbejde og har deltaget i mange møder i OECD-regi. Der blev blandt andet arbejdet på en løsning med en central indberetningsordning vedrørende udlodninger, men det kunne hverken sikkerhedsmæssigt eller it-mæssigt lade sig gøre. Hende betegnet var V12 ikke særligt involveret i TRACE, men han var jo udlandsdirektør og har sikkert fulgt med. Om TRACE var fremtidsmusik kom jo an på, hvordan man skruede det sammen, men et akut problem kunne ikke løses i TRACE.

*V5*

*V5* har forklaret blandt andet, at han har genlæst sin forklaring for landsretten som gengivet i dom af 23. juni 2021 som forberedelse til i dag, og han kan vedstå denne.

Han havde mange forskellige roller hos Bech-Bruun. Han havde sin daglige gang i skatteafdelingen, men han havde også med fast

ejendom at gøre. Han deltog i mange internationale konferencer, hvor hans funktion var at sælge firmaet bedst muligt. Der kom ad den vej en bred vifte af sager, som han videresendte.

Jones Day var på Bech-Bruuns liste over foretrukne samarbejdspartnere i Tyskland, og firmaerne besøgte indimellem hinanden. Han har givetvis mødt H i den forbindelse. Han havde ikke tidligere hørt om North Channel Bank.

Da han modtog mailen af 3. februar 2014 fra H havde han en idé om, hvad »dividend stripping« var, men det var langt fra hans eget fagområde, så han vidste straks, at mailen skulle videre til den fagrelevante partner. Han havde fra A og N hørt noget om »smuthullerne i den tyske skattelovgivning«, men han troede ikke, at dette kunne forekomme i Danmark. Han mener ikke, at han hørte om dette, før han modtog mailen af 3. februar 2014. Han tænkte nok på baggrund af mailen, at der var en klient, der var bekymret for, hvor de betalte i forhold til lovgivningen. Han får indimellem mails, hvor folk er bekymrede for, om de har gjort eller vil gøre noget strafbart. Han husker ikke, om han tænkte nærmere over formuleringerne i mailen. For ham var det alene et spørgsmål om at få henvendelsen hen til den fagrelevante partner. Han var måske i tvivl om, hvorvidt henvendelsen skulle til bankingafdelingen eller skatteafdelingen. A kunne have valgt at videresende mailen eller afvise den.

**813**

Han husker ikke, om han lagde en telefonbesked til H men han har ikke talt med ham. Han sendte mailen af 5. februar 2014 med et prisestimat. Han husker ikke, hvordan estimatet blev lavet, men det var nok A der lavede det og bad ham sende det.

Han var kopimodtager på A's mail af 18. februar 2014 med første udkast til legal opinion, fordi han var »fanget« i mailstrengen. Han havde ikke forinden set udkastet. Han slettede blot disse mails, da han havde travlt med andre ting. Dette gælder også K's mail af 10. april 2014, hvor det tyske diagram var vedhæftet. Han kiggede med sikkerhed ikke på det, da han ikke forstår tysk. Han har aldrig hørt om, at nogen hos Bech-Bruun rådgav på tysk. Han læste heller ikke K's mail af 15. april 2014, hvor det engelske resumé var vedhæftet.

Han var ikke inde over afregningen med North Channel Bank i juni 2014. At han underskrev brev af 29. oktober 2015 til North Channel Bank vedlagt en faktura, skyldtes nok A's fratræden. Han husker ikke, at han fremsendte fakturaen den 21. januar 2016. Han kan se, at den er udarbejdet af N.

Han hørte ikke om H's henvendelse af 15. juli 2015. Han var ikke inde over genbekræftelsen af 24. juli 2015.

Han husker ikke mere om korrespondancen i november 2015 mellem H og Bech-Bruun, end hvad der er anført herom i gengivelsen af hans forklaring for Østre Landsret i dom af 23. juni 2021. Han lavede ikke en kobling til North Channel Bank. Han deltog ikke i noget telefonmøde den 11. november 2015. Han ofrede ikke N's mails af 11. og 16. november 2015 til H særlig opmærksomhed.

Han læste første gang legal opinion i slutningen af oktober 2018. Der var ikke noget deri, som han studsede over.

A's speciale var banker og finansielle institutioner. Han havde en dyb specialviden om området. Han var meget dygtig, så han var helt tryg ved at overlade sagen til ham. Habilitets- og hvidvasktjek foretages altid af den sagsansvarlige partner, så det må have været A.

Det kan ikke lovligt lade sig gøre at få udbytteskat refunderet to gange. I 2014 var han ikke bekendt med, at der foregik svindel med udbytteskat i Danmark. Det havde han ikke fantasi til at forestille sig.

*V6*

*V6* har forklaret blandt andet, at han refererede til V4 frem til hendes pensionering. Herefter refererede han i det daglige til V18 idet den egentlige chef, …, befandt sig i Jylland.

V18 var involveret i opgaverne, dog mest i forhold til overholdelse af sagsbehandlingstiderne. Han drøftede ikke faglige spørgsmål med nogen, efter at V4 og V22 var gået på pension. Der fandtes en skriftlig vejledning for sagsbehandlingen. Den beskrev de ting, der skulle være opfyldt, for at man kunne godkende en ansøgning. Det fremgik blandt andet heraf, at man skulle påse skattepligten, og at der skulle foreligge en udbyttenota. Der skulle desuden være en attestation fra de udenlandske skattemyndigheder på selve blanketten, og ellers blev ansøgningen afvist. Det forekom dagligt, at ansøgninger blev afvist. Ansøgere fra USA havde dog en tilladelse til at vedlægge en separat erklæring fra skattemyndighederne som dokumentation for skattepligten, så derfor var der ikke noget stempel eller en underskrift på selve blanketten. Denne særordning for USA var fra før hans tid. SKAT's ansøgningsblanket var tiltænkt ansøgere fra hele verden og var ikke forbeholdt ansøgere fra USA.

Han er bekendt med teksten i erklæringen af 7. april 2014 fra de amerikanske skattemyndigheder vedrørende Vanderlee Technologies Pension Plan. Det var tilstrækkeligt med et sådant skattecertifikat, da der står et sted, at amerikanske pensionsplaner er undtaget fra skattepligten. Han huskede ikke at have set et certifikat med vandmærket »void«. Han ved ikke, hvad »void« betyder.

De talte i afdelingen om, at der var »et kæmpe hul« i ordningen, og de har givetvis også talt om, at der var en risiko for svindel. Han kendte ikke til, hvad der samlet blev udbetalt hver måned under blanketordningen. Det fulgte han ikke med i. Han kender heller ikke det samlede beløb på årsbasis.

Han er bekendt med reclaimagenten Goal. Han husker også Acupay, Syntax og KOI. Han husker ikke, om der blev anvendt reclaimagenter før 2012. Brugen af reclaimagenter gav ikke anledning til særlige overvejelser. Ansøgningerne fra amerikanske pensionsplaner om betydelige millionbeløb begyndte nok omkring 2014. De undersøgte ikke, hvad det var for pensionsplaner. Han husker ikke, om han havde hørt om A/C Vanderlee Technologies Pension Plan. De overvejede ikke, hvor mange aktier man skulle eje for at være berettiget til en refusion på 26,6 mio. kr., men det kunne man regne ud. En aktiepost på ca. 4 mia. kr. var ikke påfaldende, da han var vant til store tal. Han bemærkede da beløbet, men der var jo dokumentation for det.

Han har i hånden påført refusionsbeløbet på udbyttenotaen af 4. april 2014 udstedt af North Channel Bank til Vanderlee Technologies vedrørende aktier i A.P. Møller. Han husker ikke, om han havde hørt om North Channel Bank forud for maj 2014. De undersøgte ikke, om North Channel Bank var registreret i VP Securities, da de aldrig gjorde dette. Han husker også Solo Capital, som optrådte som custodian. De undersøgte ikke, om Solo Capital var en bank, men det tog han for givet. De tillagde udbyttenotaen betydning, da den skal vise, til hvem der er udloddet, og hvor megen skat der er indeholdt. Han kan ikke se, at den kunne udstedes af andre end en udenlandsk bank. Han har ikke hørt om kompensationsudbytte før. Hvis han havde

**814**

hørt, at der var udstedt to udbyttenotaer på den samme aktie, ville han have sagt, at det ikke kunne lade sig gøre.

Han husker ikke noget om, at dokumentationen udstedt af North Channel Bank skulle fremstå anderledes end dokumentationen fra andre custodians, således som det er beskrevet i SKAT's anmeldelse af 24. august 2016 til SØIK.

Han ved ikke, hvad det gennemsnitlige beløb pr. udbyttenota var før svindelsagen. En stigning fra 40.000 kr. i gennemsnit pr. udbyttenota før svindelsagen til ca. 3 mio. kr. pr. udbyttenota i svindel-

sagen er betydelig, men det var ikke nødvendigvis mistænkeligt, for både udlodninger og refusioner steg hvert år. Han kiggede nøje på det, men fandt ikke noget bekymrende. Han har muligvis talt med V18 herom, men han husker det ikke. Der var ikke nogen, der kontrollerede hans arbejde. Han hæftede sig ikke ved, at der var en betydelig lighed mellem ansøgningerne, fordi der også var en masse andre ansøgninger, så han havde ikke det samlede overblik. Han var ikke opmærksom på den markante udvikling i tallene, som fremgår af diagrammet på side 3 i Skattestyrelsens notat af 30. oktober 2018 benævnt »Status: Bankordning og aktieudlån på udbytteområdet«.

Han husker ikke navnet Y. Han bemærkede ikke, at der var mange fuldmagter underskrevet af Y.

Han ved ikke, hvad angivelsen »void« betyder.

Han husker ikke, om han fik mere travlt i 2013 og 2014. Man var i gang med at oplære nye medarbejdere, men det skyldtes, at opgaven skulle flyttes til Jylland.

Han har kun læst dobbeltbeskatningsoverenskomsten med USA i uddrag. Han husker ikke, om han har læst overenskomstens artikel 22, stk. 2, litra e, hvorefter det er en forudsætning, at mere end 50 pct. af pensionsplanens begunstigede, medlemmer eller deltagere er fysiske personer, som er hjemmehørende i en af de kontraherende stater.

Han har ikke modtaget penge eller anden form for modydelse for at behandle ansøgninger om refusion af udbytteskat fra Solo Capital, B nogen reclaimagent eller andre. Han var ikke med i svindlen. Han havde på intet tidspunkt mistanke om, at North Channel Bank, de 27 navngivne pensionsplaner, der optræder i sagen, reclaimagenterne eller Y var i færd med at lave et svindelnummer mod den danske stat.

## Anbringender

### 4.1. Skatteforvaltningen

*Skatteforvaltningen* har anført navnlig, at det ligger fast, at den danske stat er blevet frasvindlet 1,1 mia. kr., og at North Channel Bank, der var rådgivet af Bech-Bruun, har overtalgt en bøde på 110 mio. kr. for bedrageriet med refusion af udbytteskat.

*Ansvarsgrundlag*

Bech-Bruun er erstatningsansvarlig over for statskassen for den rådgivning, som advokatfirmaet har ydet North Channel Bank. Bech-Bruun rådgav om transaktioner, som intet andet formål havde end at hive penge op af den danske statskasse, og rådgivningen angår de transaktioner, som banken er straffet for. Bankens tidligere ledelse har påberåbt sig Bech-Bruuns rådgivning i den tyske straffesag, og Bech-Bruuns rådgivning er også brugt af banken som et juridisk figenblad for svindlen i forbindelse med det tyske finanstilsyns undersøgelse af banken. Bech-Bruun har altså rådgivet banken om det, der viste sig at være svindel. Dette gælder, selv om Bech-Bruun ikke vidste, at firmaet ydede rådgivning til brug for et svindelnummer og ikke havde til hensigt at medvirke til et bedrageri. Bech-Bruun udviste en bekymrende ligegladhed med selve forudsætningen for rådgivningens relevans, nemlig at den danske stat led et tab, herunder et tab forvoldt ved kriminel adfærd, således som det rent faktisk også var tilfældet. Bech-Bruun kunne henset til den naturlige bevisvægt, som bankdokumenter tillægges, ikke forlade sig på antagelse om, at staten ville kontrollere refusionsanmodningerne. Skattemyndighederne havde i modsætning til Bech-Bruun ikke fuld adgang til bedragernes masterplan.

Bech-Bruun vidste, at hvis man gik ud fra, at der var aktier i setuppet, ville der blive udstedt to udbyttenotaer for samme aktie, nemlig North Channel Banks udbyttenota og udbyttenotaen fra aktielångiverens bank. Når der udstedes to udbyttenotaer, er det for det første én udbyttenota for meget, hvis man forudsætter, at

U.2024.746H - SKM2024.123.HRH

der er aktier, idet to udbyttenotaer indebærer, at der kan søges to gange refusion på samme aktiepost, hvilket ville være kriminelt. Det setup, som Bech-Bruun vurderede og bidrog med rådgivning om, muliggjorde en sådan kriminel adfærd. Bech-Bruun gjorde intet for at forhindre en sådan dobbeltrefusion og forbeholdt sig ikke i sine forudsætninger mod en sådan dobbelt refusion. Maksimalt distancerede Bech-Bruun bankens rolle fra den dobbelte refusion. For det andet er det besynderligt, at North Channel Bank vil udstede en udbyttenota, når North Channel Bank ved, at en anden bank også udsteder udbyttenota til den, der i denne bank er registreret som ejer af aktierne og modtager af udbyttet. Bech-Bruun vidste endda, at tredjemanden skattemæssigt havde afstået aktierne og derfor ikke kunne bruge en udbyttenota til noget som helst, bortset fra skattesvig. For det tredje vidste Bech-Bruun, at denne risiko for bedrageri kunne undgås, hvis man havde fulgt de almindelige regler for afvikling i markedet, fordi der ved anvendelse af de sædvanlige T+3 kun ville blive udstedt én udbyttenota. For det fjerde fik Bech-Bruun ingen forklaring på risikoelementet med to gange

**815**

udbyttenotaer, og Bech-Bruun spurgte heller ikke nærmere ind hertil, selvom man kunne se, at det ikke hang sammen. For det femte vidste Bech-Bruun at cum/ex-modellen var brugt til formodet svindel i Tyskland, og i mails af 3. februar 2014 og 16. april 2014 var Bech-Bruun tydeligt nervøse for denne model, hvor der blev svindlet ved at adskille leverancen af udbytte fra leverancen af aktier.

Man sælger aktien cum, dvs. med udbytte, men leverer ex, dvs. uden udbytte, og udbyttet flyttes ved en kompensationsbetaling. Denne adskillelse tjente nok et formål, men Bech-Bruun overvejede ikke hvorfor, selvom advokatfirmaet - blandt andet ved den forelagte tyske transaktionsbeskrivelse - kunne se, at North Channel Bank og pensionsplanen ville adskille udbyttet og leverancen af aktier på samme måde som i Tyskland. Bech-Bruun kunne således se, at der alene var tre parter i setuppet, som var cirkulært og endte i nul for alle involverede parter. Bech-Bruun kunne se, at der ikke kom aktier eller penge ind i det cirkulære forløb, og at ingen af parterne endte med aktier eller penge. A koncentrerede sig imidlertid mere om, at North Channel Bank kunne distancere sig fra, hvad der skete, end at forhindre ulovlige refusioner. Det forekom vigtigere at rådgive North Channel Bank om, hvordan banken kunne bevisssikre sig mod ansvar med forudsætningen om, at North Channel Bank alene fik et standardhonorar.

Bech-Bruun har begået mange fejl, og fejlene er hver for sig grove. Rådgivningen er dybt usædvanlig og groft uagtsom. Bech-Bruuns forsvar er grundlæggende, at advokatfirmaet har skrevet sig ud af problemerne med transaktionskæden ud fra en betragtning om, at legal opinions skulle være noget særligt, hvor man ukritisk kan operere i en fantasiverden. Bech-Bruun mener, at man i forhold til den bedragne kan forudsætte sig ud af sit ansvar. Det er desuden urigtigt, at der ikke kan svindles med de forudsætninger, som Bech-Bruun indsatte i sin rådgivning af bedrageren, idet tredjemand jo uberettiget fik en udbyttenota og derfor kunne søge om refusion.

Det er ikke lykkedes for Bech-Bruun at skrive sig ud af problemerne, og det vil desuden være stærkt betænkeligt at tiltræde en retstilstand, hvor advokaten kan skrive sig ud af problemerne - uden at problemerne fjernes eller forhindres, når de er konstateret. For Bech-Bruun glemmer, at deres rådgivning ikke angår en situation, hvor det er deres klient, der er skadelidte. Bech-Bruuns rådgivning angår den situation, hvor en tredjemand, den danske stat, er skadelidt. En rådgivning, der endda bygger på en forudsætning om denne tredjemands tab og ansvaret derfor. Det gælder generelt, at man ikke kan fraskrive sig noget ansvar over for tredjemand, og at man tværtimod skal advare herimod, navnlig når risikoen i for-

hold til tredjemand er nærliggende. Hertil kommer advokatens særlige stilling i samfundet. Det er advokatens opgave at fremme retfærdighed og modvirke uret, som det hedder i de advokatetiske regler. Advokaten må ikke vende det blinde øje til. Og advokaten må da slet ikke rådgive om, hvordan klienten kan distancere sig selv fra ansvaret. Det, som retten skal tage stilling til, er altså ikke Bech-Bruuns ansvar i forholdet mellem Bech-Bruun som advokat og dennes klient. Her kan klienten måske tage risikoen for, at forudsætningerne kunne være undersøgt, hvis det er forudsætninger, som klienten selv har mulighed for at efterprøve. Men nøppe, når det er forudsætninger, der angår forhold, som er advokatens arbejde, så som juridiske vurderinger. Efter selskabstømmersagerne ligger det fast, at når man har rådgivet en klient, kan man som rådgiver risikere at være erstatningsansvarlig over for tredjemand, hvis klienten har handlet ansvarspådragende.

*Opdrag og advarsler*

Indholdet og ordlyden af Jones Days mail af 3. februar 2014 indeholdt en klar indikation på, at man ville fingere de tyske cum/ex-transaktioner i Danmark og dermed en klar indikation på potentiel svindel. Det påhvilede derfor Bech-Bruun at sørge for, at klienten ikke - bevidst eller ubevidst - kom til at deltage i netop dette. Bech-Bruun vidste, at cum/ex var problematisk, og Bech-Bruun endte med at udtale sig om en cum/ex-model, dvs. en transaktion, hvor man køber aktierne med ret til udbytte, men får dem leveret uden udbytte. Køberen af aktierne vil altså ikke være den samme som modtageren af udbyttet. Cum/ex er farligt, fordi der sker en kortslutning af sammenhængen mellem ejerskabet og modtagelsen af udbyttet. Man slører ejerforholdene, og der er risiko for svindel med udbyttet. Denne indbyggede risiko var Bech-Bruun opmærksom på, og hvis man indsætter aktielån i en eller begge ender af transaktionskæden, er der endnu flere, der kan benytte sig af, at ejerforholdene sløres.

Denne type handel kan ikke ske på almindelige markedsvilkår. Markedets standarder for handel og levering er nemlig indrettet således, at man vil være registreret som ejer på det tidspunkt, hvor VP Securities tjekker, hvem der skal udbetales udbytte til, hvis et køb sker på det seneste tidspunkt, hvor man kan købe med ret til udbytte. Hvis man køber efter dette tidspunkt, er man ikke berettiget til udbyttet, og man får heller ikke udbetalt et udbytte. Ved handel i overensstemmelse med markedsvilkårene opstår cum/ex-situationen derfor ikke. Bech-Bruun har i deres rådgivning slet ikke forholdt sig til baggrunden for denne adskillelse af leveringen af aktier fra udbyttet, selvom Bech-Bruun var klar over, at dette var værktøjet i cum/ex-svindlen i Tyskland. Hvis man handler uden for det regulerede marked (OTC), følger man markedsvilkårene for afvikling på det marked,

**816**

som aktierne handles på. Når markedet har ændret sin afviklingscyklus, har OTC-markedet derfor historisk set fulgt trop.

*Temaet for opdraget*

Scopet for Bech-Bruuns legal opinion var, om det ville være ansvarspådragende eller strafbart for North Channel Bank i det påtænkte transaktionsforløb at udstede ejerskabsdokumentation, der skulle bruges til at tilbagesøge indeholdt udbytteskat, og der var således tale om et scope, der byggede på en forudsætning om, at staten lider tab. Der er tale om et dybt usædvanligt opdrag, særlig henset til at North Channel Bank angiveligt alene skulle tjene som en almindelig depotbank og have betaling i form af et sædvanligt salær.

Når North Channel Bank spørger Bech-Bruun, skyldes det, at der ikke er tale om en standardaftalesituation. Cum/ex-handlerne betød, at banken ikke ville modtage en betaling, der kunne henføres til det udloddende selskab. Alle handler blev afviklet samtidigt, og

udbyttet blev udlånt. Handlerne var altså sat op, så der ikke ville være aktier på bankens depot eller udbytte på bankens konti på det tidspunkt, hvor banken skulle erklære sig om indholdet af depoterne og konti. Der skulle heller ikke i øvrigt være noget på bankens depoter og konti. Under disse omstændigheder er det særdeles risikabelt at udstede udbyttenotater, og det er ikke mindre risikabelt, når banken og Bech-Bruun vidste, at en anden bank også ville udstede udbyttenotaer, hvis der ellers havde været aktier.

*I's opinion*

Bech-Bruun har anført, at man blev betrygget af I's tax opinion. Det var imidlertid ikke denne, som Bech-Bruun endte med at udtale sig om.

I's transaktionsmodel, som var med Bech-Bruuns første udkast til legal opinion, blev således senere udskiftet med det engelske resumé af det tyske transaktionsdiagram og indeholdt en helt anden beskrivelse. En af ændringerne var, at man gik fra at bruge futures til at bruge forwards. Det forudsatte man - som det eneste - ikke ville medføre nogen økonomisk forskel. I den nye model, som erstattede I's transaktionsmodel, fik man blandt andet også indsigt i, hvad sælgeren foretog sig af dispositioner, og Bech-Bruun blev herunder gjort opmærksom på, at sælgeren ikke ejede aktierne, men at sælgeren selv ville låne disse - altså at der ville være tale om et short sale. Man ændrede også vilkåret om, at pensionsplanens låntager ikke måtte modtage udbyttet. I I's opinion skulle udbyttet forblive i banken, men i modellen, som Bech-Bruun vurderede, strøg betalingen direkte ud af banken igen. Det gjorde aktierne også, og når udbyttet eller kompensationen ligesom aktierne stryger igennem banken, muliggør dette svindlen med rene bogføringsposteringer uden penge og aktier. Dette var et brud på en af de afgørende forudsætninger for I's vurdering, hvorefter pensionsplanen kun ville udlåne aktierne uden tilknyttede udbytterettigheder.

I's opinion var imidlertid heller ikke i sig selv egnet til at betrygge Bech-Bruun. Den omhandlede en transaktion, hvor køb og salg skulle afvikles samme dag. Man indgik købsaftalen før ex-date, og salgsaftalen på eller efter ex-date, men man fraveg markedsvilkårene, så aktierne ville blive leveret til pensionsplanen i henhold til købsaftalen samme dag, som pensionsplanen skulle levere dem videre i henhold til salgsaftalen. Pensionsplanen ville ovenikøbet udlåne aktierne i perioden frem til salget, selvom pensionsplanen aldrig fik leveret aktierne, før de skulle leveres videre. Det er ikke betryggende, at banken i denne situation skulle producere dokumentation for, at pensionsplanen ejede aktierne, og I's opinion kan ikke have beroliget Bech-Bruun. Under alle omstændigheder kan den ikke have haft betydning for Bech-Bruuns endelige opinion, hvor transaktionsbeskrivelsen var en helt anden.

*Den endelige opinion*

Skatteforvaltningen er ikke enig i, at man kan se bort fra den tyske transaktionsbeskrivelse, som Bech-Bruun fik forelagt som led i rådgivningsforløbet.

Allerede på grundlag af de oplysninger, som Bech-Bruun fik forelagt på grundlag - og altså uden at inddrage den tyske transaktionsbeskrivelse - kan man imidlertid analysere sig frem til, at tingene ikke hænger sammen, og at der er en risiko for, at der ikke er aktier. Cum/ex er således kontraproduktivt for skattespekulation, hvor der er aktier, og hvor det handler om, at en skattefri skal søge refusion på en skattepligtigs aktier. Det skaber bevisusikkerhed og fører til to udbyttenotater, hvoraf kun den ene skal bruges, og der er ikke nogen fordele ved en sådan model. Cum/ex er derimod produktivt, hvis der skal opnås uretmæssig refusion, f.eks. hvis der ikke er aktier. Så kan man klare sig med bogholderimæssige posteringer og papirspor.

Der er mange forskellige udgaver og versioner af Bech-Bruuns legal opinion, men de forskellige udkast har alle haft samme kon-

klusion. Den endelige indholdsmæssige version af Bech-Bruuns legal opinion forelå i juli måned 2014 og blev underskrevet i august 2014.

*Det forretningsmæssige rationale*

Der var ikke noget forretningsmæssigt rationale bag det setup, som Bech-Bruun fik forelagt. Det handlede om at få refusion uden at have risiko - altså at spekulere i at tjene penge på den udbytteskat, som ville blive indbetalt af det udloddende selskab. Spørgsmålet er, om det skulle ske med reelle aktiehandler, proforma eller, som det blev klart vist for Bech-Bruun, uden aktier. Når der ikke er noget forretningsmæssigt formål, men kun en klar skattefordel, således som det også var tilfældet i selskabstømmersagerne, burde Bech-Bruun som led i sin rådgivning overveje, om der var risiko for en

**817**

tilsidesættelse af SKAT's interesser, altså at den danske stat ville lide tab. Det betyder ikke, at Bech-Bruun ikke kunne rådgive, men hvis man vælger at rådgive om transaktioner uden forretningsmæssigt formål, går man på line mellem den lovlige skatteplanlægning og en bred vifte af ulovligheder - fra skatteunddragelse til bedrageri. Ansvarsnormen vil være hård, hvis man falder ned på den forkerte side.

*Modellen som beskrevet i legal opinion*

For så vidt angår North Channel Banks rolle er det i sig selv ansvarspådragende, når A, der er ekspert i udbyttebeskatning, hævder, at han alene skulle udtale sig om en depotbanks rolle, og at depotbanken bare skulle udfærdige en erklæring om aktier, der ligger på et værdipapirdepot.

Der er således enighed mellem parterne om, at Bech-Bruun skulle se på registreringerne på depotet. En depotbank udtaler sig om, hvorvidt kunden har aktier og udbytte på sin konto i banken. Det er en udtalelse, der normalt vil angå det civilretlige ejerskab - det vedrører de i banken registrerede forhold. Banken skulle erklære sig om ejerskabet til et udbytte. Derudover var der ved Bech-Bruuns rådgivning til North Channel Bank en noget særlig situation, idet banken havde fået oplysninger om, hvordan og hvorfor pensionsplanen ville strukturere sine handler, som indebar, at North Channel Bank kunne forholde sig til, om pensionsplanen skatteretligt var ejer, og således, om den sædvanlige dokumentation ville være misvisende på grund af de konkrete omstændigheder. North Channel Bank havde således så meget indsigt i, hvad der foregik, at banken havde en dobbeltrolle, der for det første indebar, at banken ville være almindelig depotbank og derfor skulle interessere sig for det civilretlige ejerskab, og for det andet, at North Channel Bank havde så meget viden om transaktionerne, at de også blev nødt til at interessere sig for det skatteretlige ejerskab. Der havde ikke været behov for, at banken skulle have indblik i transaktionerne, hvis banken alene skulle være en normal depotbank. Banken får dette indblik, fordi den skal levere noget usædvanligt; nemlig en udbyttenota, selv om aktierne ikke står på bankens depot på det afgørende tidspunkt ved udgangen af registreringsdatoen, og selvom banken ikke i sine egne bøger kan se, om udbyttet kommer fra det udloddende selskab. Denne involvering af banken og bankens tilgang burde i sig selv have været et faresignal for A som erfaren skatteekspert.

A vidste, at banken kun skulle være depotbank helt kortvarigt og udstede udbyttenotaer i et usædvanligt setup - samme dag, som aktierne går ind, skulle de gå ud igen. A vidste, at udbyttenotaerne skulle bruges til at ansøge om refusion af udbytteskat, og at dokumenterne ville blive tillagt bevisværdi af skattemyndighederne, fordi de var udstedt af en reguleret, finansiel institution uden egeninteresse i at erklære sig om, at der er modtaget et udbytte på en given aktiepost. A vidste, at hele bankens troværdighed ville blive

lagt i et dokument, der kunne præsenteres over for skattemyndighederne, og som uden yderligere kontrol ville blive lagt til grund af skattemyndighederne, således som det normalt er tilfældet med tredjemandsindberetninger. North Channel Banks rolle og bankens spørgsmål til Bech-Bruun var dybt usædvanlige og krævede en grundig vurdering på grund af den åbenlyse risiko for at påføre staten et tab ved udstedelse af urigtige udbyttenotaer.

For så vidt angår de aftaler, der indgår i transaktionerne, og som alle indgås samme dag (handelsdatoen), er der tale om et kompliceret setup med mange parter, hvor alt kører frem og tilbage. Aktierne og kompensationsbetalingerne strømmer fra en tredjemand til sælger til en pensionsplan til en tredjemand på én og samme dag. Aktieafviklingsdatoen er ifølge legal opinion efter udbytteregistreringsdatoen, og der er således tale om et vilkår, der afviger fra almindelige markedsvilkår, og som skaber et cum/ex-problem, hvorved man adskiller transaktionssporet fra udbytteretten og muliggør svindel.

Aktielånene i den model, som Bech-Bruun fik forelagt, afviger også fra de almindelige lånevilkår om udbyttebetalinger ved låante aktier, hvor långiver har krav på at få afregnet et beløb, der svarer til det udbytte, der udbetales på aktierne i låneperioden. Långiver har således kursrisikoen på aktierne og ret til ethvert udbytte på aktierne. Låneaftalerne i Bech-Bruuns opinion afviger herfra. For det første er tidspunktet for aftaleindgåelsen formuleret meget kringlet. På handelsdatoen aftales det at indgå en aktieudlånstransaktion på afviklingsdatoen, om at aktierne udlånes på afviklingsdatoen. Man aftaler således på handelsdatoen, at man på afviklingsdatoen vil aftale og afvikle et aktielån. Det betyder juridisk, at aftalen om aktielån er indgået på handelsdatoen. For det andet aftales det, at sælger skal låne aktier plus udbytte. Lånet skal afvikles på aktieafviklingsdatoen, altså efter registreringsdatoen, og det fremgår desuden af aftalevilkårene, at da aktierne leveres ex udbytte, vil tredjeparten foretage en kompensationsbetaling til sælger. Dette strider imod standardaftalerne, hvor aktielångiveren beholder udbyttet, men hvis man ikke gør det på denne måde, kommer der ikke en kompensationsbetaling ind i systemet. Uden en kompensationsbetaling kan banken heller ikke på falsk grundlag dokumentere modtagelse af et udbytte i form af kompensationsbetaling. Kompensationsbetalingen er således i dette setup et centralt element i udbyttesvindlen. Der gælder helt tilsvarende vilkår for pensionsplanens udlån til tredjemand.

*Ejerskab*

Ejerskab til udbytte hænger uløseligt sammen med ejerskab til aktieposterne.

**818**

For så vidt angår det civilretlige ejerskab udbetales udbytte til den, der er registreret som ejer ved udgangen af udbytteregistreringsdatoen. Det var ikke pensionsplanen. For pensionsplanen fik først aktierne leveret efter registreringsdatoen og skulle aflevere dem til låntager samme dag. Pensionsplanen var dermed ikke ejer ved udgangen af registreringsdatoen og skulle derfor ikke modtage udbytte som registreret ejer i det udloddende selskab. Depotregistreringerne var således ikke grundlag for at udstede dokumentation for, at pensionsplanen havde modtaget et udbytte. I forhold til det civilretlige ejerbegreb har A grundlæggende lagt en forkert forståelse af begrebet til grund under sin forklaring for landsretten, idet han har forklaret, at det civilretlige ejerskab til aktier efter hans opfattelse overgik på aftaletidspunktet. Børsnoterede aktier er imidlertid en genusvare, og ejendomsretten til aktierne overgår derfor først ved bindende individualisering, dvs. når handlen afvikles, og aktierne registreres på det nye depot. Indtil da har man alene en fordring mod sin medkontrahent. Købelovens § 19 om, at køb af aktier sker inkl. alle udbytte, der forfalder efter købsaftalens indgåelse, regulerer i den forbindelse ikke ejendomsrettens overgang,

men alene det obligationsretlige forhold mellem køber og sælger - altså købers fordring på levering. A lagde således forkert til grund, at pensionsplanen ville blive ejer på aftaletidspunktet.

Ved skatteretligt ejerskab er det aftaletidspunktet, der er afgørende, og ved udlån af aktier forbliver långiver ejer, medmindre låntager sælger aktierne, idet køberen herefter bliver ejer, og långivers ejerskab ophører. Det er imidlertid også tvivlsomt, om det skatteretlige ejerskab lå hos pensionsplanen.

Pensionsplanen indgår ganske vist aftale om køb af aktier med den hermed forbundne kursrisiko, men samtidig indgås en forwardaftale, dvs. en skræddersyet aftale, som fjerner kursrisikoen igen. Herudover indgås en aktielånsaftale. Hverken aktier eller risiko ligger således hos pensionsplanen. Både aktier og kompensationsbetalinger stryger desuden igennem på aktieafviklingsdagen. Det er meget tvivlsomt, om pensionsplanen i denne situation er skatteretlig ejer.

Dertil kommer, at pensionsplanen havde indgået en fysisk forwardaftale, hvorefter pensionsplanen allerede på handelsdatoen skulle indgå en aftale om, at pensionsplanen på forwardafviklingsdatoen skulle levere aktierne til en tredjemand. Det vil altså sige, at pensionsplanen og tredjemand aftalte på handelsdagen, at pensionsplanen skulle levere aktierne til tredjemanden til en bestemt kurs. Der er svarende til et køb på termin og er dermed i overensstemmelse med forarbejderne til kursgevinstloven en afståelse. Pensionsplanen havde altså solgt aktierne og var også af denne grund ikke skattemæssig ejer.

Det samme gælder, hvis man skulle kigge på beneficial ownership. Pensionsplanen havde ingen ejerrisici og var dermed ikke beneficial owner.

North Channel Bank burde derfor ikke i nogen sammenhæng erklære pensionsplanen for ejer. For banken kan og skal ikke erklære sig om noget, de ikke er sikre på. Ejerskab kan ikke attesteres baseret på sandsynligheder. Hvis der er tvivl, skal det tages med i erklæringen. Den må ikke fremstå uforbeholden som standarddokumentation, hvilket Bech-Bruun fejlagtigt har blåstemplet.

*Forudsætninger mv.*

En legal opinion er almindelig juridisk rådgivning og udgør ikke abstrakte, teoretiske værk ud fra en eller anden særlig hjemmel. Det betyder også, at de forudsætninger, der danner grundlag for en legal opinion ikke kan være løsrevet fra virkeligheden. Der er derudover ikke holdepunkter for, at man med forudsætninger skulle kunne skrive sig ud af et ansvar over for tredjemand. Forudsætningerne har derfor ikke nogen betydning i forhold til ansvaret over for den danske stat, medmindre de konkret modificerer transaktionsforløbet.

Forudsætning 5 om, at pensionsplanen på handelsdatoen opnår ubetinget ejerskab til aktierne og vil have fulde ejerskabsrettigheder over aktierne på udbyttegodkendelsesdatoen, herunder retten til at modtage det udbytte, som deklareres på den pågældende dato, angår de juridiske forhold, og der er derfor ikke tale om en forudsætning, som banken kan efterprøve. Den angår derimod de forhold, som A ved noget om, og giver derfor helt overordnet ikke nogen mening som forudsætning for legal opinion.

Der er ikke nogen tvivl om, at Bech-Bruun under retssagen har forstået det som en forudsætning om civilretligt ejerskab, men forudsætningen er forkert, idet pensionsplanen ikke var civilretlig ejer, og det kunne Bech-Bruun se ud fra transaktionsbeskrivelsen. Hertil kommer, at A under sin vidneforklaring har forklaret, at forudsætningen angik det skatteretlige ejerskab. Når Bech-Bruun og A ikke er enige om forudsætningens betydning, kan den ikke have nogen betydning. A's forklaring om, at han havde kopieret forudsætningen fra I's opinion, kan heller ikke lægges til grund,

Copyright © 2024 Karnov Group Denmark A/S

da I jo netop skulle vurdere, om pensionsplanen var skatteretlig ejer og derfor ikke kunne have forudset at skatteretligt ejerskab.

Udbyttet følger ejerskabet, og med den tvivl, der var om ejerforholdene, kunne North Channel Bank ikke udstede en uforbeholden udbyttenota, og man kunne ikke afbøde den tvivl, der var om ejerskabet ved at indsætte forudsætning 5.

Ejerskabsvurderingen var en juridisk vurdering, og det var kernen i bankens spørgsmål.

Forudsætning 7 angiver, at North Channel Banks systemer vil vise, at pensionsplanen er juridisk ejer af

**819**

aktierne. Dét er en fejl i bankens registre, der maksimalt burde vise aktierne fra de blev leveret til pensionsplanen, og til de blev afleveret videre samme dag. Det burde Bech-Bruun have påpeget. Det er desuden forkert, når det er angivet i forudsætningen, at North Channel Banks register vil vise, at udbyttet repræsenterer et reelt udbytte, idet registeret højst vil vise, at et beløb er gået ind på kontoen. A's forklaring om, at han gik ud fra, at North Channel Bank ville have adgang til aktielångiverens bank, og at han kunne forestille sig, at man skulle gå til dem, så man kunne spore udbyttet tilbage til det udloddende selskab, har ikke fundet vej til hans legal opinion, og det er heller ikke almindeligt for en depotbank at gøre. Forudsætning 7 udgør derfor ikke et betryggende, men derimod et forværrende forhold.

Bech-Bruun skulle have frarådet banken at udstede udbyttenotaer til pensionsplanen, for banken havde fuld indsigt i de tvivlsomme ejerforhold og den manglende markedskonformitet både hvad angår købsaftale og aktielån. Ved at udstede udbyttenotaerne begik North Channel Bank groft bedrageri imod Skatteforvaltningen og dermed den danske stat. Enhver advokat ved, at man ikke kan undskylde, at man juridisk har fortolket den viden, man har, forkert. Ukendskab til loven diskulperer ikke.

Modellen indebærer, at der udstedes to udbyttenotaer. Hver af disse to udbyttenotaer kan bruges til at skabe refusion for de samme aktier. A har forklaret, at han var klar over, at der kunne udstedes to udbyttenotaer for det samme udbytte, selvom der ikke ville være to, der kunne søge berettiget. Det er uforståeligt, hvordan han kunne nå frem til, at North Channel Bank ville kunne udstede udbyttenotaer uden at ifalde strafansvar. A kunne ikke skrive sig ud af denne risiko ved at indsætte forudsætninger i sin legal opinion.

Forudsætning 8 angår, at North Channel Bank ikke vil udstede ejerskabsdokumentation til andre. Den er ligegyldig, idet A har forklaret, at han vidste, at der ville blive udstedt ejerskabsdokumentation til långiver - bare af en anden bank.

Forudsætning 13 angår, at North Channel Bank ikke har grund til at antage, at andre vil søge om refusion. Det afhjælper ikke problemet. Modellen kunne bruges til svindel, som umiddelbart konkret kunne ske i form af dobbelt refusion, men det er nærliggende at overveje, om den også kunne bruges til andre typer svindel. Når man har viden om, at noget som dette kan ske, og man selv spiller en rolle i det - enten ved at udstede en udbyttenota eller ved at afgive en opinion - så er man ansvarlig. For man kan se, hvad der skal foregå. Man kan ikke distancere sig fra ansvaret.

Forudsætning nr. 11 om et gebyr, der ikke afveg fra depotbanktjenester generelt, giver kun mening i forhold til en bevisvurdering. I selskabstømmersagerne havde nogle af bankerne krævet usædvanligt høje gebyrer for at medvirke i nogle arrangementer. Det blev anset som bevis for, at bankerne havde vidst, at der var noget galt, og derfor talte det for ansvar. Men det er jo ikke et spørgsmål om, at gebyret var ansvarspådragende - det var bare et bevismoment. Indsættelsen af denne forudsætning kan skyldes en klar mistillid til banken eller være skjult rådgivning om, hvordan banken kan distancere sig selv fra det, der skal foregå. Banken kan godt med-

virke - bare den ikke bevismæssigt kan forbindes til transaktionerne. Det er svært at læse det på anden måde. Det er i hvert fald en eklatant ligegyldighed over for, om den danske stat lider tab.

*Låntagers rolle*

Ud over at både pensionsplanen og långiver ville få en udbyttenota, skulle pensionsplanen også udlåne aktien. Udlånet skulle ske på handelsdagen - altså generalforsamlingsdagen eller tidligere. Det bemærkelsesværdigt, at pensionsplanens udlån af aktien sker på præcis samme vilkår, som da långiver udlånte aktien. De to låneaftaler beskrives med nøjagtig samme ordlyd i Bech-Bruuns legal opinion. Hvis pensionsplanens låntager sælger aktien, er der således ny potentiel ejer og også her en risiko for situationer med dobbelt refusion eller tredobbelt refusion mv. Der er således i princippet tale om en kæde, der kan fortsætte uendeligt. Bech-Bruun have have sagt nej til at rådgive eller have konkluderet, at der var risiko for erstatningsansvar og straf. Det er ikke afgørende, om North Channel Banks rolle er nær eller fjern. Der er en risiko for tredjemand, nemlig staten. Og North Channel Bank er med som en alvidende deltager i setuppet, og Bech-Bruun kan på samme måde se det hele. Så kan man ikke slippe for ansvar ved at distancere sin rolle.

*Mange udbyttenotaer*

Bech-Bruun burde have overvejet, hvad långivers og låntagers rolle i setuppet gik ud på. Hvis långiver havde aktier og var skattepligtig, ville långiver modtage udbyttet på aktierne ind på sin konto, og der ville blive indeholdt kildeskat, og långiver ville blive registreret som modtager af udbytteindkomsten. Hvis långiver skulle fritages for beskatning, skulle långiver bevise over for skattemyndighederne, at indkomsten ikke tilkom ham. Især i et skattearrangement ville det formentlig ikke være muligt og i øvrigt have en unødvendig kompleksitet og skabe problemer for de øvrige aktører. Alle aktører ville i denne situation ønske, at afvikling skete på markedsvilkår. Hvis långiver havde aktierne og var skattefri, kunne långiver selv søge refusion, og der ville ikke være nogen arbitragegevinst ved at benytte pensionsplanens skattefrihed. Setuppet er derfor også meningsløst i denne situation. Den eneste tilbageværende fornuft i modellen er, at man skal bruge det til at udstede udbyttenotaer, uden at der er nogen aktier hos långiver.

**820**

Formålet er således at få North Channel Bank til at udstede udbyttenotaer med urette, så pensionsplanen kan søge med urette.

Også i forhold til låntager skaber udlånet en klar risiko for endnu en uberettiget udbyttenota for samme udbytte. Det giver grundlæggende ikke mening, at setuppet indeholder det udlån. Det indarbejder en ekstra risiko, nemlig at aktierne sælges før generalforsamlingen, og dermed er pensionsplanen ikke længere ejer. Det viser, at pensionsplanen er fuldstændigt ligeglad med at bevare sit ejerskab og ikke har noget ønske om at have aktierne, ligesom det viser, at banken er ligeglad. Banken er således villig til at attestere ejerskab, selvom aktierne er sendt videre. Alle aktører er altså villige til at sende ejerskabet videre, og det ville de ikke være, hvis der faktisk var aktier. Pensionsplanens videreudlån indebærer, at positionerne hos sælger og pensionsplan udligner hinanden. Alt, hvad den ene får ind, afleverer den anden. Det giver nul på North Channel Banks depotniveau. Og hvis man bare stiller en kontant sikkerhed for lånene, som svarer til købesummen, giver det også nul på kontoniveau. Lånet tjener altså et klart formål - nemlig at udligne positioner. De skal udligne hinanden, fordi det er en posteringsopgave, hvor man skal fingere, at der er aktier. Da der aldrig er aktier, må der imidlertid ikke være noget ved dagens udgang af aktier eller penge, som ville skulle fremgå i et depot. Det ville nemlig skulle afstemmes til aktiedepotet eller til konti. Og når alt i North Channel Bank skal udligne hinanden, hvordan kunne Bech-Bruun så være

sikker på, at det samme ikke også skete ved tredjemand, og at tredjemændene kunne være én? Ingen af parterne havde nogen glæde af disse dybt besynderlige aftaler, hvis det handlede om, at pensionsplanen skulle søge refusion på andres aktier. Til gengæld gav det en klar mulighed for at søge refusion med urette og mulighed for at udligne positioner til nul og dermed faktisk for at undvære aktier.

Det var tilsyneladende tredjemand, dvs. sælgers långiver, der skulle opnå den uberettigede refusion, men det giver ingen mening, at pensionsplanen skulle orkestrere et setup, der gav mulighed herfor. Selv hvis det var tilfældet, ville det være klart ansvarspådragende for banken, men der ville ikke være en økonomisk gevinst for andre end tredjemand (udlåner og låntager), som kan søge refusion med urette. Ordningen går dermod ud på, at tredjemand ikke ejer aktier, og at pensionsplanen og North Channel Bank laver et komplekst aftalesetup, der giver mulighed for udbyttenotaer og uberettigede refusionsansøgninger. Lånene viser, hvordan formålet med cum/ex-modellen kun kan være at opnå uberettiget refusion, og hvordan det kan lade sig gøre uden aktier.

Det er klart ansvarspådragende.

*Økonomien*

Hvis Bech-Bruun havde overvejet økonomien i de transaktioner, som de blev præsenteret for, ville man have afdækket, at det var en model uden forretningsmæssig begrundelse, og det var tydeligt, at der var tale om en skattefidus.

Modellen indeholdt intet økonomisk rationale for pensionsplanen, og det er i sig selv problematisk, at A har forklaret, at han ikke overvejede dette spørgsmål. Den meget komplekse forklaring, som Bech-Bruun har givet på, hvorfor pensionsplanen som led i markedsspekulation i kursen efter udlodning havde en gevinstmulighed, forekommer søgt og svarer heller ikke til, hvad pensionsplanen gjorde.

Heller ikke for sælger indeholdt modellen noget økonomisk rationale, fordi sælger er short-sælger og samtidig har kurssikret sig og dermed afdækket sin position fuldt ud. Sælger vil kun agere sådan i samarbejde med de andre aktører og er dermed kun med for at flytte ejerskab til pensionskassen.

Hverken pensionsplan eller sælger har en økonomisk interesse i handlerne, men de er begge kunder i North Channel Bank, og deres positioner i banken udligner hinanden gennem de modsatrettede forwardaftaler. Det kunne Bech-Bruun se.

I forhold til banken var situationen den, at sælgerens lån blev modsvaret af pensionsplanens udlån, og at sælgerens forward blev modsvaret af pensionsplanens modsatrettede forward. Hvis man lægger dem sammen, får man altså nul. Så hvis de har samme bank - og eventuelt samme omnibuskonto - så får man nul på kontoen.

Sammenfattende kunne Bech-Bruun med den model, som den blev præsenteret på engelsk, have analyseret på parternes positioner og have konkluderet, at arrangementet ikke gav nogen mening, medmindre det handlede om at søge refusion med urette. Og når det var pensionsplanens model, måtte det logisk være pensionsplanen, der skulle opnå fortjenesten ved at søge med urette, dvs. at tredjemand ikke havde aktier, og at modellen dermed var uden aktier. Den analyse burde Bech-Bruun have lavet. Alt blev lagt åbent frem for dem. Bech-Bruun behøvede ikke være nået særlig langt i analysen, før de ville have opdaget, at de helt klart burde have afstået fra at yde den her rådgivning eller have svaret »nej« til, at North Channel Bank kunne medvirke uden at risikere erstatnings- eller strafansvar.

Det er ikke et spørgsmål om, at Bech-Bruun skulle forstå kompleks bankjura eller særlige registreringsregler. Det var en lang række forskelligartede problemer, der hver for sig skulle have ført til et »nej«. A kunne have opdaget, at der var en risiko for, at setuppet

kunne gennemføres uden aktier, og når man analyserer det igennem, giver arrangementet kun mening, når det

foregår uden aktier. Hvis der var aktier i arrangementet, havde man fulgt almindelige markedsvilkår. Setuppet med to udbyttenotaer skulle, hvis der var aktier, have til formål at begunstige tredjemand ved, at han kunne søge refusion uberettiget, hvilket i øvrigt også ville være kriminelt.

Det er tydeligt, at North Channel Bank ikke bør bekræfte noget som helst. Der var ikke nogen aktier eller penge i banken, kun papirspor.

Bech-Bruun var bekendt med de faktiske forhold, som gør, at Bech-Bruun burde have konkluderet modsat i sin opinion og dermed have tvunget North Channel Bank til at undlade at medvirke eller endda orientere myndighederne. Med Bech-Bruuns viden om de faktiske forhold kan Bech-Bruun ikke undskylde sig med, at Bech-Bruun havde misforstået det retlige grundlag som f.eks. reglerne om civilretligt ejerskab til aktier. Det gælder generelt, at man forventes at kende loven. Og det gælder jo i hvert fald her, hvor Bech-Bruun blev antaget som specialistadvokat til at analysere de danske forhold. Det har ingen betydning, at Bech-Bruun ikke havde forudset, at dette ville være bedrageri, og at man gik ud fra, at der ville være aktier. Banken spurgte således åbent til straf- og erstatningsansvar, og A så selv risikoen for svindel - i hvert fald i form af to udbyttenotaer for én aktiepost. Det var derfor ikke uforudset, at dette kunne være bedrageri, og det burde have været hovedfokus for Bech-Bruun.

*Den tyske transaktionsbeskrivelse*

En vurdering af den model, som Bech-Bruun rådgav om, forudsætter et fuldt overblik over transaktionen, hvilket Bech-Bruun fik med den tyske og engelske transaktionsbeskrivelse. Bech-Bruun kunne ikke i den forbindelse undskylde sig med, at man ikke forstod den tyske version - man må insistere på, at den bliver oversat eller selv gøre det.

En gennemgang af den tyske transaktionsbeskrivelse, der på de afgørende punkter ikke er svær at læse og forstå til trods for den omfattende tekst, viser meget klart, at der foruden North Channel Bank og brokeren kun ville være de tre aktører X, Y og Z, således at der kun var én tredjemand, hvilket ikke kan lade sig gøre, uden at arrangementet bliver cirkulært. Transaktionsbeskrivelsen viser også, at der er opstillet konti for alle parter i North Channel Bank, at det hele foregår internt i banken, og at der hele vejen rundt er tale om et nulsumsspil i forhold til alle depoter og konti. Alt udligner hinanden - der er ingen aktier og ingen penge. Alle krediteres og debiteres et lige stort beløb. Ingen er blevet rigere eller fattigere - det kører igennem dem alle tre og banken.

Man kan se, at det hele starter med en debitering hos banken. Det giver ikke nogen mening. Hvis der kom et udbytte ind i banken, skulle dette jo krediteres banken som det første. Betalingen bevæger sig så i en cirkel fra banken til kunde X til kunde Y og til kunde Z og ender tilbage i banken, hvor det så dækker den oprindelige debitering. Selv hvis det hele kunne starte mærkeligt med en debitering af banken - hvis man nu ikke viste krediteringen fra VP Securities - giver det ingen mening, at det så også slutter med at krediteres hos banken. Men var der så et udbytte? Man kan konstatere, at udbyttet i hvert fald ikke ender noget sted. Hvis der er et udbytte, må det jo komme et sted fra. Der skal være nogen, som krymper sig - og det er der ikke. Det er meget klart, at det er en »closed shop« - et lukket kredsløb. Man kan tydeligt se, at alle parter har konti og depoter i North Channel Bank. Man ser, at transaktionerne går i nul. Ingen tjener nogle penge - alt går i nul.

Det forekommer usandsynligt, at A ikke skulle have bladret de syv sider igennem i et eller andet omfang, og han har desuden