# Exhibit 41

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
 2                 CASE NO.  18-MD-2865 (LAK)

 3     _____
                                             )
 4     IN RE:                                )
                                             )
 5     CUSTOMS AND TAX ADMINISTRATION OF     )
       THE KINGDOM OF DENMARK                )
 6     (SKATTEFORVALTNINGEN) TAX REFUND      )
       SCHEME LITIGATION                     )
 7                                           )
       This document relates to case nos.    )
 8     19-cv-01783; 19-cv-01788; 19-cv-01794;)
       19-cv-01798; 19-cv-01918              )
 9     _____)

10

11

12                  C O N F I D E N T I A L

13             SUBJECT TO THE PROTECTIVE ORDER

14

15

16     REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

17                     EXAMINATION OF

18                   RICHARD MARKOWITZ

19                  DATE: April 8, 2021

20

21

22

23

24

25          REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 13

1    R I C H A R D  M A R K O W I T Z,
2         called as a witness, having been first
3    duly sworn according to law, testifies as follows:
4
5
6
7    EXAMINATION BY MR. WEINSTEIN:
8         Q    Good morning, Mr. Markowitz.
9              MR. BONGIORNO:  Marc, before we get
10        going, I just wanted to mention that
11        Mr. Markowitz is diabetic and we're
12        going to have to just keep a close eye
13        on his levels.  So every, I don't know,
14        45, 50, 55 minutes or so, we're just
15        going to ask that he check it, see
16        whether or not he needs a break or a
17        snack or anything.  But I didn't want
18        to -- I'm obviously trying to do it in a
19        way that doesn't interrupt the flow of
20        the deposition.  I just wanted to let
21        you know.
22             MR. WEINSTEIN:  Right.  Thank you.
23        I appreciate that, and we'll accommodate
24        any needs there.
25        Q    Mr. Markowitz, my name is Marc

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 137

```
 1              And ultimately they didn't find you
 2     another leverage provider?
 3              MR. BONGIORNO:  Objection.
 4        A     I disagree with the premise of your
 5     question.
 6        Q     Okay.  Ultimately, were they able
 7     to provide -- to find another leverage
 8     provider?
 9        A     No.
10        Q     Can you turn, please, to
11     Exhibit 2116?
12              MR. WEINSTEIN:  Mark this as 2116.
13              (Whereupon the above mentioned was
14        marked for Identification.)
15              MR. BONGIORNO:  Marc, maybe after
16        you finish with this one, we can take
17        our next break?
18              MR. WEINSTEIN:  Yeah.
19        Q     So Mr. Shah sends you an e-mail in
20     April of 2012 asking if you have a pension
21     fund in the U.S. that can be used for trading
22     equities and derivatives.
23              Do you recall receiving that from
24     him?
25        A     Yes.
```

```
 1          Q    At the time that you got it, did
 2    you have a pension fund in the U.S. that
 3    could be used for trading equities and
 4    derivatives?
 5          A    I don't recall.
 6          Q    Okay.  Did you understand that this
 7    question was in the context of dividend --
 8    the dividend arbitrage strategy?
 9          A    Yes.
10          Q    Do you recall what your response
11    was to Mr. Shah?
12          A    No.
13          Q    Did you end up setting up a pension
14    fund in the U.S. to be used for trading
15    equities or derivatives as part of a dividend
16    arbitrage strategy?
17          A    Yes.
18          Q    Okay.  And what pension plans did
19    you set up to be used for that purpose?
20          A    RJM Capital Pension Plan, among
21    others.
22          Q    When was RJM Capital Pension Plan
23    established?
24          A    Sometime in 2013.
25          Q    Okay.  Did -- along with your
```

1     brokers were going to go find the liquidity
2     for these trades in the marketplace?
3          A    From sellers of shares.
4          Q    Okay.  Where did you expect they
5     were going to find these sellers?
6          A    In all the dividend arbitrage
7     strategies we had looked at and participated
8     in, that was up to the brokers to find that
9     liquidity, given the economics of the trade
10    and the advantage of dividend arbitrage.
11              As I said, profitability could be
12    shared.  The sellers could have been other
13    investors who were not entitled to the tax
14    benefits.  They could have been short
15    sellers, long sellers.
16              So the source of the stock was up
17    to the brokers and the sellers to obtain
18    based on market liquidity.
19         Q    Okay.  And was it your
20    understanding that the sellers in each case
21    would be executing on the Solo platform?
22         A    We were informed by Solo that other
23    counterparty to the trade would likely be
24    customers of Solo as well.
25         Q    Okay.  And is that -- that's true

1    for the sellers of the shares?
2         A    Yes.
3         Q    Okay.  And so was it your
4    understanding that the sellers of the shares
5    were going to be customers of Solo?
6         A    Yes.
7         Q    Was that also true for the forward
8    or future counterparties?
9         A    Yes and no.
10        Q    Yeah, let me withdraw that.
11             Was that going to be true with
12   respect to the forward counterparties?
13        A    Yes.
14        Q    Okay.  Was that also going to be
15   true with respect to the stock lending
16   counterparties?
17        A    Yes.
18        Q    Okay.  And so, when you say the
19   brokers were going to go out into the market,
20   the market that they were going to go into
21   was the Solo customer list.
22             Correct?
23        A    Again, they could have gone to the
24   Solo customers or other customers if they
25   wanted to.  There was no limit placed.

1    plan get the seller his or her 50 percent
2    profit on the deal?
3        A    Again, the plan didn't pay the
4    money to the seller. The plan paid the money
5    or a fee, as was previously negotiated, to a
6    company called Ganymede Investments, I
7    believe, and would have received an invoice
8    for that.
9            And it was up to Ganymede to
10   distribute those funds, if needed, to other
11   counterparties.
12       Q    What was Ganymede?
13       A    A company.
14       Q    Okay. Was it a company that you
15   had ever heard of prior to starting this
16   dividend arbitrage trading strategy with Solo
17   Capital?
18       A    No.
19       Q    Okay. Did you do any due diligence
20   on Ganymede prior to doing any transactions
21   with it?
22       A    Patriot Act, AML, and basic
23   information on the owners of the company.
24       Q    Okay. What information did you
25   obtain on the owners of the company,

1    Ganymede?
2        A    I believe it was owned by Sanjay
3    Shah.
4        Q    Okay.  And so Mr. Shah told you
5    that?
6        A    We might have received corporate
7    documents that -- from wherever the company
8    was incorporated that showed that.
9        Q    Okay.  Do you know if you actually
10   did that, or did you just hear from Mr. Shah
11   that he owned it?
12       A    I don't recall which one it was at
13   this point.
14       Q    Okay.  What -- did Ganymede provide
15   services to any of the pension plans that you
16   were affiliated with?
17       A    The services would have been
18   assistance in the overall transaction, I
19   think, from our perspective, as I explained,
20   the amount of sharing of profit from the
21   trades and fees to Solo, similar to the
22   Merrill Lynch trade.  Those would be paid to
23   an entity designated by Solo.
24            And they designated Ganymede, and
25   it was up to that entity and Solo to decide

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 202

```
1    how those fees would be parceled out.  But it
2    was part of the overall construction of the
3    trade.
4         Q    Okay.  Other than facilitating
5    getting the money to the right places, did
6    Ganymede, the entity, provide services to the
7    pension plans?
8         A    I viewed Ganymede and Solo and
9    Sanjay Shah as one entity.  So yes, in my
10   belief, there were significant services
11   provided in developing and becoming a
12   custodian at Solo Capital, and hiring all the
13   staff necessary to allow the custodian to
14   function, and to allow our pension plans or
15   other pension plans to execute these trades.
16        Q    Okay.  So you viewed Solo Capital
17   and Ganymede as interchangeable?
18        A    Yes.
19        Q    Okay.  And do you -- did you have
20   an understanding as to why you got an
21   instruction from Mr. Shah to use the Ganymede
22   entity on certain occasions as opposed to the
23   Solo Capital entity?
24        A    No.
25        Q    Okay.  Solo Capital had operations
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 211

```
1      to this agreement, you were agreeing to pay
2      Ganymede 66.67 percent -- I'm not even sure I
3      said that right.
4              Pursuant to this agreement, you
5      were agreeing to pay Ganymede 66.67 percent
6      of that refund amount that's in the schedule,
7      but minus the Acupay fee.
8              Correct?
9         A     My understanding was that the
10     pension plan was entitled to 50 percent, the
11     other 50 to the seller, and we would pay to
12     Solo or its designee a 34 percent fee similar
13     to the arrangements we had at Broadgate.
14              The net result to the pension plan
15     is to retain approximately 34 percent of the
16     reclaim.  That's our understanding of any
17     fees that were paid.
18              It starts with a 50/50 split with
19     the seller.
20        Q     Okay.  I'm just asking what -- what
21     this agreement says.  And the agreement that
22     you signed with Ganymede was that the plan
23     would pay Ganymede 66.67 percent of that
24     refund amount in schedule -- in the schedule,
25     except that deducted from that refund amount
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 306

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2              CASE NO.  18-MD-2865 (LAK)

 3     _____
                                               )
 4     IN RE:                                  )
                                               )
 5     CUSTOMS AND TAX ADMINISTRATION OF       )
       THE KINGDOM OF DENMARK                  )
 6     (SKATTEFORVALTNINGEN) TAX REFUND        )
       SCHEME LITIGATION                       )
 7                                             )
       This document relates to case nos.      )
 8     19-cv-01783; 19-cv-01788; 19-cv-01794;  )
       19-cv-01798; 19-cv-01918                )
 9     _____)

10

11

12               C O N F I D E N T I A L

13           SUBJECT TO THE PROTECTIVE ORDER

14

15

16     CONTINUED REMOTE VTC VIDEOTAPED DEPOSITION UNDER

17                   ORAL EXAMINATION OF

18                    RICHARD MARKOWITZ

19                       VOLUME II

20                   DATE: April 9, 2021

21

22

23

24

25        REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 317

```
1      R I C H A R D  M A R K O W I T Z,
2            called as a witness, having been first
3      duly sworn according to law, testifies as follows:
4
       CONTINUED EXAMINATION BY MR. WEINSTEIN:
5
6          Q    Mr. Markowitz, if you can turn to
7      Exhibit 2133, please?
8               Did each of the partnerships listed
9      in this exhibit earn profits from the Danish
10     dividend arbitrage strategy?
11         A    (Witness reviewing.)
12              MR. BONGIORNO:  Objection.
13         A    I don't recall.
14         Q    Did the partnerships earn profits
15     from any other investing activity other than
16     the Danish dividend arbitrage strategy?
17         A    Yes.
18         Q    What other investment strategies
19     did these partnerships earn money from?
20         A    Dividend arbitrage investments.
21         Q    So their profits were generated
22     entirely by dividend arbitrage strategies?
23         A    Yes.
24         Q    Did those strategies involve
25     Denmark and Belgium?
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 354

```
 1    can establish pension plans to participate in
 2    the dividend arbitrage strategy?
 3         A    No.
 4         Q    Okay.  So you had thoughts that you
 5    would do business using the LLCs.
 6              Right?
 7         A    That is certainly one function of
 8    those LLCs.
 9         Q    Okay.  And how many LLCs were you
10    intending to have set up?
11         A    At the time, in discussions with
12    Solo Capital about market liquidity and
13    capacity, and to spread that liquidity in our
14    allocation among our allocation of the market
15    liquidity among clients, I think we were
16    intending somewhere between 30 and 40 pension
17    plans would be established.
18         Q    Okay.  But the number of pension
19    plans and LLCs that would be set up were
20    based on what Sanjay Shah and Solo told you
21    would be a market allocation for the dividend
22    arbitrage strategy?
23         A    No.  The overall allocation would
24    be indicated to us or forecasted.  It was up
25    to us to decide if we wanted to spread that
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 369

```
1      opportunity to two additional individuals.
2          Q    Okay.  And those are Ms. Jones and
3      Mr. Herman?
4          A    Yes.
5          Q    Okay.  And they are related to you?
6              MR. BONGIORNO:  Objection.
7          A    Yes.
8          Q    So after Mr. -- after Solo Capital
9      informed you that there was additional
10     capacity for the trading, LLCs and pension
11     plans were set up for Ms. Jones and
12     Mr. Herman?
13         A    Yes.
14         Q    And did they each have three LLCs
15     and pension plans set up?
16         A    Yes.
17         Q    Okay.  So, ultimately, there was a
18     group of 40 plans that were trading using
19     this strategy.
20              Is that right?
21         A    Yes.
22         Q    Were -- three of the new plans that
23     were set up were set up on your behalf.
24              Is that right?
25         A    Yes.
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 379

```
1     that role?
2         A    I don't recall.
3         Q    Well, did Mr. Ben-Jacob -- well,
4     withdrawn.
5              Did Kaye Scholer assist with the
6     establishment of the new LLCs and pension
7     plans?
8         A    Yes.
9         Q    Okay.  And was that true for all 40
10    of the new LLCs and pension plans?
11        A    No.
12        Q    And not all of them were new.
13             Is that correct?
14        A    Yes.
15        Q    Okay.  So, of the 40 LLCs and
16    pension plans, for those that were newly
17    established in 2014, did Kaye Scholer assist
18    in establishing them?
19        A    Yes.
20        Q    Was it your understanding that each
21    of the plan participants for those new
22    pension plans signed a similar limited power
23    of attorney granting Mr. Ben-Jacob the power
24    to do the same things?
25        A    I don't recall.
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 451

1      A    We received advice that explained
2  the issues surrounding that related to a
3  different jurisdiction in Denmark, and that
4  it created additional tax risk for the
5  pension plans.
6      Q    Okay.  Can you turn, please, to
7  Exhibit 1829?
8           MR. BONGIORNO:  Day 1, Volume 1.
9      Q    This e-mail from you is about
10 Danish reclaim payments received from Syntax.
11          Is that right?
12     A    Yes.
13     Q    And you say in the e-mail that "the
14 amounts on the spreadsheet were sent to each
15 plan's respective custodian, and then
16 75 percent of the gross reclaim was paid out
17 to Ganymede."
18          And in 2015, why was 75 percent of
19 the gross reclaim paid out to Ganymede?
20     A    In late 2014, after the partners of
21 Argre decided not to work together, we
22 weren't sure we would be able to continue
23 doing business with Solo Capital or its
24 related entities.
25          And as I mentioned, two of my

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 452

1    former partners, Mr. Stein and Mr. Lhote, had
2    decided to go off and do business on their
3    own.  And they had acquired North Channel
4    Bank, got authorizations to have it act as a
5    custodian, had decided to work with former
6    employees of Solo, and were going to be
7    effectively competing in this dividend
8    arbitrage marketplace.
9             So with respect to Solo Capital,
10   where Mr. Van Merkensteijn and myself, and
11   ultimately Mr. Klugman, preferred to continue
12   our relationship and client business, we had
13   discussions that initially were tense because
14   Mr. Shah thought that Mr. Van Merkensteijn
15   and myself were investors in the bank, aware
16   of the developments, were going to be
17   competing.
18            And we assured them that that was
19   farthest from the truth.  We had no
20   relationship with that, we're not aware of
21   it, or became aware of it at the time that
22   Argre Management effectively dissolved.
23            And Mr. Shah said that he would
24   consider allowing us to participate as
25   customers and clients with different

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 453

1 entities, those that were no longer
2 affiliated with or related to Mr. Stein
3 and -- Mr. Stein and Mr. Lhote, and the
4 economics would most likely change because
5 there would be additional competitors in the
6 marketplace, North Channel Bank, the ability
7 to get liquidity in shares would be impacted,
8 and that we would be -- the pension plans
9 would be receiving a lower percentage based
10 on the market pricing and the fees paid to
11 the other counterparties.
12          And that became 66 percent to
13 75 percent that would be paid away by the
14 pension plans because of this market
15 development, and perhaps Mr. Shah being upset
16 and associating Mr. Van Merkensteijn and
17 myself with the actions of my former
18 partners.
19     Q   So, in this particular case, adding
20 competitors into the market actually drove up
21 the fee as opposed to the additional
22 competitors usually driving a fee down?
23     A   No.  Additional competitors in the
24 marketplace drive up the cost of borrowing
25 shares if it's a stock lending transaction,